1  STEVEN T. GUBNER – Bar No. 156593
   JASON B. KOMORSKY – Bar No. 155677
2  SUSAN K. SEFLIN – Bar No. 213865
   JESSICA L. BAGDANOV – Bar No. 281020
3  BG LAW LLP
   21650 Oxnard Street, Suite 500
4  Woodland Hills, CA 91367
   Telephone:  (818) 827-9000
5  Facsimile: (818) 827-9099
   Email:    sgubner@bg.law
6            jkomorsky@bg.law
             sseflin@bg.law
7            jbagdanov@bg.law

8  Attorneys for David Seror, Chapter 7 Trustee

9              **UNITED STATES DISTRICT COURT**

10    **CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

11 | In re | Case No. 2:22-CV-06867-mwf
12 | Allana Baroni, | Bankruptcy Case No. 1:12-bk-10986-MB
13 |                      Debtor. |
14 |  | **CHAPTER 7 TRUSTEE'S OPPOSITION TO APPELLANTS' EMERGENCY MOTION FOR AN ORDER GRANTING A STAY PENDING APPEAL; DECLARATION OF JASON B. KOMORSKY**
15 | Allana Baroni and Richard Antognini, |
16 |  |
17 |                      Appellants, | **[No Hearing Set]**
18 | v. |
19 | David Seror, |
20 |                      Appellee. |
21
22
23
24
25
26
27
28

2854983

# **TABLE OF CONTENTS**

<u>Page</u>

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 1

II.   THE GOVERNING BANKRUPTCY RULES REQUIRED APPELLANTS TO SEEK A STAY FROM THE BANKRUPTCY COURT FIRST, WHICH THEY INTENTIONALLY FAILED TO DO ...... 7

III.   HAVING WAITED FOUR MONTHS TO SEEK A STAY, THE REQUEST IS UNTIMELY AND EVIDENCES A LACK OF EXIGENT CIRCUMSTANCE THAT WOULD WARRANT EMERGENCY RELIEF ............................................................................. 10

IV.   THE APPELLANTS ARE REQUIRED TO INITIATE AN ADVERSARY PROCEEDING TO SECURE AN INJUNCTION WHERE, AS HERE, THEY SEEK TO PREVENT THE TRUSTEE FROM CARRYING OUT HIS STATUTORY DUTIES ............................ 12

V.   ON THIS RECORD, APPELLANTS CAN NEVER DEMONSTRATE IRREPARABLE INJURY AND LIKELIHOOD OF PREVAILING ON THE MERITS ........................................................................... 14

   A.   The Debtor Will Not Suffer Irreparable Injury if the Trustee Is Allowed to Inspect the Calabasas Property ........................................ 14

   B.   There is No Likelihood, Let Alone a Strong Likelihood, that Appellants Will Prevail on the Merits of Their Appeal of the Bankruptcy Court's Removal Order .................................................. 16

VI.   CONCLUSION ........................................................................... 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

1

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

2

3

## <u>CASES</u>

4

*In re Baroni,*
    36 F.4th 958 (9th Cir. 2022), *cert. denied sub nom.*

5
    *Baroni v. Seror,* 2022 WL 16909177 (U.S. Nov. 14, 2022) ..................*passim*

6

*In re Baroni,*
    643 B.R. 253 (Bankr. C.D. Cal. 2022) ............................................1, 6, 18, 19

7

8

*In re BGI, Inc.,*
    504 B.R. 754 (S.D.N.Y. 2014) ........................................................................ 8

9

*In re Botany Industries, Inc.,*
    463 F. Supp. 793 (E.D. Penn. 1978) ............................................................. 17

10

11

*In re DeArakie,*
    199 B.R. 821 (Bankr. S.D. NY 1996) .....................................................12, 14

12

*In re debtor Stage Coach Venture, LLC,*
    2017 WL 8186568 (C.D. Cal. Feb. 14, 2017) .........................................8, 10

13

14

*In re Gardens Regional Hospital and Medical Center, Inc.,*
    567 B.R. 820 (C.D. Cal. 2017) ..................................................................... 13

15

*In re Greenfield,*
    623 B.R. 847 (D. Idaho 2020) ..........................................................12, 13, 14

16

17

*In re Ho,*
    265 B.R. 603 (9th Cir. B.A.P. 2001) .............................................................. 8

18

*In re Kaplan,*
    373 B.R. 213 (1st Cir. B.A.P. 2007) ............................................................... 2

19

20

*In re Lebbos,*
    2008 WL 844821 (9th Cir. B.A.P. Oct. 6, 2008) ......................................... 19

21

*In re Martinez,*
    2016 WL 5396648 (Bankr. C.D. Cal. Sept. 26, 2016) ................................... 5

22

23

*In re MBM Investment Corp.,*
    243 B.R. 300 (S.D. Tex. 1999) ....................................................................... 2

24

*In re Rivera,*
    2015 WL 6847973 (Bankr. N.D. Cal. Nov. 9, 2015) ..................................... 8

25

26

*In re Roussos v. Ehrenberg,*
    2017 WL 2259674 (C.D. Cal. 2017) ............................................................ 12

27

*In re Shay,*
    2017 WL 262040 (Bankr. C.D. Cal. Jan. 8, 2017)................................. 15, 16

28

ii

# **TABLE OF AUTHORITIES**

Page

## **CASES**

*In re Stage Coach Venture, LLC*,
   2017 WL 664015 (Bankr. C.D. Cal. Feb. 17, 2017) ...............................2, 10

*In re TAC Financial, Inc.*,
   2017 WL 2833246 (S.D. Cal. June 30, 2017) ................................................8

*In re Taub*,
   470 B.R. 273 (E.D.N.Y. 2012) ..................................................................7, 8

*In re Van Ness*,
   399 B.R. 897 (E.D. Cal. 2009) ....................................................................14

*Mission Power Engineering v. Cont'l Casualty Co.*,
   883 F. Supp. 488 (C.D. Cal. 1995) ................................................................4

*Paxton v. Quinlan*,
   2020 WL 3414694 (N.D. Cal. June 22, 2020) ...............................................8

*Shek v. Burchard*,
   2019 WL 1102990 (N.D. Cal. Mar. 8, 2019) .................................................8

## **STATUTES**

11 U.S.C,
   Section 363(i) ..............................................................................................16

11 U.S.C.,
   Section 704(a)(1) .........................................................................................12

## **RULES**

Central District of California Local Rules,
   Local Rule 5.1.3 (8026(b)) .........................................................................2, 7

Federal Rules of Bankruptcy Procedure,
   Rule 8007........................................................................................*passim*

Federal Rules of Bankruptcy Procedure,
   Rule 7001(7)......................................................................................4, 13, 14

## **TREATISES**

10 Collier on Bankruptcy,
   Section 8007.08 (Richard Levin & Henry J. Sommer eds., 16th ed.)............8

Appellee David Seror, Chapter 7 Trustee ("Trustee" or "Appellee") for the bankruptcy estate of Allana Baroni ("Debtor"), hereby files his opposition ("Opposition") to the emergency motion [Doc. #5] (the "Motion") filed by the Debtor and her counsel and alleged creditor Richard Antognini[1] ("Antognini" and collectively, with the Debtor, the "Appellants").  By the Motion, Appellants seek emergency relief from this Court for the imposition of an immediate stay of the Trustee's administration of the Debtor's entire chapter 7 case based on their appeal of an order (the "Removal Order") [*In re Baroni*, 643 B.R. 253, 284 (Bankr. C.D. Cal. 2022)] by the bankruptcy court entered ***four months*** ago and where Appellants have not first sought such relief from the bankruptcy court.  As set forth more fully below, the Motion is an attempt to seek relief from this Court (i) which Appellants are not entitled to, (ii) which bears almost no relation to the Removal Order, (iii) which is a collateral attack of the turnover order recently affirmed by the Ninth Circuit [*see, In re Baroni*, 36 F.4th 958, 966 (9th Cir. 2022), *cert. denied sub nom. Baroni v. Seror,* 2022 WL 16909177 (U.S. Nov. 14, 2022)], and (iv) which is a disguised request for a permanent restraining order against the Trustee to prohibit him from administering the Debtor's chapter 7 estate.  In support of his Opposition, the Trustee respectfully represents as follows:

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

The Motion is procedurally and substantively defective.  The Motion is intentionally brought before the wrong Court (in violation of this Court's local rules and the Federal Rules of Bankruptcy Procedure), is untimely in the extreme, and lacks

---

[1]  It should be noted that Antognini's standing as a creditor is currently the subject of a motion pending before the bankruptcy court.  The bankruptcy court on the record of the November 30, 2022, hearing sustained the Trustee's objection to Antognini's claim.  Declaration of Jason B. Komorsky ("Komorsky Decl."), **Exhibit 1** (attaching transcript of proceedings), at 13 ("So I'm going to -- that's why I'm disallowing the claim, Antognini. It's not even close on this record.").  However, the bankruptcy court ordered further briefing as to the effect of an amended claim filed by Antognini on the morning of the hearing.  The amended claim is defective on its face for among other reasons it admittedly seeks solely monies owed to Antognini for post-conversion legal services to the chapter 7 debtor, which fees are not an obligation of the estate.

any exigent circumstances—and these infirmities exist even before the Court conducts an inquiry as to the merits of the Motion.[2]  Rule 8007 of the Federal Rules of Bankruptcy Procedure required Appellants to move first before the bankruptcy court for a stay of any order issued by that court.  Fed. R. Bankr. Proc. 8007(1)(A).  No such motion was brought and no recognized justification for failing to follow the rules was provided by Appellants.

The Motion also violates this Court's local rules, which codify the requirement of seeking such relief first from the bankruptcy court:

> ***Stay Pending Appeal***. If the emergency motion seeks a stay pending appeal, a copy of the bankruptcy court's order denying the movant a stay pending appeal or an affidavit by the movant stating that a stay had been denied;

L.R. 5.1.3 (8026(b)).  No such bankruptcy court order or affidavit was provided because Appellants failed to comply with the local rule requirements.

Worse, by way of an expedited proceeding, the Appellants seek a stay purportedly based upon an order issued on ***August 9, 2022—four months ago***. "Implicit in [Rule 8007] is the requirement that a motion for stay pending appeal be timely filed."  *In re Kaplan*, 373 B.R. 213, 215 (1st Cir. B.A.P. 2007) *citing In re MBM Investment Corp.*, 243 B.R. 300, 310-11 (S.D. Tex. 1999) (finding a motion for stay untimely where appellant waited two months to seek stay).  Appellants' unreasonable four-month delay eliminates any right to a stay, let alone any claim of exigent circumstances that would warrant imposition of a stay on an emergency basis. *See In re Stage Coach Venture, LLC*, 2017 WL 664015, at *3 (Bankr. C.D. Cal. Feb. 17, 2017) (denying stay as untimely where appellant waited four months before seeking stay).

---

[2] The Motion is also defective because Appellants were required to: (i) provide a "statement of opposing counsel's position," which Appellants failed to do even though the Trustee's counsel wrote a detailed e-mail identifying the procedural deficiencies. Komorsky Decl., **Exhibit 4**; *see* Judge's Procedures ("Applications that fail to conform to Local Rule 7-19 and 7-19.1, including a statement of opposing counsel's position will not be considered."); and (ii) give proper notice to all interested parties, such as CIT and Wells Fargo, that would be affected by the stay requested.

1    The false claim of exigent circumstances is founded solely on a purported

2    stipulation the Trustee presented to the Debtor relating to the real property located at

3    3339 Via Verde Ct. in Calabasas, California (the "Calabasas Property") [see Motion,

4    at pp. 2-3], as if an unsigned stipulation is the proper subject for a stay.  On November

5    8, 2022, the Trustee brought a motion seeking access to the Calabasas Property (the

6    "Access Motion").  Declaration of Jason B. Komorsky ("Komorsky Decl."), **Exhibit 2**

7    [Bk. Doc. #1618].   The Access Motion was necessitated by the fact that

8    notwithstanding the Ninth Circuit's June 8, 2022, decision [*In re Baroni*, 36 F.4th

9    958] affirming the turnover of the Debtor's property to the estate (inclusive of the

10   Calabasas Property), the Debtor has steadfastly refused the Trustee's multiple requests

11   for access to the Calabasas Property.  Komorsky Decl., **Exhibit 2**, at pp. 35-46.

12   Critically, the bankruptcy court ruled on the Access Motion and issued an

13   interim order on December 2, 2022 (the "Interim Access Order").  Komorsky Decl.,

14   **Exhibit 3** [Bk. Doc. #1653].  The Interim Access Order provides as follows:

15            The Trustee's proposed real estate broker, Marc Shevin, and
             up to two of Mr. Shevin's associates/agents shall have one
16           hour to inspect and take photos of that certain residential
             real property located at 3339 Via Verde Ct., Calabasas,
17           California (the "Calabasas Property"), which is property of
             the bankruptcy estate, between December 5, 2022 and
18           December 15, 2022 during the hours of 9 a.m. and 3 p.m.

19   *Id.*

20   Thus, the parade of horribles that the Appellants claim will befall the Debtor if

21   the Court does not act immediately [see Motion, at p. 3-4] will not occur anytime

22   soon—and, critically, Appellants have not sought from the bankruptcy court a stay of

23   the Interim Access Order allowing a one-hour visit by a broker and his associates to

24   inspect the property or even advised this Court of the existence of that order.  *Id*.[3]

25

26   [3] Inexplicably and intentionally, Appellants failed to apprise or provide this Court with
     a copy of the Interim Access Order notwithstanding the fact that the Interim Access
27   Order was issued five days before they filed the Motion and, as further relevant here,
     they failed to seek an interlocutory appeal with this Court or an emergency stay of the
28   Interim Access Order from the bankruptcy court, as required by Rule 8007.

3

2854983

This Court's own rules recognize that "*[e]x parte* applications solely for extraordinary relief are rarely granted. *Mission Power Engineering v. Cont'l Casualty Co.*, 883 F. Supp. 488, 490-91 (C.D. Cal. 1995)." This instant emergency Motion does not provide a basis for an exception.

Substantively, the Motion presents an intentionally false narrative and fails to connect the dots between the appeal of the Removal Order and the stay being sought. Appellants present no argument explaining any rationale connection between the bankruptcy court's Removal Order whereby the bankruptcy court rejected the Debtor's attempt to have the Trustee removed and to have criminal referrals of the Trustee, his counsel, Wells Fargo and his counsel and the stay they seek with respect to the sale of the Calabasas Property. There is no current order approving the sale of the Calabasas Property (or motion seeking to sell the property), and the disconnect between the relief sought by Appellants and the Removal Order should be apparent to this Court. The Motion is also an improper collateral attack of the Ninth Circuit's ruling affirming the turnover order (the "Turnover Order") and lifting the stay. *In re Baroni*, 36 F.4th 598 (9th Cir. 2022).

Indeed, by way of the Motion, Appellants are not seeking a stay of the Removal Order pursuant to Rule 8007 (what is there to stay?) but are in reality seeking an injunction preventing the Trustee from exercising his statutory duties. Appellants are not seeking to maintain the status quo by means of a stay of the Removal Order but are seeking affirmative relief untethered to that order. The Motion is an improper vehicle for seeking an injunction. The Trustee submits that, pursuant to Rule 7001(7) of the Federal Rules of Bankruptcy Procedure, the only way for the Appellants to seek to prevent the Trustee from performing his statutory duties would be for the Appellants to first initiate an adversary proceeding. Fed. R. Bank. Proc. 7001(7) (an adversary proceeding "is a proceeding…(7) to obtain an injunction or other equitable relief…."); *see also In re Martinez*, 2016 WL 5396648, at *2 (Bankr. C.D. Cal. Sept.

26, 2016) (citing case law for proposition that injunctive relief must be sought by filing an adversary proceeding).

Even assuming Appellants were seeking a stay of an actual order, neither Appellant can demonstrate irreparable injury for the simple fact that the Calabasas Property no longer belongs to the Debtor.  Critically, the marketing and sale of the Calabasas Property is not the product of the Removal Order, which Removal Order is currently on appeal.  Rather, the Calabasas Property will be marketed and sold pursuant to the Ninth Circuit's June 8, 2022, affirmance of this Court's affirmance of the Turnover Order, which final, non-appealable published holding served to confirm—once and for all—that the Calabasas Property was an asset of the estate.  *In re Baroni*, 36 F.4th 958 (2022).

Thus, Appellants' premise of their Motion, that the Calabasas Property **is** the Debtor's "longtime personal … residence" [Motion, at 2:16-17], is demonstrably false.  It was but is no longer her property and has not been her property since the bankruptcy court first issued the Turnover Order on March 31, 2020.  Komorsky Decl., **Exhibit 5** [Bk. Doc. #1148].  That the Debtor lost this property was solely the product of her multiple defaults under her chapter 11 plan, the conversion of her bankruptcy from chapter 11 to chapter 7, and the required turnover of her assets to the chapter 7 estate.  Thus, if the Debtor has suffered irreparable injury, it was self-inflicted a long time ago.

Neither the Debtor nor Antognini can explain how they, a tenant and a purported unsecured creditor, will suffer irreparable injury today or even when sometime in the future the estate ultimately markets and sells estate property.  A one-hour visit from a real estate broker cannot possibly come close to any kind of injury whatsoever, let alone irreparable injury. For unless this Court will entertain a motion challenging the Turnover Order, which is subject to a final non-appealable Ninth Circuit ruling, the Debtor cannot claim to be the owner of the Calabasas Property and

2854983

1  cannot predicate her claim of irreparable injury on the false narrative that she still

2  owns the property.

3       Even assuming that the marketing and sale of the Calabasas Property is tied to

4  the Removal Order as opposed to the final, non-appealable Turnover Order,

5  Appellants have no reasonable probability of prevailing on the merits of their appeal,

6  which seeks to reverse the bankruptcy court's Removal Order finding no basis in fact

7  or law to remove the Trustee or to seek criminal referrals of the Trustee, his counsel,

8  Wells Fargo and its counsel.  As the bankruptcy court noted, not only did the

9  Appellants lack standing to seek a criminal referral (and had no facts on the merits to

10  warrant such a referral), the bankruptcy court lacked jurisdiction to rule on the

11  removal motion because the settlement claimed to be the basis for the relief sought is

12  currently on appeal before the Ninth Circuit and, in an event, the factual and

13  procedural representations made by Appellants in seeking this relief were deemed by

14  the bankruptcy court to be untrue:

15                The Motion falls woefully short of the standard necessary to
16                establish that the Trustee has breached his fiduciary duty to
                 the estate. The Debtor and Antognini have failed to present
17                any evidence demonstrating such cause. Their principal
                 arguments against the Trustee are nothing more than a
18                collateral attack on the Compromise Order, which is
                 currently before the Court of Appeals on appeals filed by the
19                Debtor and Antognini. Additionally, many of the allegations
                 advanced by the Debtor and Antognini are premised on
20                reckless misrepresentations of the procedural history of this
                 case and therefore are without merit. The Motion will be
21                denied and the Trustee will not be removed from this or any
                 other case.

22  *In re Baroni*, 643 B.R. at 284; *see also id.*, at 288 ("The Debtor and Antognini's

23  misrepresentation of the facts in this case is inexcusable.").

24       On the materially false record presented by Appellants, the Court should not

25  consider the relief sought on an emergency basis or at all.  For over two years, a stay

26  was in place while the Turnover Order was on appeal.  Now that the Ninth Circuit has

27  definitively ruled, the estate must be allowed to dispose of the estate assets so that

28  creditors that have waited patiently can finally be paid.

**II.  THE GOVERNING BANKRUPTCY RULES REQUIRED APPELLANTS TO SEEK A STAY FROM THE BANKRUPTCY COURT FIRST, WHICH THEY INTENTIONALLY FAILED TO DO**

The Central District local rules require that if an appeal is sought on an emergency basis the movant first seek such stay from the bankruptcy court.  See LR 5.1.3 (8026(b)) Stay Pending Appeal.  This local rule required Appellants to provide this Court with "a copy of the bankruptcy court's order denying the movant a stay pending appeal or an affidavit by the movant stating that a stay had been denied."  LR 5.1.3 (8026(b)).  Obviously, such an affirmation would not be necessary if, as Appellants posit, they were not required to seek a stay from the bankruptcy court first.  Having failed to comply with this Court's local rules, the Motion should be denied.

The local rule requirement is in lock step with Rule 8007 of the Federal Rules of Bankruptcy Procedure.

> Rule 8007 contains a presentation requirement. "Ordinarily, a party must move first in the bankruptcy court for the following relief...a stay of a judgment, order, or decree of the bankruptcy court pending appeal." Fed. R. Bankr. P. 8007(a)(1)(A). If the request is instead made directly to the court where the appeal is pending, the moving party must show "that moving first in the bankruptcy court would be impracticable," or "if a motion was made in the bankruptcy court" must "state the court has not yet ruled on the motion, or state that the court has ruled and set out any reasons given for the ruling." Fed. R. Bankr. P. 8007(b)(2).
>
> ***A failure to seek emergency relief in the bankruptcy court is a critical defect and not often overlooked***. "The reason for requiring that the initial application be made to the Bankruptcy Court is obvious....[t]he reviewing court should have the benefit of the learning of the lower court," which is more familiar with the parties, facts and legal issues. *In re MSR Resort Golf Course, LLC*, No. 11-10371 (SHL), 2013 U.S. Dist. LEXIS 29065, at *4-5, 2013 WL 766166 (S.D.N.Y Feb. 26, 2013); *In re Zahn Farms*, 206 B.R. 643, 645 (B.A.P. 2nd Cir. 1997) ("Having elected not to present this Motion to the trial court, the Debtors have denied this Panel the benefit of the views of the Judge who is familiar with the issues pertaining to any purported emergency."). "If the party improperly bypasses the bankruptcy court and seeks a stay first from the district court, the district court lacks the jurisdiction to hear the matter." *In re Taub*, 470 B.R. 273, 276 (E.D.N.Y. 2012). "Thus, district courts routinely dismiss motions for a stay pending appeal when stay relief is not first sought from the bankruptcy judge and

2854983

the failure to do so is not adequately explained." *In re BGI, Inc.*, 504 B.R. 754, 761 (S.D.N.Y. 2014).

*In re Rivera*, 2015 WL 6847973, at *2 (Bankr. N.D. Cal. Nov. 9, 2015); *see also In re Ho*, 265 B.R. 603, 604 (9th Cir. B.A.P. 2001) ("[m]otions for stay pending appeal or for other relief pending appeal must ordinarily be presented to the bankruptcy court in the first instance, before the movant may seek relief from the [Bankruptcy Appellate Panel] or the district court"); *In re TAC Financial, Inc.*, 2017 WL 2833246, at *3 (S.D. Cal. June 30, 2017) ("as the bankruptcy court was not permitted to determine whether a stay is appropriate in the first instance, and concluding that Appellants' assertions supporting a finding of impracticability unpersuasive, the Court finds that Appellants have improperly bypassed the bankruptcy court") (footnote omitted) *citing In re Taub*, 470 B.R. 273, 276 (E.D.N.Y. 2012) (when a party "improperly bypasses the bankruptcy court and seeks a stay first from the district court, the district court lacks the jurisdiction to hear the matter"); *In re BGI, Inc.*, 504 B.R. 754, 761 (S.D.N.Y. 2014) ("district courts routinely dismiss motions for a stay pending appeal when stay relief is not first sought from the bankruptcy judge and the failure to do so is not adequately explained"); *Paxton v. Quinlan*, 2020 WL 3414694, at *3 (N.D. Cal. June 22, 2020) ("It would seem that a showing of impracticability would normally require a showing that the [bankruptcy] judge is unavailable, or that, to be effective, relief must be immediate, and that based upon what occurred in the [bankruptcy] court, relief from it is improbable.") quoting 10 Collier on Bankruptcy, § 8007.08 (Richard Levin & Henry J. Sommer eds., 16th ed.) (citations omitted); *Shek v. Burchard*, 2019 WL 1102990, at *3 (N.D. Cal. Mar. 8, 2019) ("[appellant] has not moved the Bankruptcy Court for a stay pending this appeal. Nor has he shown that doing so would be impracticable. That alone is grounds for denying his stay motion."); *In re debtor Stage Coach Venture, LLC*, 2017 WL 8186568, at *1 (C.D. Cal. Feb. 14, 2017) (denying stay for failing to seek stay from bankruptcy court in the first instance).

2854983

In *Stage Coach Venture*, a California Central District Court judge faced an almost identical situation, save for the fact that in that case a sale of the property was scheduled (while here no such sale motion has been made).  Relevant here, in rejecting the appellant's attempt to secure a stay from the district court, the district court discussed the issue of impracticability:

> District and Circuit courts deny motions seeking a stay if the appellant did not first seek relief from the bankruptcy court or show that doing so was impracticable. *See, e.g., In re Ho*, 265 B.R. 603, 604 (B.A.P. 9th Cir. 2001) (dismissing motion for stay pending appeal for failure to first seek a stay from the bankruptcy court); *In re Rivera*, 2015 WL 6847973, at *2 (N.D. Cal. Nov. 9, 2015) ("A failure to seek emergency relief in the bankruptcy court is a critical defect and not often overlooked."). "The reason for requiring that the initial application be made to the bankruptcy court is obvious ... [t]he reviewing court should have the benefit of the learning of the lower court [.]" *Five Mile Capital Partners, LLC v. MSR Resort Golf Course, LLC (In re MSR Resort Golf Course, LLC*), 2013 WL 766166 (S.D.N. Y Feb. 26, 2013); *see also Zahn Farms v. Key Bank of N.Y. (In re Zahn Farms)*, 206 B.R. 643, 645 (B.A.P. 2nd Cir. 1997) ("Having elected not to present this Motion to the trial court, the Debtors have denied this Panel the benefit of the views of the Judge who is familiar with the issues pertaining to any purported emergency.").
>
> Here, Appellant did not first seek a stay from the bankruptcy court, so he must show that doing so was "impracticable." Appellant has not made this showing. Appellant addresses this issue in less than one page of text. The gravamen of his argument is that "Appellant believes, as does the representative of the Debtor, that ... the likelihood of a stay being granted by the Bankruptcy Court is extremely slim." See Mot. pp. 11-12. ***But that the bankruptcy court was unlikely to grant a stay is not equivalent to it being impracticable for Appellant to move for one. At a minimum, an adequate explanation of impracticability would have to contend with the fact that more than four months have passed since the October 11, 2016 order was issued and one month has passed since the NOTS was recorded, yet instead of moving the bankruptcy court for a stay, Appellant sought one in the district court, on an emergency basis, about one week before the sale is scheduled.***
>
> Because the Motion fails to show that seeking a stay from the bankruptcy court was impracticable, it is DENIED WITHOUT PREJUDICE.

*Id.*, at *1-*2 (emphasis added).

1   Like the appellant in *Stage Coach Venture*, Appellants have waited four months

2   from the entry of the bankruptcy court's order before seeking a stay and make no

3   showing of impracticability.  That the bankruptcy court might deny their request is not

4   a basis to avoid presenting the issue to the bankruptcy court.  Having failed to satisfy

5   the requirements of Rule 8007, the request for a stay should be denied.

### III.   HAVING WAITED FOUR MONTHS TO SEEK A STAY, THE REQUEST IS UNTIMELY AND EVIDENCES A LACK OF EXIGENT CIRCUMSTANCE THAT WOULD WARRANT EMERGENCY RELIEF

8   The *Stage Coach Venture* decisions also sheds light on the impropriety of

9   seeking a stay on an expedited basis.  Both the bankruptcy court and the district court

10  rebuked the appellant for waiting four months before seeking, on an emergency basis,

11  a stay of the bankruptcy court's order (in addition to failing to seek a stay from the

12  bankruptcy court first).  As the bankruptcy court held:

> Further, the Motion is untimely. "Implicit in [Rule 8007] is the requirement that a motion for stay pending appeal be timely filed." *In re Kaplan*, 373 B.R. 213, 215 (B.A.P. 1st Cir. 2007) (citing *In re MBM Investment Corp.*, 243 B.R. 300, 310–11 (S.D. Tex. 1999)). "Failure to timely file the motion can result in denial." Id. In Kaplan, the Bankruptcy Appellate Panel of the First Circuit found untimely a motion for stay pending appeal where the movant "sat on his hands for two months." *Id.* Here, the Court entered the Dismissal Order in October 2016. Mr. Nelson did not file the Motion until approximately four months later. It appears Mr. Nelson was spurred into action by the upcoming foreclosure sale. However, upon dismissal of the bankruptcy case, it was possible that secured creditors would pursue their rights under relevant non bankruptcy law, including by foreclosing on the Poway Property. If Mr. Nelson wanted to avoid this outcome, he could have filed the Motion promptly after dismissal. Nevertheless, even if these issues were not present, the Court finds there is no cause to impose a stay of the Dismissal Order, as discussed below.

*In re Stage Coach*, 2017 WL 664015, at *3; *see also In re debtor Stage Coach*, 2017

WL 8186568, at *1 (noting debtor's four-month delay as basis to deny stay).

Here, Appellants' inexplicable delay is compounded by the fact that there

simply are ***no*** exigent circumstances presented to the Court that would warrant

expedited consideration of the stay request, as they seek here (or even such a request

2854983

on regular notice). On this score, Appellants cite to no pending order of the bankruptcy court that, if not stayed, will cause them irreparable injury. Rather, while they initially cite to the Removal Order, in point of fact the entirety of their argument of irreparable injury rests on an unsigned stipulation. For lack of a better term, the unsigned stipulation is a "nothingburger." It is not an order, it is not binding on the Debtor, and it certainly does not create an emergency situation necessitating immediate relief.

More to the point, the Debtor's argument purposefully seeks to muddle the factual record by ignoring the bankruptcy court's actual Interim Access Order relating to the Trustee's request for access to the Calabasas Property. The Interim Access Order did not approve the very things of which Appellants complain. Rather, at this point the bankruptcy court has merely granted the Trustee's proposed broker the right to make a one-hour visit to the Calabasas Property to inspect the property and to take photos. That is, there is no pending sale motion and, in fact, the property has not as of yet been listed for sale. Komorsky Decl., ¶ 9.

There simply is no urgency that requires this Courts' immediate attention. Rather, this is simply part of the Debtor's years-long pattern of delay and obfuscation. Pursuant to the Interim Access Order, the Debtor was required to provide dates for the court-ordered inspection. That inspection is scheduled to take place on December 15, 2022, from 11:45 a.m. to 12:45 p.m. Komorsky Decl., **Exhibit 6.** The Debtor likely intends on refusing the broker access; thus, this is an obvious attempt to stay the Interim Access Order, which order was hidden from this Court by the Debtor and from which order the Debtor did not first seek a stay from the bankruptcy court.

In seeking emergency relief, it was Appellants' burden to demonstrate immediate harm they would suffer absent such a stay. The only harm they claim is the sale of the Calabasas Property, not the inspection thereof. Setting aside that the Debtor no longer owns that property, there is no urgent need for relief because the Calabasas Property is not yet on the market, let alone under contract, let alone subject

to a sale motion.  Komorsky Decl., ¶ 9.  It is also of great concern that Antognini, a purported creditor of the Debtor's estate, has joined this appeal, seeking to prevent the Trustee from administering estate assets that would theoretically inure to his (Antognini's benefit). That Appellants have cried wolf once again does not make it so. The Court should find that there is no basis for relief on an expedited basis.

## IV.   THE APPELLANTS ARE REQUIRED TO INITIATE AN ADVERSARY PROCEEDING TO SECURE AN INJUNCTION WHERE, AS HERE, THEY SEEK TO PREVENT THE TRUSTEE FROM CARRYING OUT HIS STATUTORY DUTIES

"One of a bankruptcy trustee's primary responsibilities in a Chapter 7 case is to 'collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of the parties in interest.'" *In re Roussos v. Ehrenberg*, 2017 WL 2259674, at *5 (C.D. Cal. May 23, 2017) (quoting 11 U.S.C. § 704(a)(1)).  Here, Appellants seek to ***enjoin*** the Trustee from performing his fundamental obligation to liquidate and maximize the assets for the benefit of creditors.  Specifically, the Appellants seek to enjoin the Trustee from marketing and selling the Calabasas Property that, as recently affirmed by the Ninth Circuit, belongs to the estate and not to the Debtor.  *See In re Baroni*, 36 F.4th 958.

Appellants cite no case or statutory authority for the proposition that this Court has *carte blanche* by way of the stay of an order to prevent a Trustee from carrying out his statutory duties, such as liquidating the Calabasas Property that is an asset of the bankruptcy estate.  Called a stay by Appellants, in reality what they seek is an injunction.  *See In re Greenfield*, 623 B.R. 847, 857-858 (D. Idaho 2020) ("Though stylized as a stay of execution, Debtor essentially requests the Court enjoin Trustee from taking steps to sell property of the estate.  **A request to enjoin a trustee from selling property of the estate requires an adversary proceeding**."); *see In re DeArakie*, 199 B.R. 821, 824 (Bankr. S.D.N.Y 1996) (debtor's motion for a stay of the sale of his apartment actually seeks "to enjoin the trustee from selling property").

2854983

Here, Appellants seek to interfere with the Trustee's statutory duties.  The difference between a stay and injunction should be apparent: as reflected in Rule 8007, a stay is directed at temporarily preventing the execution of a judgment, order or decree.  *See In re Gardens Regional Hospital and Medical Center, Inc.*, 567 B.R. 820, 830 (C.D. Cal. 2017) ("Pursuant to Fed. R. Bankr. P 8007(a)(1), the Court may issue a stay of a judgment, order, or decree pending appeal.").  Clearly, Appellants do not seek to stay the execution of the Removal Order for that order merely maintained the status quo.  It did not provide any affirmative relief to the Trustee.

An injunction, on the other hand, is designed to compel a party from refraining from certain acts, such as restraining a Trustee from entering and investigating estate property.  *See also In re Greenfield*, 623 B.R. at 857.  Here, Appellants seek to enjoin the Trustee from accessing, inspecting, marketing, and/or selling the Calabasas Property.  Appellants, therefore, seeks an injunction and, accordingly, need to initiate an adversary proceeding:

> Next come the rules of procedure. Rule 7001 mandates that an injunction or other equitable relief be obtained by way of adversary proceeding or plan confirmation, rather than by way of a "contested matter" motion. Fed. R. Bankr.P. 7001(7).
>
> An adversary proceeding under Federal Rule of Bankruptcy Procedure 7001 is essentially indistinguishable from a civil action under the Federal Rules of Civil Procedure. See Christopher Klein, Bankruptcy Rules Made Easy (2001): A Guide to the Federal Rules of Civil Procedure that Apply in Bankruptcy, 75 AM. BANKR.L.J. 35, 38 (Winter 2001).
>
> In contrast, a contested matter under Federal Rule of Bankruptcy Procedure 9014 is a motion procedure susceptible of more expeditious resolution than an adversary proceeding. In particular, the pleading rules that entail complaint, answer, counterclaim, crossclaim, and third-party practice are dispensed with in favor of a simple motion procedure. *Johnson*, 346 B.R. at 195; *Khachikyan v. Hahn (In re Khachikyan)*, 335 B.R. 121, 125–26 (9th Cir. BAP 2005); *GMAC Mortgage Corp. v. Salisbury (In re Loloee)*, 241 B.R. 655, 660 (9th Cir. BAP 1999); *United States v. Valley Nat'l Bank (In re Decker)*, 199 B.R. 684, 690 (9th Cir. BAP 1996) (concurring op.); Klein, 75 AM. BANKR.L.J. at 40–41.

2854983

*In re Van Ness*, 399 B.R. 897, at 903-904 (E.D. Cal. 2009); *see also In re Greenfield*, 623 B.R. at 858 ("A request to enjoin a trustee from selling property of the estate requires an adversary proceeding. [citations].  Seeking such relief through a motion is procedurally improper."); *In re DeArakie*, 199 B.R. at 824 ("Because, by its own terms, the debtor's motion requests that I invoke my equity powers pursuant to 11 U.S.C. § 105(a) to enjoin the trustee from selling property, an adversary proceeding is required by Federal Rule of Bankruptcy Procedure 7001(7).").

Section 7001(7) makes clear that an injunction can only be had, if at all, by means of initiating an adversary proceeding.  Simply labeling the Motion as a motion seeking a stay, does not make it so.  This is especially so where, as here, the Removal Order for which they seek a stay has nothing whatsoever to do with the marketing and sale of the Calabasas Property.  The Motion is procedurally defective and should be denied on those grounds.

**V.    ON THIS RECORD, APPELLANTS CAN NEVER DEMONSTRATE IRREPARABLE INJURY AND LIKELIHOOD OF PREVAILING ON THE MERITS**

### A.    The Debtor Will Not Suffer Irreparable Injury if the Trustee Is Allowed to Inspect the Calabasas Property

Appellants' misrepresentations of both the procedural history and facts know no bounds.  They claim that the Debtor (not Antognini) will suffer irreparable injury if the Calabasas Property is sold.  As an initial matter, there is no sale order presently pending before the bankruptcy court.  The property is not even on the market. Komorsky Decl., ¶ 9.  The Interim Access Order merely allows a broker to inspect and take photos of the property.  *Id.*, Exhibit 3.  Thus, the premise of the Debtor's emergency motion, that the Court must act immediately to prevent the immediate sale of the Calabasas Property (and, hence, the alleged irreparable injury), finds no support in the record.  Indeed, the Debtor does not claim that she could or would suffer any irreparable injury from the bankruptcy court's Interim Access Order.  Nor could she. Thus, the entire foundation of the Motion is false.

14

2854983

Nevertheless, and assuming that a sale of the Calabasas Property were pending, the Debtor could still not demonstrate irreparable injury for the obvious reason that she no longer owns the Calabasas Property. Thus, the case authority holding that the owner of a property will suffer irreparable injury if the owner's property is sold[4] does not apply here because the Calabasas Property is an asset of the estate. *In re Baroni*, 36 F.4th 958; see Komorsky Decl., **Exhibit 5** [Bk. Doc. # 1148] ("The real property located at 3339 Via Verde Ct., Calabasas, California 91302 is property of the estate.").

This issue was addressed by at least one bankruptcy court. In *In re Shay*, 2017 WL 262040 (Bankr. C.D. Cal. Jan. 8, 2017), the bankruptcy court rejected a chapter 7 debtor's request for stay pending appeal of the bankruptcy court's order approving the sale of the debtor's residence. As an initial matter, the debtor brought the motion to stay before the bankruptcy court, not the district court, as required pursuant to Rule 8007. Further, he brought the motion for stay *after* the bankruptcy court approved the sale of the residence. As noted above, Appellants brought the motion for stay before the wrong court and there is no current order approving the sale of the residence.

Nevertheless, the bankruptcy court disabused the debtor of the argument that the debtor will suffer irreparable injury in light of the fact that the residence no longer belonged to the debtor but was an asset of the bankruptcy estate:

> The second factor under *Lair v. Bullock* is whether the applicant will be irreparably injured absent a stay. Debtor's only cognizable right in the Pine Bluff Property is the exemption he claimed against the Pine Bluff Property. Even if it was his residence at one time, Debtor does not have a per se right to reacquire the Pine Bluff Property, Debtor did not bid on the Pine Bluff Property at the sale, nor has Debtor ever expressed to the court any intention to reacquire the Pine Bluff Property from Trustee. Debtor's claimed exemption against the Pine Bluff Property of $5,182.50 is adequately assured by receipt of sale funds in excess of this amount.

---

[4] Appellants present a series of unpublished decisions purporting to support their claim of irreparable injury. See Motion, at pp. 57-58. Those cases all have one thing in common: the person claiming irreparable injury owned the property at issue, a situation not presented here.

2854983

This factor does not favor Debtor since when he filed this Chapter 7 bankruptcy case, Debtor knew or should have known that Trustee would be liquidating his nonexempt assets to pay creditors, which would include available nonexempt equity in the Pine Bluff Property. ***While Debtor feels that losing his residence is an irreparable injury, this is something that was more directly caused by Debtor filing his bankruptcy petition then by Trustee's sale***. Although Debtor will lose his right to attempt to reacquire the Pine Bluff Property from Trustee, something that Debtor has not demonstrated any intent of doing, in the court's view, the fact that Debtor will not suffer an injury through the sale that Debtor would not suffer otherwise cuts against a finding of irreparable injury absent a stay pending appeal. Because Debtor's sole cognizable right in the Pine Bluff Property is his exemption, which is protected by the sale, the court determines that this factor weighs against issuance of a stay. *See, In re Frantz*, 534 B.R. 378, 389 (Bankr. D. Idaho 2015), citing inter alia, *Klein v. Chappell (In re Chappell)*, 373 B.R. 73, 77–82 (9th Cir. BAP 2007) (discussing extent of debtor's interest under a federal homestead exemption, and noting that it does not extend to the entirety of the residential real property, stating inter alia "the debtor's property remains property of the estate to the extent that its value exceeds the statutory amount which the debtor is permitted to exempt.").

*Id.*, at *10 (emphasis added).

Here, the injury—*i.e.*, the Debtor's loss of her house—was the direct result of the Debtor's defaults under her chapter 11 plan, the conversion of her chapter 11 to a chapter 7, and the resulting turnover of the Debtor's assets to the chapter 7 estate. To the extent the Debtor suffered irreparable injury, it occurred years ago and was the product of her own malfeasance. Thus, her claim that the sale of an estate asset—which asset has not even been put up for sale—is causing or could in the future cause her irreparable injury is without merit.[5]

> **B.    There is No Likelihood, Let Alone a Strong Likelihood, that AppellantS Will Prevail on the Merits of Their Appeal of the Bankruptcy Court's Removal Order**

Even assuming for purposes of argument that irreparable injury would be met in this case if the Trustee markets and sells the properties (some time in the future), the Trustee submits that the Debtor cannot satisfy the balance of the relevant standard.

---

[5] Indeed, the Debtor's non-debtor spouse will have the opportunity to exercise his 11 U.S.C §363(i) rights and purchase the Calabasas Property "at the price at which such sale is to be consummated."

2854983

Specifically, assuming a showing of imminent irreparable harm, the Debtor still must show "(a) that there is a strong likelihood of success on the merits and that public interest does not weigh heavily against a stay, *or* (b) that there is a substantial question as to the merits and the balance of hardships tips sharply in the appellant's favor." *Leiva-Perez v. Holder*, 640 F.3d at 970. The Debtor cannot meet this standard.  The Debtor does not have a strong likelihood of success on the merits on of the Removal Motion, including her request that the Court make a criminal referral.

The only "crime" alleged by the Debtor was the Trustee's settlement with Wells Fargo, which settlement was approved by this Court, affirmed by the Bankruptcy Appellate Panel, and this appeal is now pending before the Ninth Circuit.  In order to rule in the Debtor's favor, it is not sufficient that the Ninth Circuit reverse this Court's ruling, which itself is unlikely, but that this Court further find on remand that the settlement itself was criminal.

This Court currently does not have jurisdiction to even make this determination because such jurisdiction rests with the Ninth Circuit, which is currently considering the Debtor's appeal of the settlement order.  Rather, the bankruptcy court's approval of the settlement, affirmed by the BAP, is *res judicata* on the issue of alleged fraud as between the Trustee and the secured lenders.  *See In re Botany Industries, Inc.*, 463 F. Supp. 793, 795 (E.D. Penn. 1978) (finding *res judicata* and collateral estoppel barred debtor's fraud claim seeking removal of trustee and criminal referral for criminal prosecution where the debtor already had a full and fair opportunity to be heard).

But, even if it had such jurisdiction the bankruptcy court's published opinion sets forth a detailed analysis of the Debtor's attempt to have the Trustee removed and have the Trustee, his counsel, Wells Fargo, and its counsel, criminally investigated, including:

1.      "[N]either the Debtor nor Antognini have statutory standing to request a criminal referral pursuant to 18 U.S.C. § 3057 because the statute does not grant

parties to a bankruptcy case the procedural right to make such a request." *In re Baroni*, 643 B.R. at 260; *see also id.*, at 273-278 (detailed discussion of standing).

2. "[E]ven if the request were appropriate, the Court does not find reasonable grounds for believing that a bankruptcy crime has been committed under 18 U.S.C. § 152(4). *Id.*, at 260; *see also id.*, at 278-283 (analyzing merits of Debtor and Antognini's request for a criminal referral).

3. The Debtor lacks standing to seek the removal of the Trustee where, as here, the estate is insolvent. As the bankruptcy court found:

> The Debtor has been on notice for nearly three years that, as a chapter 7 debtor, she lacks standing to challenge the Trustee's administration of the estate unless she provides admissible evidence that she has a pecuniary interest in the estate or in the specific asset or claim at issue. . . .
>
> Despite multiple rulings that she is required to establish that she has standing to be heard in this chapter 7 case, and despite Fondiller being black-letter law in this Circuit for nearly 40 years, the Debtor inexplicably fails to brief standing in her Motion. The Debtor's 270-page Motion fails to offer even a scintilla of evidence that this is a surplus estate or that the Debtor has any pecuniary interest in the Trustee's administration of the estate. Based on the foregoing, the Court concludes that the Debtor lacks standing to seek removal of the Trustee based on his administration of the estate in general (including her complaints about estate funds being deposited in non-interest-bearing accounts), his administration of the Carmel Property, or statements by the Trustee or his counsel out of court or in filed pleadings (except to the extent they directly involve his communications with the Debtor).

*Id.*, at 286-287.

4. Assuming the Debtor had standing, the bankruptcy court recognized that, in large measure, "[t]heir principal arguments against the Trustee are nothing more than a collateral attack on the Compromise Order, which is currently before the Court of Appeals on appeals filed by Appellants." *Id.*, at 284.

5. Finally, the bankruptcy court analyzed each and every allegation of malfeasance presented by the Debtor and concluded that they were not supported by the fact and in many respects were based on a knowingly false presentation of the

facts and "reckless misrepresentations of the procedural history of this case." *Id.*  For example, the Debtor argued that an *ex parte* communication influenced substantive rulings by the bankruptcy court.  The bankruptcy court not only pointed out the impossibility of the argument but the fact that Appellant knew that the substantive ruling preceded in time the alleged *ex parte* communication—by a full five months:

> The focus of their argument is that the *ex parte* communication influenced and prejudiced the Court against the Debtor and her family, resulting in the denial of her Motion to Dismiss and the granting of the Trustee's Turnover Motion.
>
> Even so, the Debtor and Antognini's argument depends on their gross mischaracterization of the procedural history of this case. It is undisputed that the *ex parte* communication occurred on February 6, 2020. See the Court's Notice of Ex Parte Communication and Order Setting Deadline for Any Responses Thereto, Case Dkt. 1118; Adv. 1:19-ap-01134-MB, Dkt. 34. But the Court denied the Debtor's Motion to Dismiss and granted the Trustee's Turnover Motion on August 29, 2019 — ***five months before the ex parte communication.*** Hearing Transcript for August 29, 2019, Case Dkt. 1059 at 72:8-73:6 ("I'm going to deny the motion to dismiss the case ... at the time the case was converted, the proceeds of the Henderson property were property of the estate, and I'm going to order those turned over ... as well as the three other properties and the rents that are derived from those properties"); see also Interim Order Directing Turnover of Property of the Estate, Case Dkt. 1057 (entered August 30, 2019).29
>
> Both the Debtor and Antognini were present in the courtroom for the August 29, 2019, rulings on those motions, and therefore had first-hand knowledge of the Court's rulings. See Hearing Transcript for August 29, 2019, Case Dkt. 1059 at 3:19-20 ("Ms. Baroni is present in the courtroom"), 5:3-5:5 ("Richard Antognini on behalf of the Debtor in items six and seven"). Their argument that the February 6, 2020 ex parte communication caused, or influenced, the Court's rulings on those motions is patently unfounded.

*Id.*, at 296.

Critically, Appellants do not attempt to meet their burden on appeal to demonstrate that that bankruptcy court abused its discretion in denying the motion.  *See In re Lebbos*, 2008 WL 844821, at *4 (9th Cir. B.A.P. Oct. 6, 2008).  They do not even identify the proper legal standard that this Court would apply on appeal to the

2854983

bankruptcy court's initial determination, let alone show the type of error that would support reversal.  Rather, they simply regurgitate the same false facts that the bankruptcy court found "fall[] woefully short of the standard necessary to establish that the Trustee has breached his fiduciary duty to the estate."  *Id*. at 284.  It is not for this Court to ferret through the record to find support for the rejected arguments of Appellants.

They have not demonstrated any likelihood of success on appeal, let alone the strong likelihood necessary to support a stay.

## VI.   CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court deny Appellants' request for emergency relief and, further, deny the relief altogether as procedurally improper.  Alternatively, the Court should deny the Motion on the merits Appellants do not (and cannot) come close to meeting their burden to show irreparable injury and likelihood of success on the merits.

Dated:  December 8, 2022                     BRUTZKUS GUBNER

                                             By: _____
                                                 Jason B. Komorsky
                                                 Susan K. Seflin
                                                 Jessica L. Bagdanov
                                                 Attorneys for David Seror, Chapter 7
                                                 Trustee

20

2854983

## <u>DECLARATION OF JASON B. KOMORSKY</u>

I, Jason B. Komorsky, declare:

1.      I am an attorney duly licensed to practice before all courts of the State of California and this Court. I am a partner in the law firm of BG LAW LLP, counsel of record in this case for David Seror, chapter 7 trustee (the "Trustee"). I have personal knowledge of the facts contained in this declaration, and if called as witness, I would and could competently testify thereto under oath.

2.      I make this declaration in support of the Chapter 7 Trustee's Opposition to Appellants' Emergency Motion for an Order Granting a Stay Pending Appeal.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of the November 30, 2022, Transcript of Proceedings before the Honorable Martin R. Barash.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of the Motion for Order (1) Directing the Debtor to Provide Access to Calabasas Property and to Cooperate in the Sale of Said Real Property and (2) Awarding Damages to the Trustee for Willful Violation of Stay filed in the bankruptcy court [Bk. Doc. #1618].

5.      Attached hereto as **Exhibit 3** is a true and correct copy of the Interim Order on Trustee's Motion (1) Directing the Debtor to Provide Access to Calabasas Property and to Cooperate in the Sale of Said Real property Pursuant to 11 U.S.C. § 362(A)(3), 11 U.S.C. § 521(A)(3) and Fed. R. Bankr. P. 4002(A), and (2) Awarding Damages to the Trustee for Debtor's Willful Stay Violation [Bk. Doc. #1653] entered on December 2, 2022.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of an email I sent to Richard Antognini on December 6, 2022, advising him of the substance of the Trustee's position on his request for consent to a stay of the administration of the case.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of the bankruptcy court's Order Granting Trustee's Turnover Motion [Bk. Doc. #1148].

21

8.      Attached hereto as **Exhibit 6** is a true and correct copy of an email string with Antognini confirming that the Trustee's broker representative will inspect the Calabasas Property on December 15, 2022, commencing at 11:45 a.m.

9.      Currently, the Trustee has not yet entered into a listing agreement, sought to employ the broker to sell the Calabasas Property, or sought to list the Calabasas Property.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 8th day of December 2022 at Woodland Hills, California.

Jason B. Komorsky

2854983

# EXHIBIT 1

1                    UNITED STATES BANKRUPTCY COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                              --oOo--

4   In Re:                      ) Case No. 1:12-bk-10986-MB
                                )
5   ALLANA BARONI,              ) Chapter 7
                                )
6           Debtor.             ) Woodland Hills, California
    _____ ) Wednesday, November 30, 2022
7                                 11:00 a.m.

8                                 MOTION FOR ORDER (1) DIRECTING
                                  THE DEBTOR TO PROVIDE ACCESS
9                                 TO CALABASAS PROPERTY AND TO
                                  COOPERATE IN THE SALE OF SAID
10                                REAL PROPERTY AND (2) AWARDING
                                  DAMAGES TO THE TRUSTEE FOR
11                                WILLFUL VIOLATION OF STAY

12                                MOTION FOR PROTECTIVE ORDER
                                  AND FOR MONETARY SANCTIONS
13                                PURSUANT TO RULES 26 AND 37 OF
                                  THE FEDERAL RULES OF CIVIL
14                                PROCEDURE MADE APPLICABLE
                                  PURSUANT TO RULE 9014(C) IN
15                                THE AMOUNT OF $26,325

16                                MOTION TO DISALLOW CLAIMS NO.
                                  14-1 FILED BY RICHARD
17                                ANTOGNINI AND TO DISGORGE
                                  CERTAIN MONIES
18

19                   TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE MARTIN R. BARASH
20               UNITED STATES BANKRUPTCY JUDGE

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

ii

1 | APPEARANCES:

2 | For the Chapter 7 Trustee:    JASON B. KOMORSKY, ESQ.
                                      STEVEN T. GUBNER, ESQ.

3 |                                         JESSICA L. BAGDANOV, ESQ.
                                        SUSAN K. SEFLIN, ESQ.

4 |                                         BG LAW, LLP
                                        21650 Oxnard Street

5 |                                         Suite 500
                                        Woodland Hills, California

6 |                                            91367
                                        (818) 827-9000

7 |

8 | For the Debtor and for       RICHARD L. ANTOGNINI, ESQ.
  Creditor Richard          Law Office of Richard L.

9 |   Antognini:                  Antognini
                                        2485 Notre Dame Boulevard

10 |                                         Suite 370
                                        Chico, California 95928

11 |                                         (916) 295-4896

12 | For CIT Bank, NA:            BRIAN H. NEWMAN, ESQ.
                                        Dykema Gossett, LLP

13 |                                         333 South Grand Avenue
                                        Suite 2100

14 |                                         Los Angeles, California 90071
                                        (213) 457-1800

15 |

16 | Court Recorder:            J. Cetulio
                                        United States Bankruptcy Court

17 |                                         21041 Burbank Boulevard
                                        Woodland Hills, California

18 |                                           91367

19 | Transcriber:               Briggs Reporting Company, Inc.
                                        9711 Cactus Street

20 |                                         Suite B
                                        Lakeside, California 92040

21 |                                         (310) 410-4151

22 |

23 |

24 |

25 |

1

1    WOODLAND HILLS, CALIFORNIA WEDNESDAY, NOVEMBER 30, 2022

2                              11:00 AM

3                              --oOo--

4        (Call to order of the Court.)

5            THE COURT:  So the three things we have on today,

6    18, 19, and 20, are all in the case of Allana Baroni.  We've

7    got the motion, the Trustee's motion, for an order directing

8    the Debtor to provide access to the Calabasas property and

9    to cooperate with his efforts to market and sell it, as well

10   as a request for damages for violation of the stay.

11            We have Number 19, which is a protective -- a

12   motion for a protective order and sanctions with respect to

13   certain pending discovery, and Number 20 is a motion to

14   disallow Claim Number 14.1 filed by Richard Antognini, and

15   for disgorgement.  All right?

16            So let's have -- clean pad of paper.  Let's

17   have -- those are the items on calendar.  Let's have

18   appearances.  I'll begin with the Trustee's professionals.

19            MR. KOMORSKY:  Good morning, your Honor.  This is

20   Jason Komorsky.  With me today are my partner, Mr. Gubner,

21   Steve Gubner, Jessica Bagdanov, and Ms. Seflin, Susan

22   Seflin.

23            THE COURT:  Okay.  All right.

24            Mr. Antognini.

25            MR. ANTOGNINI:  Good morning, your Honor.  Richard

2

1  Antognini on behalf of myself as creditor, and also on

2  behalf of the Debtor.

3          THE COURT:  Okay.  All right.

4          Mr. Newman.

5          MR. NEWMAN:  Good morning, your Honor.  Brian

6  Newman appearing on behalf of creditor CIT Bank, NA.

7          THE COURT:  Okay.  And is there anyone else that

8  wants to make an appearance?  Sort of going with the people

9  I could see on video.

10     (No response.)

11          THE COURT:  By the way, for the record, this

12  hearing is being conducted with the benefit of Zoomgov

13  videoconferencing technology.

14          All right.  Let me just say at the outset that I

15  have about an hour today.  If we don't finish, I have time

16  tomorrow afternoon.  Unfortunately, I have to go to a

17  funeral this afternoon, so I apologize.  I usually am happy

18  to go as long as people need to be heard, but that's my

19  constraint, and so I appreciate your indulgence.

20          I want to start with the claims objection motion,

21  and I'll give you sort of my preliminary take on -- it's not

22  just a claims objection.  It's a claims objection and

23  disgorgement motion.  Hold on.  I want to find the right

24  notes, here.  Okay.  So, I mean, I think, you know, the

25  claims objection part is pretty -- looks pretty

3

1 straightforward to me, in the following sense.

2          Proof of claim is filed, and objection is made to

3 it.  At that point, it's really up to the creditor to

4 produce evidence to substantiate the claim.  This is a

5 $20,000 claim, you know, alleged for services provided

6 before the conversion of the case to Chapter 7, while Mr.

7 Antognini was representing Ms. Baroni in the

8 post-confirmation Chapter 11 period.

9          The Trustee produced evidence, in this case Ms.

10 Baroni's own declaration, and that was submitted in the

11 District Court, that said, "I paid $20,000."  It didn't --

12 or she said, "I made the payments that are on this chart,"

13 that included -- that was the $20,000 payment to Mr.

14 Antognini.  This is kind of run-of-the-mill stuff.

15          At that point, it was up to Mr. Antognini to put

16 into evidence, evidence that he had an unpaid debt, and, you

17 know, that could have looked like billing statements,

18 billing and payment summaries, et cetera, to show that there

19 was still a balance of at least $20,000, and we didn't get

20 anything like that.  So I think the claims objection has to

21 be sustained, but I'm a little more skeptical of the

22 disgorgement piece.

23          Section 320(b) -- and let me just pull it out and

24 get it right.  Okay.  So 329(a) creates the disclosure

25 requirement, which is also reflected in the Bankruptcy

4

1   Rules, 2016, if I'm not mistaken, but 329(b) talks about,

2   basically, the Court's disgorgement power.  It says:

3              "If such compensation exceeds the

4              reasonable value of any services, the

5              Court may cancel any such agreement or

6              order the return of any such payment, to

7              the extent excessive, to the estate, if

8              the property basically would have been

9              estate property, or to the entity that

10             made such payment."

11             So, yes, the case cited in the Trustee's brief,

12  the name of which is escaping me at the moment -- I think it

13  was a BAP case -- it says, "Yes, the Court has broad

14  discretion to disallow fees for nondisclosure" -- is

15  technically correct, but, if you look at that case that was

16  cited by the Trustee, the Bankruptcy Court, and then the

17  Bankruptcy Appellate Panel, what they were engaged in was

18  the 329(b) analysis that asked, "Were the fees unreasonably

19  high?"

20             Now, if I had to surmise what the -- just from the

21  plain text, what the purpose of the statute is, is to

22  protect Debtors who -- many of whom come to Bankruptcy Court

23  in kind of a vulnerable place in their lives, pay too much

24  for bankruptcy services.  The Bankruptcy Court has the

25  ability to go back and cancel the agreement, and disgorge,

5

1 and either award something that is more reasonable or simply

2 deny funds altogether.

3          Here it doesn't seem like the situation in that

4 case that was cited to me, first of all, and, second of all,

5 the record, as it's been presented to me, given how

6 litigious this case has been over the course of six or eight

7 years or more, however you want to look at it -- I think Mr.

8 Antognini has been involved for about six years, give or

9 take -- 150-some-odd-thousand dollars of billing spread over

10 that many years is like $25,000 a year, and without getting

11 too deep into the details of, you know, asking to look at

12 billing records and all that, it just doesn't sound like --

13 I'm a bit surprised that it was that little.  But it

14 certainly doesn't strike me as being too much in the way

15 that Section 329 asks me to look at an attorney's

16 compensation.

17          Again, here we have an attorney -- Mr. Antognini,

18 I believe, was -- you know, came in post-confirmation, so,

19 you know -- what else did I want to say about that?  There's

20 some intimation in that Trustee's papers that somehow, you

21 know, that's money that was taken from the estate, and I'm

22 just not -- I'm not persuaded of that completely.

23          With respect to the $20,000, okay, I get it.  The

24 $20,000 was proceeds of the Henderson property.  The courts

25 ruled -- various appellate courts, I think, have agreed --

6

1 that that was -- that the proceeds of that property became

2 property of the estate, so that, when it was sold, the

3 proceeds were property of the estate, or an obligation of

4 the Debtor, and there's an order to that effect.  The order

5 already orders Ms. Baroni to return the entirety of the

6 proceeds of the sale of that property, including the $20,000

7 that apparently went to Mr. Antognini.

8 So I'm not going to -- like, I don't think there

9 should be a double-dipping.  You know, she's already been

10 ordered to return those funds, number one, and, number two,

11 you know, the rest of the money, you know, his declaration

12 says it came from Mr. Baroni.  Okay?  So, if it's disgorged,

13 it's going to go back to Mr. Baroni?  I don't see how that

14 benefits the estate or, again, how it benefits -- certainly

15 it doesn't benefit the estate, and I'm not sure that, under

16 these circumstances, it advances the purpose of this

17 particular statute.

18 So my tentative ruling would be, for all those

19 reasons, to disallow the claim, but to also deny the request

20 for disgorgement, and I'll hear from both sides, beginning

21 with the moving party, the Trustee, Mr. Komorsky.

22 MR. KOMORSKY:  First of all, your Honor, I'm

23 getting an echo.

24 THE COURT:  From me?

25 MR. KOMORSKY:  No.  I was just speaking, and I

7

1  hear an echo back, but it's better now.

2          THE COURT:  Okay.

3          MR. KOMORSKY:  My condolences, your Honor.  Sorry

4  for your loss.  But, having said that, I agree, your Honor,

5  with the Court's tentative with respect to the claim itself.

6  We don't have a scintilla of evidence.  I would like to

7  address the $20,000, and I'll take it in reverse order,

8  because I wrote it down.  I'll do last first.

9          It's not double-dipping, your Honor, because we

10 haven't recovered that money from Ms. Baroni yet, which

11 means, if we get $20,000 from him, we credit Ms. Baroni the

12 $20,000.  I agree with you.  You cannot get a double

13 recovery.  If the Henderson proceeds belong to the estate

14 and we recover some of those proceeds from people who

15 received them, Ms. Baroni gets a credit.  So it's not

16 double-dipping.

17         I will say this about the $20,000.  Mr. Antognini

18 has put in a false declaration from Ms. Baroni, claiming

19 today that that $20,000 was paid from her husband's income,

20 and so the Court isn't presented with a declaration that

21 says the other amounts were paid from the Debtor's

22 non-Debtor spouse income.

23         What he's now saying is "That declaration that I

24 filed in the District Court for Ms. Baroni, where she gave a

25 detailed analysis of the Henderson proceeds, that

8

1 declaration is false," because, even though she said, "I got

2 paid," Mr. Antognini got paid $20,000 from the Henderson

3 proceeds, he now purports to present to this Court a

4 declaration that is irreconcilable with his prior

5 representation.

6        It isn't just that he put forth a declaration of

7 Ms. Baroni saying that he got paid $20,000 from the estate.

8 He chided the Trustee, saying, "How dare you not believe

9 her.  Here's the chart," and now he's telling the Court,

10 "Don't believe that chart.  The $20,000 didn't come from

11 estate assets."  He was either lying then or he's lying now,

12 but the lying needs to stop, and the point is, your Honor, I

13 don't think he can backtrack from the prior admission that

14 the $20,000 was an estate asset.

15        As to what he's gotten paid, I believe the statute

16 is clear.  If you don't file the 329 disclosure if and when

17 it is required, you forfeit your fees.  That's the standard.

18 You forfeit your fees.  So he filed six and a half years

19 late.  It was due 14 --

20        THE COURT:  I think, to be -- Mr. Komorsky, that's

21 an overstatement of the standard.  You don't -- it's not

22 a -- you don't forfeit anything.  You certainly -- you're

23 subject to disgorgement, but I don't think it's a -- I think

24 the Court has discretion, and -- well, anyway, I just -- I'm

25 sorry to interrupt, but -- I'm not sorry to interrupt.  You

9

1  know, I just don't think that's the legal standard.

2       MR. KOMORSKY:  I actually agree with the Court

3  that the Court has discretion.  The default, the starting

4  point, is forfeiture.  The Court can say, "No, I don't

5  believe forfeiture is appropriate."  So I'm not suggesting

6  it is a per se rule, but the case law seems to say you start

7  from there, and then you determine whether there are

8  mitigating circumstances or other circumstances that warrant

9  the payment of the fees, notwithstanding the failure to file

10 the disclosure.

11      So I am not disagreeing with the Court that it's

12 not a rule.  It's more of a guideline, where we start, but

13 here, your Honor, that means the disclosure statement, from

14 all appearances, is materially false.  If you read that

15 statement, your Honor, okay, he worked for over three years

16 without ever getting a payment from the Debtor, including

17 the $20,000 she declares she made to him.  He declared that

18 the first payment he ever got was in May 2019, under that

19 disclosure statement.

20      What we have asked for was an accounting, your

21 Honor, because we think that statement is, on its face,

22 false.  We don't think he worked for three and a half years

23 without getting paid, because, if that is the case, your

24 Honor, then, when the Debtor filed her statement of money

25 she owed, and she said, "I only owe Mr. Antognini $20,000,"

10

1  that means, for the three years' worth of work that he did,

2  from 2015 to 2019, he's only done $20,000 worth of work,

3  because, according to him, he hadn't gotten paid, and his

4  claim -- and, by the way, multiple filings by him, multiple

5  appeals by him, multiple appearances by him.

6         So this Court has to really conclude that, in that

7  three-year period, Mr. Antognini billed $20,000 and got paid

8  zero, because that's what the disclosure says, and that's

9  how you reconcile it with what Ms. Baroni said when she

10 identified creditors.  It's inconceivable, your Honor, and

11 our concern is that Mr. Antognini received a lot more than

12 the $20,000 of estate assets, which is why we not only ask

13 to have the $20,000 returned, but we also ask that the Court

14 conduct an investigation requiring an accounting, requiring

15 the invoices and the other things that weren't produced.

16        Look, your Honor.  I may not dissuade you, and we

17 have two other motions.  I just wanted to make this point

18 perfectly clear, that we looked at the disclosure statement

19 in light of what Ms. Baroni said, and they don't match up.

20        THE COURT:  Okay.  I hear you.

21        Mr. Antognini.

22        MR. ANTOGNINI:  Your Honor, can you hear me?

23        THE COURT:  Yes, sir.  Go ahead.

24        MR. ANTOGNINI:  Good.  I'm glad.  Okay.  Maybe I

25 made a mistake in filling out the disclosure form.  It says,

11

1 "Post-petition compensation."  Now, the way I understood
2 that is, post-petition compensation was essentially
3 compensation paid after the conversion of a case to a
4 Chapter 7, and that's what these figures -- that's what
5 these dates indicate, all the payments from -- on this case
6 to me since the conversion, and the figures about, you know,
7 post-petition and how much were owed are based on that
8 assumption.

9         So, you know, if -- you know, and Mr. -- and the
10 Trustee's counsel has not been entirely clear on exactly
11 what he wants out of all this, but, you know, I would be
12 glad to provide my billing records, redacted, of course.  It
13 will take a while, and, of course, the Baronis will have to
14 pay for that expense, you know, but I will do that, and I
15 will -- you know, I can back up the $20,000 fees easily.

16         So I'm not sure what, you know, the Trustee's
17 concern is here, but I do understand the Court's ruling, at
18 least on the claim issue.  Unfortunately, you know, it may
19 have been moot, because, in light of, you know, this
20 disclosure statement that says I have a balance due of
21 32,779 and 16 cents, I filed an amended claim this morning
22 just to reflect that new amount, just to be accurate.  I
23 don't know how that affects all these proceedings here.  I
24 just realized last night, you know, "Oh, my God," you know,
25 that this amount, 32,000, does not (indiscernible) the

12

1  statement of 20,000.  Maybe I should amend my claim.

2          So I'm just trying to be a honest as I can with

3  the Court, and I do not appreciate Mr. Komorsky's comments

4  calling me a liar.  I think that is uncalled for.  To my

5  knowledge, and based on conversations I have had with the

6  Baronis, all payments came from James Baroni's income,

7  period.  That is what I know.  Mr. Komorsky can call me a

8  liar.  At least he's not calling me an over-biller.  I might

9  note for the record that, on a case of three motions, there

10 are three representatives from Mr. Komorsky's law firm on

11 this case.  I presume only Mr. Komorsky is charging the

12 estate for this time.  If not, it is unreasonable.

13         You know, I am glad to produce evidence.  You'll

14 notice in my response to the motion that I said I would, you

15 know, submit bills to the Court for the Court's review in

16 camera, because I am very concerned about attorney-client

17 information being revealed, you know, and I think it was the

18 only way it could be handled, but, again, I will defer to

19 the Court's wisdom on that subject.

20         THE COURT:  Well, the 329(a)/Rule 2016(d)

21 disclosures typically don't involve billing statements.  So,

22 you know -- and, like I said, I'm not persuaded on this

23 record that there should be disgorgement.  In terms of the

24 claim that's in front of me, I haven't hear anything that

25 would cause me to change my assessment that there is no

13

1 evidence in the record to support the claim.

2        The way it works is, proof of claim is filed.  If

3 it's properly filed, it's entitled to a prima facie

4 presumption of validity.  It's been argued that the proof of

5 claim that's in front of me was not entitled to prima facie

6 validity.  The rules and the form require that, if a claim

7 is based on a writing, that the writings be attached.  There

8 were no writings attached.

9        Even still, what happens when a claim objection is

10 filed?  The issue then becomes -- or the preliminary issue

11 is, does whatever has been filed by the Trustee -- or the

12 objecting party, okay, in this case the Trustee -- does that

13 evidence -- is that sufficient to refute or return the

14 burden back to the creditor, to establish by evidence the

15 validity of the claim?

16        So here we have a situation where the claim is

17 filed for 20,000.  The Trustee says, "Look.  Here's

18 evidence.  Here is a declaration under penalty of perjury

19 from Ms. Baroni saying that $20,000 was paid.  That appears

20 to be the same $20,000."  The burden then shifted to Mr.

21 Antognini to produce evidence, with his objection, to

22 establish the bona fides of the client, and I got nothing

23 from him in terms of evidence.

24        So I'm going to -- that's why I'm disallowing the

25 claim, Mr. Antognini.  It's not even close on this record.

14

1          MR. ANTOGNINI:  Your Honor, if I may just --

2          THE COURT:  And I know that the disgorgement is

3    sensitive.  I know people get exercised, upset, you know,

4    when someone is wanting to hold them liable for tens, if not

5    hundreds of thousands, of dollars, but it's kind of not

6    the -- like, I just -- I don't think there's a case here for

7    disgorgement on this record.

8          Yes, Mr. Komorsky.

9          MR. KOMORSKY:  You know, two things.  One is, Mr.

10   Antognini has now acknowledged that the $150,000 he received

11   that he put in the 329 disclosure is not accurate, because

12   he only identified post-conversion monies, post-conversion

13   bills, not post-petition bills.  So it may be hundreds and

14   hundreds of thousands of dollars.  We don't know.

15         THE COURT:  Okay.

16         MR. KOMORSKY:  We don't know.

17         THE COURT:  I'm not -- you know, my -- let's

18   say -- I'm not ruling on the adequacy of Mr. Antognini's

19   disclosures today under 329(a) or 2016(b).  I am ruling

20   that, on the record before me, I don't see that there is

21   cause for disgorgement.

22         MR. KOMORSKY:  I don't disagree, your Honor.

23   That's not the point I'm making.  The point I'm making, your

24   Honor, is he's now said that he submitted a new claim based

25   on --

15

1          THE COURT:  I'm not going to get exercised about

2     it, Mr. Komorsky.  I don't know who's telling the truth and

3     who's not.  All I can tell you is, on the record before me,

4     there isn't a case for disgorgement.

5          So I am not going to get drawn into this, what is

6     an ongoing debate, and I want to caution you -- I'll caution

7     everybody, but I think it arises from Mr. Komorsky's

8     comments.  I really don't appreciate using -- like, calling

9     people a "liar" or using derogatory terms, especially from

10    the officers of the Court.  There is a polite way to say

11    that you believe that somebody's testimony is not true.

12    Please err on the side of the more polite manner of making

13    that case.

14         MR. KOMORSKY:  My apologies, your Honor, to the

15    Court and to opposing counsel.  I was disrespectful, and I

16    apologize for that.  Your Honor, I'm fine with the Court's

17    tentative on no disgorgement.  That's not the point I was

18    trying to make, and if we need to get an amended disclosure,

19    I'll reach out.  The point I'm making --

20         THE COURT:  You know, this is typically -- you

21    know, this is unusual.  This is a Chapter 7 case.  Usually

22    I'm hearing about these issues from the United States

23    Trustee's Office.  Maybe they're not as focused on this

24    because there's active representation of the Chapter 7

25    Trustee.  I don't know.

16

1        MR. KOMORSKY:  Good question.

2        THE COURT:  Yes.  And, you know, to be fair, Mr.

3  Komorsky, I don't know whether these questions have been

4  asked of any of the myriad counsel who have appeared for Ms.

5  Baroni over the course of the last 10 years.  Okay?  I know

6  right now you're locked in litigation with Mr. Antognini,

7  and so I understand, naturally, your attention may gravitate

8  to him, but, you know, this case has been going on a long

9  time.

10        There's been an unusual amount of litigation.

11  It's been in a post-confirmation posture for an unusually

12  long time before it was then converted, and I don't know

13  that -- I don't know if any of the lawyers that have

14  represented Ms. Baroni complied with their obligations under

15  329(a) or 2016(b), and, you know, I just -- I don't know.  I

16  throw that out there for what it's worth.

17        MR. KOMORSKY:  Your Honor --

18        THE COURT:  We do aspire to fairness here, even

19  though I'm confident that people frequently disagree that

20  that's what we do.

21        So, anyway, that's going to be my ruling on that

22  motion.  The ruling on disgorgement, I guess, will be

23  without prejudice, given that we don't know -- maybe we

24  don't know all the facts.  Maybe Mr. Antognini has further

25  disclosures or corrective disclosures.  But I'm warning

17

1  everybody, what's the point of this disclosure?

2          The point of this disclosure typically, in my

3  mind -- maybe you'll find some authority, some other

4  authority I don't know about it, but, to my mind, this is

5  about looking at whether a Debtor has been overcharged.

6  Okay?  Because Debtors frequently -- you know, in your

7  typical -- say, in your typical Chapter 7 case, where the

8  Debtor is insolvent and financially distressed, there are

9  people out there who take advantage of them.

10         Now, the code isn't written that way.  It's not

11 limited to certain kinds of Debtors.  The disclosure

12 obligation is pretty clear that Mr. Antognini has the

13 disclosure obligation, and the rules -- Rule 2016 makes it

14 even more clear, and Rule 2016(b), by the way, makes it even

15 more clear, you know, that that applies post-petition, but

16 does that -- but does the mere failure to do it timely -- is

17 that -- it's a reason, in and of itself, to disgorge?  I am

18 not persuaded on this record that it is --

19         MR. GUBNER:  Your Honor?

20         THE COURT:  -- nor am I persuaded that, given the

21 numbers we know about, that there has been overcharging.

22 But, again, it's without prejudice.

23         Yes, Mr. Gubner.

24         MR. GUBNER:  Thank you, your Honor.  First of all,

25 let me apologize for your loss.  Certainly I'm sorry for any

18

1  hardship that you're going through, and appreciate your

2  taking the time today to still hear these matters.

3          I am not -- and we submit on your tentative, your

4  Honor.  I don't intend to argue it.  I just -- I've got a

5  few years more in the Bankruptcy Court than Mr. Komorsky,

6  and, your Honor, I think you are correct that -- I think

7  that the purpose of that rule was to put people on notice

8  when some lawyer was doing work for the Debtor, and, based

9  on that notice, the Trustee could make sure that potential

10 estate assets were not dissipated, and the reason the

11 requirement exists to file such a notice timely is to put

12 people on notice that, if there is a lawyer doing all this

13 work, that the Trustee is aware, and can ensure that no

14 estate assets are dissipated.

15         I just want to give you my thoughts on that.  I've

16 had a couple of those arguments.  We accept your ruling,

17 your Honor, and I don't mean to argue it.  I wanted -- in

18 relation to Mr. Antagonini's (sic) comment about three

19 lawyers on the phone --

20         THE COURT:  I believe he pronounces it

21 "Antognini."

22         MR. ANTOGNINI:  "Antognini."

23         MR. GUBNER:  Thank you, your Honor.  My apologies.

24         THE COURT:  The G is silent.

25         MR. GUBNER:  As Mr. Antognini pointed out, I am

19

1 here for one housekeeping matter, your Honor, and that is

2 the fact that, as the Court is aware, last November we had

3 an employment application.

4          THE COURT:  Yes, I know, and you should get my

5 ruling very soon, in the next week or so.

6          MR. GUBNER:  Thank you, your Honor.  I was just --

7          THE COURT:  I know it's important to you.  It was

8 delayed by the litigation.

9          What Mr. Gubner is referring to, of course, is his

10 firm's fee application, and it took me longer than I

11 expected to deal with the motion to remove and refer, and

12 the arguments were linked, and I thought it would just be a

13 quickie thing, once I did one or the other, and it's just

14 taken me time, but you will get it in the next couple weeks.

15          MR. GUBNER:  Your Honor, thank you.  I just want

16 to remind the Court that there is -- it's an interim

17 application only, obviously, and there was a consensual

18 reduction to satisfy the U.S. Trustee's concerns, so those

19 have been handled.  As you can appreciate --

20          THE COURT:  All right.  Don't get into the merits.

21 It's not in front of me today.

22          MR. GUBNER:  No, no.  I'm not.

23          THE COURT:  It's under submission.

24          MR. GUBNER:  I just -- the only other housekeeping

25 matter, your Honor -- we've obviously been embroiled in a

20

1  fair amount of litigation in this case, as the Court is

2  clearly aware, and we have not filed another application,

3  despite it being over a year, and so we'd like to get that

4  on file, and so I just wanted to say thank you, your Honor,

5  for addressing the prior one.  We didn't want to inundate

6  you with another application until the Court had issued the

7  order on the prior application.

8           Just to keep things clear, I don't intend to argue

9  it, and, in light of Mr. Antognini's comments, with the

10 Court's permission, I would like to be excused.

11          THE COURT:  Yes, you're excused.

12          MR. GUBNER:  Thank you very much, your Honor.

13          THE COURT:  Okay.  All right.  Let's move along.

14 We have less than a half an hour left, so we may not get to

15 the end, but let's -- the other two things are the motion

16 for a protective order with respect to certain discovery and

17 the motion regarding access, and let's see.  Maybe we'll

18 take up the access motion first.  I understand there is a

19 request for discovery on that, but we can talk about that.

20 But let me just get to the right screen, here.  Hold on.

21 Okay.  All right.

22          So let me ask Mr. Komorsky.  I want to make sure I

23 understand completely.  What all are you asking for in this

24 motion?  I understand the part about having a prospective

25 real estate agent come in and examine the property and take

21

pictures.  I understand your argument that it's a part of
the process of getting sort of an initial analysis and for
this Trustee deciding, in this instance, whether to hire
that real estate agent, and, undoubtedly, if you hire that
real estate agent, what -- you know, the pictures, the
evaluation, the whatever, all that goes into formulating
what a list price might be and all that.  What else is
covered by this?

MR. KOMORSKY:  I think, your Honor, that we
spelled it out, and identified the things that we wanted,
the six things that we wanted.

THE COURT:  All right.  Tell me again.

MR. KOMORSKY:  Okay.  We want immediate
cooperation, so that the broker can take photos and obtain a
realistic valuation for purposes of preparing a listing
agreement, and, your Honor, we've done this a couple times
before with the Court.

We get the broker to go and look at the property.
They evaluate it.  They tell us what they think it's worth.
We then fill out a leasing agreement, which we present to
the Court in the context of retaining the broker, because
it's the listing agreement upon which the broker gets paid,
the percentage of the sale price.  They're not hired on an
hourly basis, like a lawyer.

So the broker, before you even retain them, needs

22

1  to go in and tell the Trustee -- before you enter into a

2  listing agreement, they need to tell the Trustee what needs

3  to be done on the property, if anything, and what the value

4  of the property is, by looking at comps, by looking at the

5  interior, the exterior, things that need to be done.  That's

6  what we've done for the other properties.  That's what we

7  want here.

8          So first we want to be able to have access to the

9  property for our prospective broker, whose identity we

10 provided to Mr. Antognini the day after he asked for the

11 identity of the broker, that the broker be provided access

12 on a 24-hours' notice, but, if they need 48 hours' notice,

13 that's fine as well, your Honor, but the point is, we have

14 literally been waiting two months for a response to "Can we

15 have access?"

16         In return, what we got is "You can't have access,

17 for three reasons that we just created for purposes of our

18 opposition, never raised them when you asked for access,

19 but, now that you've had to file a formal motion, we're now

20 taking the position that you should have gotten formal

21 approval for the broker before you even asked for access."

22 That's not how it works, but, again, it wasn't a reason why

23 we weren't given access.

24         So we want a certain amount of notice period, so

25 it's not so the broker can just walk in unannounced.  So

23

1  we'd, you know, set a parameter, your Honor, on how much

2  notice needs to be given to Ms. Baroni in order to access

3  the property.  That was number two.  The third is to provide

4  a key for access gates and codes.

5         Again, we pulled this from a case, a similar case,

6  where a Debtor was in possession -- a Debtor or creditor was

7  in possession of a piece of property, and wasn't giving

8  access.  So the Court fashioned a cooperation ruling that

9  provided this type of access.

10         THE COURT:  But I thought your argument was "Well,

11  24 hours' notice is reasonable," but you're also arguing,

12  "We should just get the keys, and be able to come in

13  whenever we want"?

14         MR. KOMORSKY:  No, no.  That is not what we're

15  saying, your Honor.  I mean, this 24 hours' notice -- the

16  fact that we have a key doesn't mean we can go in whenever

17  we want.  We're subject to giving notice, your Honor.  But,

18  if we give notice, and she says, "I'm out of town, and I'm

19  out of town for a month," your Honor, do we have to wait a

20  month for her to come back, or can, if we've given the

21  proper notice, use the key?

22         That's the whole point, your Honor.  There is

23  nothing in the order we requested that said, by giving us

24  the key, we can go in any time unannounced.  It would still

25  be subject to the notice requirements as set forth in the

24

1 order we've asked for.  You know, I rarely have -- you know,

2 to have -- I will say this, your Honor.  The corroboration

3 we're seeking is prospective, and what I mean by that is,

4 right now all we need is to get the broker onto the property

5 to give an evaluation.

6          The concern is that, once we get that, and once we

7 present our motion to the Court to retain a broker, we will

8 then -- and the Court approves it, which I suspect will

9 happen -- we will then be forced to go and get another

10 motion regarding what happens next.  So I will tell the

11 Court that some of the things on this list are what happens

12 next, meaning it's designed to address the entire process,

13 so that we don't have to come back and do seriatim motions,

14 which oftentimes we've had to do.

15          So it's designed to address both the preapproval

16 process and the actual listing and sale process, and of

17 that -- so, for example, number five, your Honor, so the

18 Debtor maintains the Calabasas property in condition for

19 showing to prospective buyers.  Well, she obviously doesn't

20 need to do that with respect to the initial access to the

21 broker, but she will need to do that once the broker is, in

22 fact, retained and approved by the Court.  So the idea here

23 was to get an order that would run from beginning to end of

24 process, as opposed to having to come back at each step.

25          THE COURT:  Okay.  So let me -- as I did before,

25

1  I'll give sort of everybody my initial reaction, and then
2  I'm happy to hear argument.

3          This house is property of the bankruptcy estate.
4  This is an issue that was litigated.  It was litigated up to
5  the Ninth Circuit, and a petition for certiorari was filed,
6  and denied by the Supreme Court.  So, whether you agreed
7  with me or not, it's kind of how our process works.

8          When an appellate court tells me I got it wrong,
9  it doesn't matter what I think.  That's how it works.  Okay?
10 But, in this case, it got affirmed, and it is the job of the
11 Chapter 7 Trustee, as I've said before, to liquidate the
12 property of the estate and turn it into money to pay
13 creditors, and the Trustee is given quite a bit of
14 discretion, business judgment, to decide how and when to
15 liquidate the assets of the estate.

16         We are not faced presently with a motion to
17 approve a sale of it.  I'm simply being asked to direct the
18 Debtor in accordance with her obligations under the
19 Bankruptcy Code, and, more specifically, under the
20 Bankruptcy Rules, 4002, if I 'm not mistaken, to cooperate
21 with the liquidation of the estate.  I think that is an
22 eminently reasonable request.

23         I don't think that there is any -- that any of --
24 let me put it this way -- that any of the proposed discovery
25 or propounded discovery is at all legally relevant to the

26

1  question of the Debtor's duty to cooperate, and to the

2  extent there is a theory for why maybe it's sort of

3  indirectly relevant, it relies on theories that have been

4  argued and rejected by this Court already.

5          So I think this is -- this issue of cooperation,

6  as a general matter, is very straightforward.  The rule

7  says, "You shall cooperate with the liquidation."  The

8  Trustee has asked, "We'd like to get a broker in there.

9  We'd like to take pictures.  We'd like to be able to get

10 access on 24 hours' notice as part of the marketing

11 process."  The Trustee has asked to be able to do his job.

12 To the extent that there are arguments that he shouldn't,

13 those arguments are based on theories that have been

14 litigated and rejected.

15         However, that's not the only thing that this

16 motion is asking for.  This motion is asking for damages.

17 This Court (sic) is asking me to find that the Debtor, by

18 not cooperating up until now -- and we'll get into more

19 about what that means -- that the Debtor has violated the

20 automatic stay and is, therefore, in contempt of court, and

21 should be sanctioned.  Tentatively, I do not agree, for a

22 couple reasons.

23         First of all, even if you're proceeding under

24 105 -- well, I'll get back to the requested surreply in a

25 second.  The motion cites 105 as another source of authority

27

1  for contempt sanctions.

2          So I don't think that was an issue that was raised

3  for the first time in the reply, but, more importantly, I

4  have a problem with the analysis under 362(a)(3), which is

5  the provision of the Bankruptcy Code that allegedly was

6  violated, and let me just turn to the page and read from it,

7  so I get it right, "The automatic stay acts as a stay,"

8  Subsection Three:

9          "Under Subsection A of this section, of

10          any act to perfect or maintain or

11          continue the perfection of an interest

12          in property, to the extent the Trustee's

13          rights and powers are subject to

14          perfection" --

15          Actually, that's not the one.  That's (b)(3).  I

16  should be reading (a)(3):

17          "Any act to obtain possession of

18          property of the estate or of property

19          from the estate, or to exercise control

20          over property of the estate."

21          Okay.  I have made it clear many times before, but

22  I've reiterated today, the house is property of the estate,

23  but what is the act that is complained of here?  The act

24  that's complained of here is that "We have reached out

25  through counsel and asked for access, and we never heard

28

1  back."

2          Is that frustrating?  Yes.  Is it unprofessional?

3  Maybe, depending on the circumstances.  Is that an act to

4  obtain possession or exercise control over property of the

5  estate?  I have serious doubts, and those doubts are

6  amplified by the Supreme Court's recent decision in the

7  Fulton case.  Okay?

8          In the Fulton case, for a while -- this is now a

9  digression -- for a while, the Bankruptcy Court for the

10 Northern District of Illinois surpassed the Central District

11 of California in the number of filings.  For years and

12 years, our district was number one, and then Chicago, in the

13 Northern District, became number one.  Why?  Well,

14 apparently Chicago has been very -- is very aggressive about

15 collecting parking fines and impounding vehicles for unpaid

16 parking fines, and I'm assuming, without any social science

17 to back me up, that there's probably not enough parking in

18 Chicago, which is why this is a source of revenue.

19         In any event, so there are all these bankruptcy

20 cases where the car was impounded, and the Debtor files a

21 case, and the case is partly to get the car back, and maybe

22 there's a plan.  The plan says, "We'll pay the fines over

23 five years," and that all makes sense, but they say, "Look.

24 I've got to get the car back as soon as possible.  I've got

25 to go to work," and they make demand on the city of Chicago,

29

1   "Give me the car back," and Chicago said no, and so then the

2   enterprising Debtor's lawyers claimed this was a violation

3   of the automatic stay.

4          The Supreme Court says no.  Yes, it's true that

5   that vehicle is, I don't know, kept in a yard, behind a

6   fence.  You've asked for it back.  You don't give it back.

7   You're still holding it behind your fence.  Maybe you have a

8   security guard or a canine patrolling it, keeping you from

9   taking possession, but that, the Supreme Court says, is not

10  exercising control over property of the estate.

11         This was a surprise to many bankruptcy lawyers who

12  thought otherwise, but that's how it works.  Supreme Court

13  says, "No.  There has to be an affirmative act, and holding

14  on to the car, refusing to cooperate with the request to

15  return to car, is not an affirmative act."

16         So I think this really hurts the argument about

17  the stay violation.  I don't think it matters to the first

18  part of the relief, which is the cooperation, and let me

19  further say that if the Court ultimately enters an order

20  directing the Debtor to cooperate, and she unjustifiably

21  fails to abide by the Court's order, well, that will be a

22  contempt, and that will be punishable by contempt, but I am

23  not persuaded that the automatic stay has been violated

24  based on the record I have in front of me.  So, regardless

25  of whether it's 362(k) or 105, I don't think it matters.  I

30

1 don't think there's been a stay violation.

2          Let me add, again tentatively, that I don't think

3 cause is shown here to permit Mr. Antognini to file a

4 surreply, and his request, his motion to file a surreply,

5 will be denied, because 105 was raised in the original

6 thing.

7          Further, he claims that there's cause because the

8 Trustee lied.  I'm not persuaded that that was the case.  I

9 think there was testimony that described a process by which

10 the Trustee -- or the process by which the Trustee is trying

11 to proceed here, by having a prospective broker come in and

12 make an assessment and report back before entering into a

13 listing agreement, but that may not be the way other

14 Trustees do it, on other occasions.  I think choosing to do

15 it this way falls squarely within the Trustee's business

16 judgment.

17          So I don't think there was a need for a surreply,

18 and to the extent -- in an oral argument, in a situation

19 where you want to say something about something that's in a

20 reply, you can come and argue.  I don't know.  I just wasn't

21 persuaded.  We have a set briefing schedule in our court,

22 under our local rules, and I rarely deviate from that to

23 permit surreplies, and yes, they are sometimes permitted,

24 but I wasn't persuaded there was cause here.

25          So it's noon, and I, unfortunately, have to go.

31

1 This is -- I have time tomorrow.  I think it's safe, maybe,

2 to set up for 2:30 tomorrow.  I have a matter on at 1:30,

3 and, you know, I don't want you to have to sit through that

4 if it goes long.  So come back at -- come at 2:30 tomorrow,

5 and we will continue this discussion, but I would like if

6 counsel for the parties would, between now and then,

7 sometime this afternoon or sometime tomorrow morning, meet

8 and confer on the following.

9        Assume, just for the sake of argument, that the

10 Court is going to grant an order directing the Debtor to

11 cooperate with the marketing of the home, okay, however you

12 define that.  Okay?  Mr. Komorsky says he spelled it out in

13 the motion.  I've read a lot of paper in the last so many

14 days.  I want you to focus on that, and figure out where you

15 can't agree or disagree, so that, when we reconvene

16 tomorrow, I can focus on where the rub is.

17        I understand Ms. Baroni, I understand Mr. Baroni,

18 don't want to deal with this, in the sense that they don't

19 want the Trustee to market the house.  They don't even want

20 a broker to come in and take an initial first assessment.

21 They would be well advised to consider the possibility,

22 perhaps even the likelihood, that I'm going to grant the

23 motion and permit some, if not all, of what the Trustee is

24 asking for.

25        If there are real, absolute, "Judge, you just

32

1  can't let them do that, because of X, Y, and Z," be ready to

2  tell me what it is.  If it's that the Trustee is a crook,

3  and shouldn't be able to market the property, I've already

4  spent many, many pages ruling on those arguments.  If it has

5  to do with the lenders, I don't know that it even applies.

6  The Trustee here is trying to do the work necessary to prep

7  the property for sale and begin to market it.

8          We've been through so many of these issues, and I

9  know that Ms. Baroni disagrees with me, and her counsel,

10  various counsel, have disagreed with me and feel strongly,

11  but many of these issues have already been decided, and, as

12  I said with respect to the Camarillo property, I believe, at

13  an earlier hearing, where there was similar resistance to

14  the Trustee trying to do the job of the Trustee, this is

15  property of the estate.  The Trustee is doing his job, and I

16  have yet to be persuaded that he should not be permitted to

17  continue to do his job.

18          So I would get -- you know, get realistic, and

19  focus on the specifics, and be ready to explain to me, if

20  you disagree on specifics, what the grounds are.  Okay?  I

21  think that's where we'll pick up tomorrow.

22          MR. ANTOGNINI:  Your Honor, Ms. Baroni is not

23  available at 2:30 tomorrow, I just found out.

24          THE COURT:  Okay.  Well, you're her counsel.

25          MR. ANTOGNINI:  Well, I understand that.  She

*Briggs Reporting Company, Inc.*

**57**

33

1  would --

2           THE COURT:  There's no constitutional right to be

3  here in a civil matter.  I mean, we're trying to keep -- I'm

4  trying to be responsive to the Trustee.  There have been

5  many, many attempts in delaying the Trustee from doing his

6  job, and we are going to keep moving, and so she can get a

7  transcript.  You can report to her on what happened, but

8  you'll be here.  So we're going to go forward.

9           MR. ANTOGNINI:  Well, all right, your Honor.

10          THE COURT:  Okay.

11          MR. ANTOGNINI:  I mean, she's available Monday.

12  That's not much of a delay.

13          THE COURT:  I'm sorry?

14          MR. ANTOGNINI:  She is available Monday.  That's

15  much of a delay.

16          THE COURT:  I'm not available Monday.  Okay?

17          All right.  Thank you all.  Court will be in

18  recess until tomorrow.

19          MR. ANTOGNINI:  Your Honor, one question.

20          THE COURT:  Yes.

21          MR. ANTOGNINI:  Is the Zoom link the same for

22  tomorrow?

23          THE COURT:  No, no.  There's a different Zoom link

24  for tomorrow.  We have a new -- usually we have a new one

25  every day, and it's on the posted calendar.

34

1          MR. ANTOGNINI:  All right.  Very good, your Honor.

2   Okay.

3          THE COURT:  All right.  Thank you all.

4          MR. KOMORSKY:  Thank you, your Honor.

5          THE COURT:  All right.  Court is in recess -- or

6   court is adjourned for the day today.  Thanks.

7          THE CLERK:  Off the record.

8       (Proceedings concluded.)

9

10          I certify that the foregoing is a correct

11   transcript from the electronic sound recording of the

12   proceedings in the above-entitled matter.

13   /s/ Holly Steinhauer          12-7-22

14   Transcriber                   Date

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| STEVEN T. GUBNER - Bar No. 156593<br>JASON B. KOMORSKY - Bar No. 155677<br>SUSAN K. SEFLIN - Bar No. 213865<br>JESSICA L. BAGDANOV - Bar No. 281020<br>BG LAW LLP<br>21650 Oxnard Street, Suite 500<br>Woodland Hills, CA 91367<br>Telephone: (818) 827-9000<br>Facsimile: (818) 827-9099<br>Email: sgubner@bg.law, jkomorsky@bg.law,<br>sseflin@bg.law, jbagdanov@bg.law<br><br>☐ Individual appearing without attorney<br>☒ Attorney for: David Seror, Chapter 7 Trustee | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO VALLEY DIVISION** ▼

| In re:<br><br>ALLANA BARONI,<br><br><br><br><br><br><br><br><br><br><br>Debtor(s). | CASE NO.: 1:12-bk-10986-MB |
|---|---|
| | CHAPTER: 7 |
| | **NOTICE OF MOTION FOR:**<br><br>MOTION FOR ORDER (1) DIRECTING THE DEBTOR TO PROVIDE ACCESS TO CALABASAS PROPERTY AND TO COOPERATE IN THE SALE OF SAID REAL PROPERTY AND (2) AWARDING DAMAGES TO THE TRUSTEE FOR WILLFUL VIOLATION OF STAY<br><br>*(Specify name of Motion)* |
| | DATE: 11/30/2022<br>TIME:  11:00 am<br>COURTROOM:  303<br>PLACE:  VIA ZOOMGOV ONLY |

1. TO (*specify name*):  Chapter 7 Debtor Allan Baroni, James Baroni, their Counsel and All Other Interested Parties

2. NOTICE IS HEREBY GIVEN that on the following date and time and in the indicated courtroom, Movant in the above-captioned matter will move this court for an Order granting the relief sought as set forth in the Motion and accompanying supporting documents served and filed herewith. Said Motion is based upon the grounds set forth in the attached Motion and accompanying documents.

3. **Your rights may be affected**. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2012                                   Page 1                        **F 9013-1.1.HEARING.NOTICE**

4. **Deadline for Opposition Papers:** This Motion is being heard on regular notice pursuant to LBR 9013-1. If you wish to oppose this Motion, you must file a written response with the court and serve a copy of it upon the Movant or Movant's attorney at the address set forth above no less than fourteen (14) days prior to the above hearing date.  If you fail to file a written response to this Motion within such time period, the court may treat such failure as a waiver of your right to oppose the Motion and may grant the requested relief.

5. **Hearing Date Obtained Pursuant to Judge's Self-Calendaring Procedure:** The undersigned hereby verifies that the above hearing date and time were available for this type of Motion according to the judge's self-calendaring procedures.


Date:  11/08/2022

BG LAW LLP
Printed name of law firm



/s/ Jason B. Komorsky
Signature



Jason B. Komorsky
Printed name of attorney

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2012                    Page 2                    **F 9013-1.1.HEARING.NOTICE** 66

1   STEVEN T. GUBNER – Bar No. 156593
    JASON B. KOMORSKY – Bar No. 155677
2   JESSICA L. BAGDANOV – Bar No. 281020
    BG LAW LLP
3   21650 Oxnard Street, Suite 500
    Woodland Hills, CA 91367
4   Telephone:  (818) 827-9000
    Facsimile:   (818) 827-9099
5   Email:      sgubner@bg.law
                jkomorsky@bg.law
6               jbagdanov@bg.law

7   Attorneys for David Seror, Chapter 7 Trustee

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                   **SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| 11  In re | Case No. 1:12-bk-10986-MB |
| 12  ALLANA BARONI, | Chapter 7 |
| 13              Debtor. | **MOTION FOR ORDER (1) DIRECTING THE DEBTOR TO PROVIDE ACCESS TO CALABASAS PROPERTY AND TO COOPERATE IN THE SALE OF SAID REAL PROPERTY PURSUANT TO 11 U.S.C § 362(a)(3), 11 U.S.C. § 521(a)(3), AND FED. R. BANKR. P. 4002(a)(4), AND (2) AWARDING DAMAGES TO THE TRUSTEE FOR DEBTOR'S WILLFUL STAY VIOLATION; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF JESSICA L. BAGDANOV AND JASON B. KOMORSKY IN SUPPORT THEREOF** |
| | Hearing: |
| | Date:  November 30, 2022 |
| | Time: 11:00 a.m. |
| | Place:  Courtroom 303 |
| | VIA ZOOMGOV ONLY |

2845541

63

David Seror, Chapter 7 Trustee (the "Trustee") for the bankruptcy estate of Allana Baroni (the "Debtor"), hereby moves the Court pursuant to 11 U.S.C. §362(a)(3), 11 U.S.C. § 521(a)(3) and Rule 4002(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Motion") for an Order as follows: (1) finding that the Debtor willfully violated the automatic stay by failing to allow access to property of the estate located at 3339 Via Verde Ct. in Calabasas, California (the "Calabasas Property"), (2) awarding the Trustee actual damages in the amount of $12,150,[1] and (3) directing the Debtor to provide access to the Calabasas Property and to cooperate in the eventual sale of such property (the "Cooperations Order"), which Cooperations Order shall require the following:

1.  That the Debtor immediately cooperate with the Trustee's real estate broker, including but not limited to providing access to the Calabasas Property so that the broker may take photos and obtain a realistic valuation for purposes of preparing a listing agreement;

2.  That the Debtor provide broker access to the Calabasas Property on 24-hours' notice;

3.  That the Debtor provide a key to the Calabasas Property as well as all access / gate codes;

4.  That the Trustee's real estate broker be permitted to: (a) post a "For sale" sign in the front of the Calabasas Property; (b) install a lock box on the house; (c) hold open houses; and (d) take prospective buyers through the Calabasas Property on 24 hours' notice;

5.  That the Debtor maintain the Calabasas Property in condition for showing to prospective buyers;

6.  That the Debtor refrain from any actions that interfere with the orderly showing of the Calabasas Property to prospective buyers or negatively affects the value of the house to prospective buyers; and

7.  Granting such other and further relief as the Court deems just and proper including the issuance of civil contempt sanctions to ensure compliance with the Order.

---

[1] See Declaration of Jason B. Komorsky ("Komorsky Decl."), ¶ 3.

1

1    In support of the Motion, the Trustee respectfully represents as follows:

2    **MEMORANDUM OF POINTS AND AUTHORITIES**

3    **I.    INTRODUCTION**

4        Since June 2022, the Trustee has attempted to secure access to real property located at 3339

5    Via Verde Ct. in Calabasas, California (the "Calabasas Property") for purposes of establishing

6    current market value and taking photos, but has been rebuffed by the Debtor at every turn.  These

7    actions by the Debtor have continued even after September 12, 2022 when this Court entered its

8    Order Denying Motion of Debtor Allana Baroni for a Stay Regarding Sale of Calabasas Residence

9    or Camarillo Rental Property.  Doc. No. 1547.  The Debtor is willfully exerting control over property

10   of the estate in violation of the automatic stay.

11       Despite numerous requests to Debtor's bankruptcy counsel—first to Ms. Kathleen March and

12   then to Matthew Resnik (collectively, "Debtor's counsel")—the Debtor has refused to provide a

13   substantive response to the Trustee's repeated requests for access to the Calabasas Property.

14   Declaration of Jessica L. Bagdanov ("Bagdanov Decl."), **Exhibits 1, 2.**  11 U.S.C. §362(a)(3)

15   prohibits the Debtor from interfering with the Trustee's ability to sell estate property, and such

16   interference constitutes a violation of the automatic stay.  *See In re Brooks-Hamilton*, 348 B.R. 512,

17   525 (Bankr. N.D. Cal. 2006) (Section 362(a)(3) applies to debtors and prohibits debtors from

18   exercising control over estate property to the detriment of the trustee).  Indeed, pursuant to 11 U.S.C.

19   §521(a)(3) and Fed. R. Bankr.P. 4002(a)(4), the Debtor has an affirmative duty to cooperate with the

20   Trustee as necessary to enable the Trustee to perform his duties.  In this case, the Trustee has a duty

21   to administer the Calabasas Property for the benefit of the estate and the estate's creditors, but the

22   Debtor has refused to respond to the Trustee's requests for access to the Calabasas Property.[2]

23       The Debtor is currently in violation of Section 362(a)(3), Section 521(a)(3) and Fed. R.

24   Bankr.P. 4002(a)(4), and the Trustee has no remedy available at law other than to secure the

25   Cooperations Order requested herein directing the Debtor to provide the Trustee and his agents

26

27   _____

     [2] This Motion does not preclude the Debtor or her spouse from exercising their rights with respect to
28   the Calabasas Property, including the Debtor's spouse's right of first refusal and the Debtor's right to
     purchase the estate's equity.

1

1   access to and entry upon the Calabasas Property and, in all other material respects, directing the

2   Debtor to cooperate with the Trustee in the sale of the Calabasas Property.

3        Her violation of the automatic stay is willful in light of the Court's decision establishing that

4   the Calabasas Property is an asset of the estate, now affirmed by the Ninth Circuit and unstayed.

5   Accordingly, the Trustee should be awarded actual damages, the fees he incurred in bringing this

6   motion, pursuant to 11 U.S.C. §362(k)(1).

7   **II.     RELEVANT BACKGROUND**

8        **A.     <u>The Bankruptcy Case</u>**

9        The Debtor filed a voluntary chapter 13 petition on February 1, 2012.  The Debtor, then, filed

10  a motion to convert her case to chapter 11, which the court granted by an order entered on February

11  29, 2012 (Docket No. 17).  In her original schedules, the Debtor listed the Calabasas Property as an

12  asset of the bankruptcy estate.  (*See* Schedule A, Docket No. 19).

13       After one of the Debtor's secured creditors filed a motion to convert the case from chapter 11

14  to chapter 7, the court granted the creditor's motion, converting this case to chapter 7 on April 29,

15  2019 (Docket No. 967).  On April 30, 2019, the Trustee, David Seror, was appointed the chapter 7

16  trustee of this case (Docket No. 968), in which capacity he continues to serve.

17       On June 26, 2019, the Trustee filed a motion for turnover (the "Turnover Motion," Docket

18  No. 991), pursuant to which he sought entry of a court order directing the Debtor to turnover, among

19  other things, rent proceeds from the Calabasas Property, and the Calabasas Property itself, as

20  property of the estate.  On August 30, 2019, the court granted the Trustee's Turnover Motion,

21  ordering that the Calabasas Property is property of the Estate to be turned over to the Trustee.

22  Docket No. 1057.  This Court's order was affirmed on appeal to the District Court and,

23  subsequently, on appeal to the Ninth Circuit.  *In re Baroni*, 36 F.4th 958 (June 8, 2022).

24       Following the Ninth Circuit's opinion, the Debtor sought and obtained a brief stay enjoining

25  the Trustee and his agents from engaging in any activity to market and sell the Calabasas property.

26  The Court's stay order was issued on July 8, 2022 and was set to expire on August 10, 2022.  Doc.

27  No. 1493.  This temporary stay was extended through August 18, 2022.  By order issued on

28

2394195

1   September 12, 2022, the Court lifted the temporary stay clearing the way for the Trustee to market

2   and sell the Calabasas Property.  Doc. No. 1547.

3            **B.  The Trustee's Efforts to Access and Enter the Calabasas Property**

4         After the Ninth Circuit affirmed the Turnover Order and lifted the prior stay imposed by the

5   District Court and on June 30, 2022, counsel for the Trustee emailed Kathleen March, Esq. on behalf

6   of the Debtor, requesting access to the Calabasas Property. Bagdanov Decl., **Exhibit 1.** Instead of

7   responding to that email and just five days later, Debtor's counsel filed a barrage of motions with the

8   Court, seeking a stay of any marketing efforts while the Court had her prior motion to remove the

9   Trustee under submission. *See, e.g.,* Doc. Nos. 1484-1490. Litigation ensued.

10        In connection with such litigation, the Court entered an order temporarily staying the

11   Trustee's marketing efforts of the Calabasas Property (which temporary stay was imposed without

12   opposition from the Trustee). On September 12, 2022, the Court entered its Order Denying Motion

13   of Debtor Allana Baroni for a Stay Regarding Sale of Calabasas Residence or Camarillo Rental

14   Property [Doc. No. 1547], which order, among other things, lifted the temporary stay.

15        On October 3, 2022, the Trustee wrote to Debtor's counsel asking for access and entry to the

16   Calabasas Property:

17
18          Hi Matt: I would like my broker to inspect the interior of the property at
          3339 Via Verde Court, Calabasas.  Please provide several convenient dates
19          and time over the next 10 day period.  Thanks.

20   Bagdanov Decl., **Exhibit 2.**

21        Receiving no response, on October 11, 2022, the Trustee wrote again to Debtor's counsel:

22          Matt.  I have not heard back from you.  My next step is seeking a court
          order.  Also, please provide mortgage, insurance and payment of property
23          taxes.

24   *Id.*

25        On October 11, 2022, Debtor's counsel wrote back advising that Kathleen March, not

26   Debtor's counsel, should be contacted with respect to the Calabasas Property, but that he otherwise

27   would follow up with the Debtor.  *Id.*  That same day, the Trustee's counsel responded and advised

28

Debtor's counsel that he, not Kathleen March, was counsel of record and that Ms. March's

representation was very limited in scope. *Id.*

Again on October 11, 2022, Debtor's counsel advised Trustee's counsel that he was not

aware of limitations to Ms. March's representation but that he had forwarded the Trustee's request.

*Id.*  Finally, on that same day Trustee's counsel wrote back to Debtor's counsel and advised him as

follows:

> Yes, this is her only attorney disclosure filed – it states that it dates back to
> October 7, 2021.
>
> We shouldn't have to sift through all of these filings to figure out who
> represents the debtor for what – please let us know about access and the
> documents requested. We will follow up with you if we don't receive a
> response in the next few days.

*Id.*

On October 19, 2022, having heard nothing back from Debtor's counsel, Trustee's counsel

wrote again:

> Matt,
>
> What is the update? Please advise on access; it would be most helpful to
> have 3 acceptable dates and times on your end and we will make one of
> them work for the broker.
>
> We would like I do not want [sic] the estate to bear even further expense
> gaining broker access to the property to simply view and take photos.

*Id.* Debtor's counsel responded that same day, as follows:

> Good morning:
>
> I guess we were crossed. I will contact Allana again to see if we can get
> some dates.
>
> I do appreciate the fact that it would be nice not to have to go through the
> expense of having to go to Court.

*Id.*

Having still not received a substantive response, on October 27, 2022, Trustee's counsel

advised Debtor's counsel that the Trustee would proceed with a motion given that the Debtor was

not providing dates for access and entry to the Calabasas Property.  *Id.*

2394195

1    As of the date of the filing of this Motion, the Trustee's counsel has still not been provided

2    any dates for access to and entry upon the Calabasas Property, or any response from Debtor's

3    counsel other than, essentially, "I'll ask the Debtor again."  Bagdanov Decl., ¶ 4. Thus, the Trustee is

4    once again in the unfortunate position of seeking the assistance of this Court in compelling the

5    Debtor's compliance with her duties in this case. This time, all facts indicate that the Debtor is

6    intentionally frustrating the Trustee's administration in violation of the automatic stay.

7    **III.    ARGUMENT**

8          A.    **The Debtor's Refusal to Allow the Trustee Access to the Calabasas Property**
                 **Constitutes a Willful Violation of the Automatic Stay; The Trustee Is Entitled to**
9                **Recover His Actual Damages**

10    In pertinent part, Section 362(a)(3) "provides that the automatic stay prohibits "any act to ...

11    exercise control over property of the estate...." *In re Brooks-Hamilton*, 348 B.R. at 525 citing 11

12    U.S.C. § 362(a)(3).  Section 362(a)(3) "appl[ies] to debtors as well as to creditors.  *Id.* citing *In re*

13    *BNT Terminals, Inc.*, 125 B.R. 963, 971 (Bankr. N.D. Ill. 1990) ("The court will not tolerate

14    unauthorized acts by debtors or creditors by allowing possession of, or facilitating the exercise of

15    control over, or permitting the dismemberment of property of the estate outside the provisions of the

16    Code.").

17    Since no later than June 8, 2022, the Debtor has known that the Calabasas Property is an

18    asset of the estate.  *See In re Baroni*, 36 F.4th 958 (9th Cir. June 8, 2022).  The Trustee has sought

19    access to the Calabasas Property on multiple occasions over the past few months, without any

20    meaningful response from the Debtor. It is clear from her actions that the Debtor has no intention of

21    allowing the Trustee access to her home.

22    The Trustee respectfully submits that the Debtor's refusal to provide the Trustee and his

23    agents with access to the Calabasas Property to allow the Trustee to inspect, market and sell the

24    Calabasas Property effectively constitutes the exercise of control over property of the estate to the

25    detriment of the estate and constitutes an intentional violation of the automatic stay. *See In re Vu*,

26    591 B.R. 596, 603 (E.D. Pa. 2018) (finding that a landlord exercised control of estate property in

27

28

5

violation of Section 362(a)(3) when he changed the locks and excluded the debtor from possession

and ignored debtor's counsel's requests for access).

Because the Debtor is obviously aware of the bankruptcy, the Trustee's right to sell the

property (in light of recent Ninth Circuit decision), and the Debtor's own failure to secure a stay, her

conduct constitutes a "willful violation of the automatic stay." *Id.* It simply cannot be attributed to

inadvertence, and correspondence from Debtor's counsel. In light thereof, the Trustee is entitled to a

finding that the Debtor violated the automatic stay and, further, to recover his actual damages that, in

this case, are the attorneys' fees incurred in bringing the instant motion. In total, counsel has

expended twelve hours to date in drafting this motion and anticipates an additional six hours in

drafting a reply and in attending the hearing. Komorsky Decl., ¶__. Accordingly, the Trustee seeks

damages in the amount of $12,150.[3] *Id.*

### B. The Debtor Is in Violation of Her Affirmative Obligation to Cooperate; The Trustee Is Entitled to an Order Setting Forth the Parameters of the Debtor's Cooperation

> Section 521 imposes self-executing obligations upon a debtor. Among other things, § 521 requires a debtor to 1) cooperate with the trustee so as to enable the trustee to perform his or her duties, and 2) surrender all property of the estate and recorded information. 11 U.S.C. § 521(3)-(4). [footnote]. This section is supplemented by Bankruptcy Rule 4002, which provides that it is the debtor's duty to "cooperate with the trustee in ... the administration of the estate." Fed. R. Bankr.P. 4002(3). . . .

> 'The nature of a debtor's cooperation is coextensive with the tasks to be performed by the trustee in administering the estate.' *In re Nesse*, 137 B.R. 797, 800 (Bankr.C.D.Cal.1992). 'Cooperate' must be construed broadly and requires a debtor to respond whenever the trustee calls upon him for assistance in the performance of the trustee's duties. *Id.* at 801.

*In re Sarp*, 2011 WL 1454072, at *5 (9th Cir. BAP Mar. 28, 2011).[4]

"The duties imposed by § 521 are affirmative obligations." *In re Neese*, 137 B.R. 797, 800

(Bankr. C.D. Cal. 1992). As the *Neese* court further instructs:

> An examination of the duties of a trustee serving under chapter 7, 11 or 13 will disclose wherein the debtor can cooperate with the trustee in the

---

[3] These damages do not include any other attorney's time in this case, or even the initial emails Trustee's counsel sent trying to obtain compliance without Court intervention. The Trustee submits this amount is more than reasonable under these circumstances.

[4] A copy of this unreported case is attached as Appendix A.

6

1   performance of his duties. The trustee, in a liquidation case, is required to
    collect and reduce to money the property of the estate.  The debtor may well
2   cooperate in this respect, informing the trustee of and assisting him in
    locating property of the estate in the possession of third parties, executing
3   documents necessary to convey property and assisting in the collection of
    accounts receivable.... "Cooperate" is a broad term, indeed, and must be
4   construed that whenever the trustee calls upon the debtor for assistance in
    the performance of his duties, the debtor is required to respond.... [Debtors]
5   meet the requirement of section 521(3) if they cooperate to the best of their
    ability.

6   *Id.*, at 800-801.

7           The Debtor has boldly refused to cooperate with the Trustee in the Trustee's efforts to

8   administer the Calabasas Property in any way, even by refusing to allow a broker to access the

9   property for purposes of taking photos and establishing value.  The Debtor is in clear violation of her

10  affirmative and ongoing duty to cooperate with the Trustee provided for pursuant to 11 U.S.C.

11  §521(a)(3) and Rule 4002(a)(4) of the Federal Rules of Bankruptcy Procedure.  *See* Fed. R. Bank.

12  Proc. 4002(a)(4) ("the debtor shall. . . cooperate with the trustee in . . . the administration of the

13  estate").

14          Section 105 provides this Court with broad authority to enter orders that carry out bankruptcy

15  code-imposed obligations.  In relevant part, Section 105 provides that "[t]he court may issue any

16  order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

17  11 U.S.C. § 105(a); *see also Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375 (2007)

18  ("bankruptcy courts have "broad authority" under §105 "to take any action that is necessary or

19  appropriate to prevent an abuse of process.").

20          Section 105 further authorizes this Court to impose sanctions necessary to enforce the

21  Bankruptcy Code, including civil contempt, compensatory damages, attorneys' fees, and the

22  offending party's compliance.  *In re Dyer*, 322 F.3d 1178, 1193 (2003).  Here, the Trustee is guided

23  by the holding in *In re Hicks*, 2006 WL 6810987 (9th Cir. BAP Feb. 1, 2006)[5] and the "Order

24  Directing the Debtor to Provide Access to Real Property and to Cooperate in The Sale of Real

25  Property" issued by the bankruptcy court in that case, which provided in pertinent part:

26

27

28  _____
    [5] A copy of this case is included as Appendix B.

IT IS HEREBY ORDERED that [Debtor] shall immediately cooperate with the Trustee's real estate broker, provide access to the [Property], provide a key to the Property, and permit the broker to post a "For Sale" sign in front of the Property, to install a lock box on the house, to hold open houses, and to take prospective buyers through the Property on 24 hours' notice.

*Id.*, at *1.

Here, as in *Hicks*, the Trustee requests a cooperation order that requires the Debtor to:

1.    Immediately cooperate with the Trustee's real estate broker;

2.    Provide access to the Calabasas Property on 24-hours' notice;

3.    Provide a key to the Calabasas Property and all needed access / gate codes;

4.    Permit the real estate broker to: (a) post a "For sale" sign in the front of the Calabasas Property; (b) install a lock box on the house; (c) hold open houses; and (d) take prospective buyers through the Calabasas Property on 24 hours' notice;

5.    Maintain the Calabasas Property in condition for showing to prospective buyers; and

6.    Refrain from any actions that interfere with the orderly showing of the Calabasas Property to prospective buyers or negatively affects the value of the house to prospective buyers.

*See id.*, at *10.

Given the history of the Debtor's intransigence, the Trustee is rightfully concerned that the Debtor—even if ordered to cooperate—will nevertheless interfere with the Trustee's efforts to maximize the value of the Calabasas Property sale for the benefit of the estate and its creditors. For example, in *Hicks* and notwithstanding the court's cooperation order the court found overwhelming evidence of Debtor's noncompliance:

When the first buyers came to see the Property, including children, Debtor's two large dogs had to be locked up, on the sheriff's orders. [footnote]. Then, Debtor restricted the showing by requiring Ms. and Mr. Beltran and the family to remove their shoes and not to open any doors or drawers. In addition, Debtor posted curses and offensive signs throughout the house to intimidate the buyers, usurped the broker's presentation by focusing the buyers' attention on his posted list of problems with the Property, and pointed out to them that the house was allegedly worth less than the listing price. He then discouraged the second buyers by not allowing access to their chosen contractor in order to advise them, even though the house had construction items still to be completed. It was uncontroverted that the lack of offers from both buyers was due, at least in part, to Debtor's conduct during the showings. Therefore, the bankruptcy court's ultimate finding, that Debtor's conduct during the showings was intended to, and did, discourage and frustrate Trustee's efforts to sell the property, was not clearly erroneous.

8

1   *Id.*, at 10.

2       Accordingly, the Trustee requests that the Court not only issue the Cooperations Order with

3   the above-identified requirements but also consider imposing civil contempt sanctions to ensure

4   compliance with the requested order to cooperate.  As explained in *Dyer*, the Court has authority to

5   impose sanctions necessary to enforce the Code, and to coerce compliance.  Dyer, 322 F.3d at 1192.

6   Rather than compensate the Trustee or criminally penalize the Debtor, the Trustee recommends a

7   civil sanction that can be avoided provided the Debtor complies with the Cooperations Order

8   requested by way of this motion.  Otherwise, the Trustee has concerns—borne from past misconduct

9   by the Debtor—that she will simply ignore the requested order altogether.

10  **IV.    CONCLUSION**

11      Based on the foregoing, the Trustee respectfully requests that the Court enter an order

12  granting this Motion and:

13      (1)    Finding that the Debtor willfully violated the automatic stay;

14      (2)    Awarding actual damages to the Trustee in the amount of $12,150; and

15      (3)    Entering the Cooperations Order that directs the Debtor to immediately provide

16  access to the Calabasas Property and to cooperate in the sale of the Calabasas Property, including the

17  following terms:

18      a.  That the Debtor immediately cooperate with the Trustee's real estate broker,

19          including but not limited to providing access to the Calabasas Property so that the

20          broker may take photos and obtain a realistic valuation for purposes of preparing a

21          listing agreement;

22      b.  That the Debtor provide broker access to the Calabasas Property on 24-hours' notice;

23      c.  That the Debtor provide a key to the Calabasas Property as well as all access / gate

24          codes;

25      d.  That the Trustee's real estate broker be permitted to: (a) post a "For sale" sign in the

26          front of the Calabasas Property; (b) install a lock box on the house; (c) hold open

27

28

9

1    houses; and (d) take prospective buyers through the Calabasas Property on 24 hours'

2    notice;

3    e.   That the Debtor maintain the Calabasas Property in condition for showing to

4    prospective buyers;

5    f.   That the Debtor refrain from any actions that interfere with the orderly showing of the

6    Calabasas Property to prospective buyers or negatively affects the value of the house

7    to prospective buyers; and

8    (4)   Granting such other and further relief as the Court deems just and proper, including

9    the issuance of civil contempt sanctions to ensure compliance with the Order.

10

11   DATED:  November 8, 2022                    BG LAW LLP

12                                               By: _____

13                                                   Jason B. Komorsky
                                                     Jessica L. Bagdanov
14                                               Attorneys for David Seror, Chapter 7 Trustee

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10

1

**UNPUBLISHED OPINIONS CITED IN
MEMORANDUM OF POINTS AND AUTHORITIES**

2

3    <u>**Case**</u>                                                                      <u>**Tab**</u>

4    *In re Hicks,*
        2006 WL 6810987 (9th Cir. BAP Feb. 1, 2006)....................................................A

5

      *In re Sarp,*
6        2011 WL 1454072 (9th Cir. BAP Mar. 28, 2011) ...............................................B

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

2394195

# TAB A

2006 WL 6810987
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States Bankruptcy Appellate Panel
of the Ninth Circuit.

In re Ernest Wilbert HICKS, Jr., Debtor.
Ernest Wilbert Hicks, Jr., Appellant,
v.
Suzanne L. Decker, Chapter 7 Trustee, Appellee.

No. NC–05–1110–MaSZ.
|
Argued and Submitted on Nov. 16, 2005.
|
Filed Feb. 1, 2006.

Appeal from the United States Bankruptcy Court for the Northern District of California, Honorable James R. Grube, Bankruptcy Judge, Presiding.

Before: MARLAR, SMITH and ZURZOLO,[1] Bankruptcy Judges.

### MEMORANDUM [2]

### INTRODUCTION

**\*1** After a trial, the bankruptcy court revoked the chapter 7[3] debtor's discharge based on his refusal to obey a court order to cooperate with the chapter 7 trustee ("Trustee") and her broker in their efforts to sell his residence.

In this appeal, the debtor contends that his behavior did not amount to a "refusal" to obey, as that term is used in the discharge statute, and that the bankruptcy court erroneously based its ruling on equitable considerations beyond the scope of the order.

Our review reveals neither an incorrect application of the law nor clear error in the bankruptcy court's findings, which were sufficient for a ruling under § 727(d)(3), and therefore we AFFIRM.

### FACTS

Ernest Wilbert Hicks, Jr. ("Debtor") filed a voluntary chapter 7 petition on August 18, 2003. He received a bankruptcy discharge in November, 2003.

As of the petition date, Debtor owned real property (the "Property"), consisting of a house on five acres of land in Gilroy, California. Debtor estimated its value at $800,000, and it was encumbered by a first deed of trust in the amount of $636,000, and by a second deed of trust in the amount of $65,000. As of the petition date, Debtor figured that there was no nonexempt equity considering the encumbrances and homestead exemption. However, Trustee subsequently avoided the second deed of trust and recovered the $65,000 for the estate, yielding nonexempt equity in the Property.

Trustee believed the Property was worth more than $800,000. All parties agreed the Property was in good condition even though certain construction items and repairs were yet to be completed.

In late 2003, Trustee initiated efforts to sell the Property, and the bankruptcy court approved the employment of Trustee's real estate broker, David Cauchi ("Cauchi"), for that purpose.

Cauchi's initial efforts to obtain Debtor's cooperation were unsuccessful, and upon Trustee's motion, the bankruptcy court entered an "Order Directing the Debtor To Provide Access To Real Property And To Cooperate In The Sale of Real Property" (the "Order"), on January 26, 2004, which stated in pertinent part:

> IT IS HEREBY ORDERED that [Debtor] shall immediately cooperate with the Trustee's real estate broker, provide access to the [Property], provide a key to the Property, and permit the broker to post a "For Sale" sign in front of the Property, to install a lock box on the house, to hold open houses, and to take prospective buyers through the Property on 24 hours' notice.

Thereafter, Cauchi listed the Property for sale at $875,000, but immediately took it off the market pending negotiations between Debtor and Trustee to allow Debtor to buy the estate's interest in the Property. Those negotiations were unsuccessful.

Trustee then filed a complaint to revoke Debtor's discharge based, in part, on Debtor's alleged refusal to obey the Order, pursuant to §§ 727(d)(3) and (a)(6)(A). Trustee's motion for summary judgment on the complaint was heard on May 13, 2004. The bankruptcy court concluded that a trial would be necessary and denied the motion without prejudice.

**\*2** Meanwhile, the court instructed the parties to cooperate in the showing and sale of the Property. Specifically, the bankruptcy court noted Debtor's resistance to sell, and stated:

> THE COURT: Mr. Hicks, let me just tell you something because you sit there and you keep dropping your head and you keep shaking your head, and I can appreciate the fact that you're very upset about this. And if I were sitting there, I'd be very upset about this too. This is not something that is at anybody's whim or within my discretion as to what I do. Congress makes a bankruptcy law. I don't make it. Congress makes it and Congress says here's the way it works, and here's what you do.
>
> And so number one, you have a duty, according to the Bankruptcy Code, the bankruptcy law, to cooperate with the trustee. The trustee wants to look at something. The trustee gets to look at something. It's not up to me whether they get to look. As long as they act politely and in a businesslike fashion, they get to look. That's number one.

Tr. of Proceedings (May 13, 2004), p. 22:7–22.

The parties then agreed to show the Property by appointment only. The bankruptcy court commented that Debtor's request to set parameters on showing the Property was reasonable, assuming his full cooperation.

Finally, when Debtor's attorney expressed concern that Trustee's sale efforts might continue indefinitely, the bankruptcy court suggested that Debtor file a motion to compel abandonment. Debtor filed the motion, but it was not resolved prior to the trial on the complaint.[4]

Following the hearing, Trustee re-listed the Property for sale at $875,000 and there was immediate interest in it. Michelle Beltran ("Ms.Beltran"), a local real estate broker, represented a family who visited the Property on or about May 16, 2004. Ms. Beltran's husband, a contractor, also accompanied her for the showing in order to advise on the cost to construct or repair the incomplete items. They were also accompanied by a sheriff's deputy, as Ms. Beltran had been advised to obtain a "civil standby" for the rural showing.

At that first visit, the Beltrans later testified, Debtor had posted multiple signs inside the house with curses, such as "a curse on all who entered uninvited," and with upside-down crosses. Tr. of Proceedings (Aug. 11, 2004), p. 107:1–4. Debtor had also posted lists of alleged defects with the Property in prominent places throughout the house. Another sign had a child's picture, supposedly Debtor's son, with a quotation stating that if the house were sold, the son would have nowhere to live. Between the first and second showing, Debtor removed these signs.

During a second showing of the Property, Debtor refused to allow access to the contractor, even though the prospective buyers required advice on improvements, such as the placement of a barn and on the cost of completion of certain items on the Property.

In each case, the prospective buyers did not follow through with offers. On June 11, 2004, Trustee filed a first amended complaint to revoke Debtor's bankruptcy discharge under §§ 727(d)(3) and (a)(6)(A).[5] Trustee alleged that Debtor "had refused to obey a lawful order of the court, directing him, in January, 2004, to cooperate with the Trustee in the marketing and efforts to sell the Debtor's Property." *Id.* at 3–4, ¶ 22. The trial went forward on August 11, 2004, and the following testimony was pertinent to the court's ruling.

### *Trial Testimony*

#### *1. Trustee's Broker, David Cauchi*

**\*3** Cauchi testified that, from Debtor's comments at that first meeting, his opinion was that the sale would be difficult. Initially, Debtor did not give Cauchi a key nor allow him to install a lock box, nor did he return Cauchi's telephone calls. For these reasons, Cauchi and Trustee requested the court's Order requiring Debtor to cooperate.

Cauchi viewed the Property in January, 2004, and listed it for a price of $875,000. Cauchi testified that after the Order was entered, Debtor still did not comply with it, but

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.    2

was negotiating with Trustee for a settlement in regards to purchasing the equity. Therefore, Cauchi took the Property off of the market in late February, 2004, so that it would not get "stale." Tr. of Proceedings (Aug. 11, 2004), p. 22:10.

Cauchi relisted the Property in May, 2004, after which time Debtor gave him a key, and he was able to put a lock box on the Property in June, 2004. (However, Debtor admitted, under cross-examination, that he did not give Cauchi a key or access to install the lock box until July, 2004. *See id.* at 180:23–25; 181:3–10.)

Cauchi also stated that on two occasions he found that the "for sale" sign on the Property had been removed and was lying on the ground, and that he reattached it.

### *2. The Beltrans*

#### *a. First Showing*
Ms. Beltran and her husband Dick ("Mr.Beltran"), a contractor, testified that, in mid-May, 2004, they showed the property to a family with three children. Based on her conversations with Cauchi and the rural setting, Ms. Beltran had requested that a sheriff be present.

When they arrived at the Property, Debtor met them. The sheriff asked Debtor to lock up two very large dogs which were running loose. Debtor then led the people into the house through the garage, first requiring them to take off their shoes so as not to scuff up the floors. In her letter evidence,[6] Ms. Beltran stated that Debtor also instructed them not to open any doors, cupboards or drawers.

Mr. and Ms. Beltran testified that when they went inside, there were papers taped to the floors, walls and windows of the house. Ms. Beltran stated: "[T]he writing on it was a curse, a curse on all who entered uninvited.... And there was [an] upside down crucifix on it." *Id.* at 107:1–4 (alteration added).

Ms. Beltran described the proliferation of signs and how Debtor captured the buyers' attention by listing problems with the Property:

Q. Was it one poster, two posters, three posters?

A. Very, very many posters. In the laundry room it was on the floor, it was on the wall, it was on the

window. We went through into the main hallway. It was on the floor, on the walls, on the bedroom windows. I mean, just to a point of ridiculous, in my mind. And the same repetition until we went into the master bedroom.

Q. What was there?

A. Well, that great big, beautiful window was—had the same stuff, but then it had a big long list of problems with this property. And, of course clients go right to it and they are staring there and reading them, you know, instead of viewing the property like they should.

**\*4** Q. Do you recall what some of those problems were that were listed on there?

A. A thing about a rodent infestation, rattlesnakes, leaky roof, no PG & E, trucking company next door. "You'll be kicking my child out into the streets."

Q. Did you get the impression that the signs were set up for the purpose of preventing a sale of the house?

....

A. They threw me, too. Yes, they were there. Plus the fact that it said, "It won't appraise for over 600,000,"....

*Id.,* at 107:5–25; 108:1–4.

Afterwards, the prospective buyers discussed making an offer, but did not follow through. Ms. Beltran testified that, in her opinion, their decision was related to the signs and posters on the Property.

#### *b. Second Showing*
Ms. Beltran then took another couple to see the Property. They were interested in erecting a barn, and Mr. Beltran came along to advise on construction and repairs. However, the Beltrans testified that after Debtor had a discussion with the sheriff, the sheriff would not let Mr. Beltran onto the Property.

She further testified that the prospective buyers' inability to "visualize" the barn, without Mr. Beltran's input, influenced their decision not to make an offer. *Id.* at 114:25.

Ms. Beltran also testified that, when driving by the

Property, she saw the "for sale" sign unhinged and lying on the ground.

### 3. Debtor's Neighbor

Debtor's neighbor, Robert Maciel ("Maciel"), who owned the trucking company, also testified that he had viewed the property with his interested friends on or about May 16, 2004, and recalled seeing the posters, including one of a child who apparently represented Debtor's son, asking "Where will I live?"

He testified:

> A. Mr. Hicks had—well, there were numerous ... pieces of paper all throughout the house, in every room. They all had writings, sayings on them. The ones that stand out my [sic] head the most were, "Curse those who"—to—"want to buy this house." There was another one of a picture of this—this child and in the—one of the—in the hallway or in the bedroom. "If you buy this house"—it was a quote coming from this child—"If you buy this house, where am I to go? Where will I live? Seven reasons why not to buy this home." That one stood out the most, because I was number seven, and said because of a trucking company lives next door.

*Id.* at 149:5–16.

Maciel also observed that the "for sale" sign was sometimes up and sometimes down.

### 4. Debtor

Debtor took the stand as well.[7] He testified that he took down the offending posters after his attorney told him to.

He admitted asking the sheriff to keep Mr. Beltran off the Property for the second showing. He explained, as follows:

> So Ms. Beltran came down, ... And said that she was the Realtor and she would be showing the property.

> At that time I saw who she was bringing. I informed the sheriff that the one gentleman that was with her, I believe was her husband and not a potential client. He had been on the property once before and I was only willing to show the property to the clients, the Realtors,

and any of their associates.

> **\*5** And she said that—I think she said that she'd talked [sic] to them and come back. So she went.

> The officer talked to me for a few more minutes. He went and spoke to them and came back. And he said, "That's fine. There's no objection to that. Can they now view the property?"

> I said, "Yeah, no problem."

*Id.* at 172:10–25.

In cross-examination, Debtor testified that he learned from his attorney, in January of 2004, that Trustee would be selling the Property. Although he stated that his attorney had sent him a copy of the Order, Debtor did not specify when he actually saw it or learned its contents.

Debtor further testified that he had made only three monthly payments of $4,000 each on the first deed of trust and had not paid any property taxes postpetition.

### The Court's Ruling

On January 20, 2005, the bankruptcy court issued its oral ruling on the first amended complaint.

First, the court found that the Order compelled Debtor's cooperation in the sale of the property and directed him to immediately cooperate with Trustee's broker.

Next, it found that Cauchi's testimony was factually ambiguous and did not prove that Debtor knew about the Order between December of 2003, when Cauchi first began his efforts to sell the Property, and the May 13, 2004 summary judgment hearing, when Debtor was made aware of his duty to cooperate with Trustee and Cauchi, and of the Order itself. Therefore, the bankruptcy court based its ruling on Debtor's behavior after May 13, 2004, which time period included both showings of the Property by Ms. Beltran.

Next, the bankruptcy court made the following findings:

> After this [May 13, 2004] hearing, the property was shown by Ms. Beltran to potential buyers. Ms. Beltran testified that she wrote the letter dated May 18, 2004 immediately after showing the property.

> The letter and Ms. Beltran's testimony outlined what she saw at this showing. When she entered Mr. Hicks'

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.    4

home with her client she noticed that there were signs on the walls with curses, such as: A curse on all who enter uninvited.

There were upside down crucifixes on the signs. She elaborated that signs to the same effect were put up throughout the house, on the floor, on windows, and she stated that it was to the point of being ridiculous.

In addition, when she entered the master bedroom she saw that there was a large sign up on the wall which posted all the problems with the house that would affect a potential buyer.

Nevertheless, she was confident after this showing that an offer would be made. However, the client later contacted her and told her that they would not make an offer. She was of the impression that it was due in large part to the signs Mr. Hicks had put up throughout the house.

On the second showing of the property to a potential buyer, Mr. Hicks would not let the buyer's contractor go on the property. Mr. Hicks stated it was because he had already been on the property once before.

**\*6** Ms. Beltran felt that an offer was not made on the house because the buyer did not have the assistance of the contractor to help visualize the improvements that she wanted to make.

Court's Oral Ruling (Jan. 20, 2005), pp. 6:20–25, 7:1–22.

The bankruptcy court further found that Debtor took these actions in order "to discourage any sale of the Property" and that his "behavior during the showings discouraged any offers." *Id.* at 10:7–13. Therefore, the bankruptcy court determined that Debtor had ignored the Order and failed in his affirmative duties, including his "duty to participate in that [bankruptcy] proceeding by meeting the requirements of the Bankruptcy Code and by obeying the Court's lawful orders." *Id.* at 9:21–24. The court stated:

> Debtors are not free to ignore a court's orders. [Debtor] went beyond ignoring the Court's January 26th order. He chose to flaunt the very process he chose to participate in.

*Id.* at 9:24–25–10:1.

Debtor's behavior was "particularly disturbing," the bankruptcy court found, in regards to upholding the integrity of the bankruptcy process. *Id.* at 10:2. To wit, Debtor had not kept current on the mortgage payments, and if the Property were not sold by Trustee, then a foreclosure sale would be detrimental to the unsecured creditors. Essentially, the court found, Debtor's behavior "prevented the equitable distribution of the estate among his creditors by prolonging the period it took to sell the property and increasing the arrearages owed to the secured creditor holding the first deed of trust." *Id.* at 10:14–17.[8]

The court concluded that it would revoke Debtor's discharge under § 727(d)(3) "in order to uphold the integrity of the bankruptcy process." *Id.* at 10:18–19. The judgment was entered on January 26, 2005, and was timely appealed by Debtor.

### *ISSUES*

1. Whether we have jurisdiction over a judgment which resolved only one count of a two-count complaint.

2. Whether Debtor's behavior during the first and second showings, including posting paper signs with offensive content and not allowing repeat visits on the Property by the contractor, constituted a refusal to obey the Order, as those terms are used in §§ 727(d)(3) and (a)(6)(A).

3. Whether the bankruptcy court's revocation order was based on sufficient findings of Debtor's refusal to obey the Order.

### *STANDARDS OF REVIEW*

We review our own jurisdiction *de novo. Silver Sage Partners, Ltd. v. City of Desert Hot Springs (In re City of Desert Hot Springs),* 339 F.3d 782, 787 (9th Cir.2003).

In denial of discharge cases, the panel reviews a bankruptcy court's findings of fact for clear error, its conclusions of law *de novo,* and its conclusions on mixed

questions of law and fact de *novo. Searles v. Riley (In re Searles),* 317 B.R. 368, 373 (9th Cir.BAP2004).[9] "A mixed question of law and fact exists if historical facts are established, the rule of law is undisputed, and the issue is whether the facts satisfy the legal rule." *Id.*

### DISCUSSION

### A. Our Jurisdiction

**\*7** The judgment revoking Debtor's discharge did not dismiss the alternative count under § 727(d)(1). Under this circumstance, we may raise, *sua sponte,* the threshold question of whether we have jurisdiction over an appeal of a judgment as to only one count of a multiple-count complaint. *See Belli v. Temkin (In re Belli),* 268 B.R. 851, 853 (9th Cir.BAP2001).

The panel has jurisdiction over appeals from final orders. *See* 28 U.S.C. § 158(a)(1)(A). Judgments that resolve only one claim in a multiple-claim adversary proceeding may be interlocutory, unless the bankruptcy court has certified the judgment for appeal. A court which rules on one count of a multiple-count complaint ordinarily will dismiss the adversary proceeding in regard to the remaining counts following a trial on the merits, *see Roberts v. Erhard (In re Roberts),* 331 B.R. 876, 880 (9th Cir.BAP2005). Or, the court can certify for immediate appeal a judgment of less than all claims, under Federal Rule of Civil Procedure ("FRCP") 54(b) (incorporated by Bankruptcy Rule 7054).[10] Here, the bankruptcy court did neither.

The jurisdictional question turns on whether the §§ 727(d)(1) and (d)(3) counts were separate claims. *See Talamini v. Allstate Ins. Co.,* 470 U.S. 1067, 1069 n. 5 (1985) (" 'The line between deciding one of several claims and deciding only part of a single claim is sometimes very obscure.' ") (quoting 10 C. Wright, A. Miller & M. Kane, *Fed. Prac. & Proc.* § 2657, pp. 60–61 (1983)). The Ninth Circuit has held that "[t]he word 'claim' in Rule 54(b) refers to a set of facts giving rise to legal rights in the claimant, not to legal theories of recovery based upon those [same] facts." *CMAX, Inc. v. Drewry Photocolor Corp.,* 295 F.2d 695, 697 (9th Cir.1961) (alteration added). Where one claim is stated in two ways for the purpose of presenting two legal theories of recovery, FRCP 54(b) is inapplicable. *Id.*

In *Belli,* we held that a complaint to determine the nondischargeability of a debt that asserts claims under both § 523(a)(4) (fiduciary fraud) and § 523(a)(6) (willful and malicious injury) was a multiple-claim complaint, which was subject to Rule 54(b) in a partial summary judgment proceeding. However, the issue of whether the subsections of § 523 could be a single claim was not addressed in *Belli.*

The various subsections of § 727(d), like the § 523 exceptions, require proof of different facts. Subsection (d)(1) requires proof of fraudulent intent at the time of discharge. Here, Debtor already obtained his discharge, in November, 2003, before Trustee had even begun her efforts to sell the Property. And yet, in the first amended complaint, Trustee relied on the same facts for both counts. To wit, Trustee alleged that proof of Debtor's fraudulent intent could be "shown by the Debtor's deliberate efforts to hinder and discourage potential buyers of the Property." First Amended Complaint (June 11, 2004), p. 3, ¶ 19. In essence, Trustee asserted two legal theories based on the same underlying facts.

**\*8** Therefore, we hold that FRCP 54(b) was inapplicable,[11] and we have jurisdiction over the final order.

### B. Revocation of Discharge for Refusal to Obey a Lawful Order: § 727(d)(3) and § 727(a)(6)(A)

Section 727 "is the heart of the fresh start provisions of the bankruptcy law" and "must be construed liberally in favor of the debtor and strictly against the objector." *Beauchamp v. Hoose (In re Beauchamp),* 236 B.R. 727, 730 (9th Cir.BAP1999) (citations omitted), *aff'd,* 5 Fed. Appx. 743 (9th Cir.2001).

Nevertheless, a bankruptcy discharge and fresh start are intended only for honest debtors, *First Beverly Bank v. Adeeb (In re Adeeb),* 787 F.2d 1339, 1345 (9th Cir.1986), and for those who comply with the requirements of the Bankruptcy Code and Rules, and with orders of the court. The denial of discharge under § 727 is consistent with the well-established principle that "[t]here is no constitutional right to obtain a discharge of one's debts in bankruptcy." *United States v. Kras,* 409 U.S. 434, 446 (1973).

Trustee, as the plaintiff, has the initial burden of going forward and the ultimate burden to prove the elements of § 727 by a preponderance of the evidence. *See Searles,* 317 B.R. at 377; *Grogan v. Garner,* 498 U.S. 279, 291 (1991); 6 *Collier on Bankruptcy* ¶ 727.09[1] (15th ed. rev.2005). Once Trustee has produced sufficient evidence to support the claim, the burden of going forward then shifts to Debtor to satisfactorily explain his behavior. *See Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir.1984); 6 *Collier, supra.*

Section 727(d)(3) provides that the court shall revoke a debtor's discharge upon the trustee's request if the debtor committed an act enumerated in § 727(a)(6). Section 727(a)(6)(A) provides that a debtor is not entitled to a discharge if he "has refused ... to obey any lawful order of the court, other than an order to respond to a material question or to testify." 11 U.S.C. § 727(a)(6)(A).

Trustee asserted, and the bankruptcy court found, that Debtor's conduct violated the Order which mandated his cooperation in regards to the sale of the Property.

Debtor does not dispute the bankruptcy court's specific findings regarding his awareness of the Order and his conduct during the first and second showings of the Property. He concedes that he posted the signs and posters, and that he would not allow Mr. Beltran onto the Property for the second showing. Debtor challenges, however, the bankruptcy court's conclusion that he "refused" to obey the Order, as that term is used in § 727(a)(6)(A). Specifically, Debtor maintains that his behavior was merely bad judgment or protected expression of opinion.

When interpreting a statute on appeal, the task begins with the language of the statute itself. *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241 (1989). When a statute's language is plain, " 'the sole function of the courts is to enforce it according to its terms.' " *Id.* (quoting *Caminetti v. United States,* 242 U.S. 470, 485 (1917)).

**\*9** "Refuse" means "to express oneself as unwilling to accept" or "to show or express unwillingness to do or comply with." *Miriam–Webster OnLine Dictionary* (2005–2006). This common definition is clear and it requires a willful expression of noncompliance.

The question whether Debtor's behavior constituted a refusal to obey the Order, because it was a "willful expression of noncompliance," is a mixed question of fact and law. *Searles,* 317 B.R. at 373. Mixed questions are reviewed *de novo* because the court, in selecting and applying the applicable law, "consider[s] legal concepts and exercise[s] judgment about values animating legal principles." *Id.*

The entire evidence reveals that Debtor, being motivated by a desire to retain the nonexempt equity in the Property, took affirmative steps to control the disposition of the Property, in hopes that it would eventually be abandoned to him. Indeed, Debtor was informed, at the May 13, 2004 hearing, that the court would not allow Trustee's sale efforts to go on indefinitely. In May, 2004, he attempted to frustrate the sales, and in June, 2004, he filed a motion to compel abandonment.

The bankruptcy court found that by mid-May, 2004, Debtor was fully aware of the Order and of his duty to cooperate with Trustee in the sale efforts. Nevertheless, Debtor engaged in delay and scare tactics at the two showings by Ms. Beltran, which frustrated the sale process. The evidence was undisputed that his conduct resulted in the loss of offers from both potential buyers.

Therefore, Debtor's conduct in posting offensive signs and information that could undermine any potential sale, as well as in preventing Mr. Beltran from giving contractor's advice, were all willful expressions of noncompliance with Trustee's sale efforts. We conclude that Debtor's behavior constituted a "refusal" to obey as that term is used in the statute.

### C. The Bankruptcy Court's Findings

Debtor contends that the bankruptcy court's ruling was based on equitable considerations that exceeded the scope of any violation of the Order. He finds support for this argument in the bankruptcy court's ruling that Debtor "went beyond ignoring" the Order, as well as its findings concerning the effects of Debtor's affirmative actions upon the estate. To the contrary, Debtor contends that he obeyed the Order and therefore, there were no grounds for revocation under §§ 727(d)(3) and (a)(6)(A). We disagree.

This argument simply presents a factual question: whether the bankruptcy court made sufficient findings to meet the statutory requirements for revocation.

The bankruptcy court found that the Order compelled

Debtor to cooperate with Trustee in the sale of the Property as well as directing him to perform certain immediate steps to cooperate with Cauchi. It further determined that Debtor had ignored the Order based on his conduct during the two showings.

The Order required affirmative acts from Debtor:

**\*10** 1. "immediately cooperate with the Trustee's real estate broker";

2. "provide access to the [Property]";

3. "provide a key to the Property";

4. "permit the broker to"

a) "post a "For Sale" sign in front of the Property";

b) "install a lock box on the house";

c) "hold open houses"; and

d) "take prospective buyers through the Property on 24 hours' notice."

Debtor maintains that he performed steps 2 through 4 and that those steps showed his compliance with step 1. That interpretation is not in accord with the express terms of the Order, because step 1 is a separate "cooperation provision" that also required Debtor's compliance. Such "cooperation provision" is a reinforcement of the Bankruptcy Code, which provides that debtors have a duty to "cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties under this title." 11 U.S.C. § 521(3). As a corollary, any conduct which frustrates a trustee's efforts is a violation of the Code. In this case, a violation of the Code and the Order are one and the same.

The undisputed evidence was overwhelming of Debtor's noncompliance with the cooperation provision of the Order. When the first buyers came to see the Property, including children, Debtor's two large dogs had to be locked up, on the sheriff's orders.[12] Then, Debtor restricted the showing by requiring Ms. and Mr. Beltran and the family to remove their shoes and not to open any doors or drawers. In addition, Debtor posted curses and offensive signs throughout the house to intimidate the buyers, usurped the broker's presentation by focusing the buyers' attention on his posted list of problems with the Property, and pointed out to them that the house was allegedly worth less than the listing price. He then discouraged the second buyers by not allowing access to their chosen contractor in order to advise them, even though the house had construction items still to be completed. It was uncontroverted that the lack of offers from both buyers was due, at least in part, to Debtor's conduct during the showings. Therefore, the bankruptcy court's ultimate finding, that Debtor's conduct during the showings was intended to, and did, discourage and frustrate Trustee's efforts to sell the property, was not clearly erroneous. *See* Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985) (finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed").

The bankruptcy court properly found that Debtor's conduct was not only a violation of the Order but also an abuse of the Code, from which the Order sprung. These findings were sufficient grounds to deny Debtor his discharge.

Finally, Debtor maintains that revoking his discharge was too severe a sanction for his behavior. "Denial of discharge is a harsh result. However, bankruptcy has its roots in equity. To get equity, one must do equity." Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1283 (9th Cir.1996). To the extent Debtor maintains that discharge was improper because he complied with other provisions of the same Order, such argument misses the mark. Debtor failed in his duty to cooperate, notwithstanding his alleged technical compliance with other, more specific instructions.[13]

**\*11** Furthermore, the bankruptcy court properly rejected Debtor's excuses for his behavior. His posters and signs were well-planned subversion techniques, not a mere mistake or bad judgment. Debtor's excuse for not allowing Mr. Beltran onto the Property a second time was that the contractor had already seen it and was not a broker or trustee. Such testimony did not address the broker's opinion that the second buyers desired, and needed to obtain, a contractor's advice during the showing. By this conduct, Debtor subverted the broker's role, imposing unnecessary conditions and obstructing the sale process.

We conclude that the bankruptcy court made sufficient findings that Debtor refused to obey the Order, which findings were based on undisputed evidence of Debtor's behavior during the two showings. In addition, such findings were supported by the entire record evidence and were not clearly erroneous.

*CONCLUSION*

Debtor voluntarily sought the protection of the bankruptcy court to shield him from his creditors. By so doing, he assumed a duty to participate in that proceeding by obeying the court's lawful orders. This he refused to do, instead engaging in willful acts of noncompliance and frustrating Trustee's efforts to sell the Property. His behavior was an abuse of the bankruptcy process. The bankruptcy court acted within its statutory authority to revoke Debtor's discharge under § 727(d)(3).

**AFFIRMED.**

**All Citations**

Not Reported in B.R., 2006 WL 6810987

## Footnotes

1    Hon. Vincent P. Zurzolo, United States Bankruptcy Judge for the Central District of California, sitting by designation.

2    This disposition is not appropriate for publication and may not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel. *See* 9th Cir. BAP Rule 8013–1BAP Rule 8013–1.

3    Unless otherwise indicated, all chapter and section references are to the pre-amended Bankruptcy Code, 11 U.S.C. §§ 101–1330 in effect when this case was filed, and prior to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Rule references are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr.P."), Rules 1001–9036.

4    The bankruptcy court docket reveals that the motion was denied without prejudice by order entered on September 2, 2004.

5    Trustee also asserted a § 727(d)(1) count which alleged that: "Debtor's discharge was obtained through fraud, and that the Debtor had the intent, at the time that the discharge was entered, to retain for himself the non-exempt estate property, specifically the non-exempt equity in the Property, and has in fact retained for himself the non-exempt equity in the Property, as shown by the Debtor's deliberate efforts to hinder and discourage potential buyers of the Property." First Amended Complaint (June 11, 2004), p. 3, ¶ 19.

     This count was not upheld by the bankruptcy court, nor has fraud been raised as an issue in this appeal. Therefore, the issue has been waived and we do not address it, except as it may affect our jurisdiction. *Doty v. Co. of Lassen,* 37 F.3d 540, 548 (9th Cir.1994) (by failing to brief an issue on appeal, the appellant waives his right to raise that issue). See the jurisdictional discussion, below.

6    Ms. Beltran's follow-up letter to Cauchi was also admitted into evidence in which she repeated these allegations and added a few more details. (*See* May 18, 2004 letter.)

7    The transcript of Debtor's testimony in the excerpts of record is sketchy. We may presume that any additional

transcript would not have been helpful to Debtor's case. *McCarthy v. Prince (In re McCarthy),* 230 B.R. 414, 417 (9th Cir.BAP1999).

8    We take judicial notice of the sale of the Property for $801,000 in November, 2004. *See* Order Approving Sale (Nov. 17, 2004).

9    Appellee incorrectly cites *Cox v. Lansdowne (In re Cox),* 904 F.2d 1399, 1401 (9th Cir.1990), for the proposition that denial of discharge cases are reviewed for "gross abuse of discretion." *Searles,* 317 B.R. at 373, overruled cases which reviewed discharge judgments for an abuse of discretion. We have held that the bankruptcy court's equitable power must be linked to a specific provision of § 727(a)(1)-(10) and, therefore, the sound discretion of the court is not a sufficient standard upon which to rely. *See Yadidi v. Herzlich (In re Yadidi),* 274 B.R. 843, 852 (9th Cir.BAP2002). Although the bankruptcy court, here, also spoke of its discretion to revoke Debtor's discharge, we can affirm on any basis fairly supported by the record. *Aheong v. Mellon Mortgage Co. (In re Aheong),* 276 B.R. 233, 240 n. 8 (9th Cir.BAP2002).

10   FRCP 54(b) provides:

> **(b) Judgment Upon Multiple Claims or Involving Multiple Parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

FRCP 54(b).

11   Even if the § 727 counts were independent claims, the death-knell doctrine is a possible exception to Rule 54(b) that applies in this case. That doctrine requires the appellant to have been put effectively out of court. *Belli,* 268 B.R. at 857. *See also Eisen v. Carlisle & Jacquelin,* 370 F.2d 119, 121 (2d Cir.1966) ("Where the effect of a district court's order, if not reviewed, is the death knell of the action, review should be allowed ."), *cert. denied,* 386 U.S. 1035 (1967). *But see Eluska v. Andrus,* 587 F.2d 996, 1000–01 (9th Cir.1978) (noting disapproval of this theory by the Supreme Court).

Here, the court's adjudication of the remaining count is dead. Debtor's discharge has already been revoked, the trial on the merits is over, Trustee has not requested a continued trial date on the remaining count, and the Property, which Debtor allegedly sought to retain with fraudulent intent, has been sold by the bankruptcy estate.

12   We may affirm on any basis fairly supported by the record. *United States v. Hemmen,* 51 F.3d 883, 891 (9th Cir.1995). "A reviewing court may 'look to facts in the record not specifically mentioned by the fact finder when such

facts support the fact finder's factual findings and inferences.' " *Leavitt v. Soto (In re Leavitt),* 209 B.R. 935, 940 (9th Cir. BAP 1997 (quoting *In re Love,* 957 F.2d 1350, 1362 (7th Cir.1992)), *aff'd,* 171 F.3d 1219 (9th Cir.1999).

[13]    Moreover, the evidence reveals that Debtor's acquiescence in the Order's other directives was merely half-hearted. Indeed, he provided a key to the Property and access to Cauchi to install a lock box, but not until July of 2004, two months after the May summary judgment hearing. He also allowed a "For Sale" sign to be erected, but it could be inferred that he was responsible for the sign being down on the ground, a phenomenon repeatedly witnessed by Cauchi, Ms. Bernard, and the neighbor. Debtor did not deny or controvert these facts in the testimony provided on appeal.

---

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# TAB B

In re Sarp, Not Reported in B.R. (2011)
2011 WL 1454072

2011 WL 1454072
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States Bankruptcy Appellate Panel,
of the Ninth Circuit.

In re Anthony J. SARP, Debtor.
Anthony J. Sarp and The Marital Community of
Anthony J. Sarp & Barbara Sarp, Appellants,
David S. Mork, Chapter 7 Trustee, Appellee.

No. WW–05–1478–SPaMo.
|
Bankruptcy No. 03–24716.
|
Adversary No. 05–01143.
|
Argued and Submitted on Nov. 16, 2006.
|
Filed March 28, 2011.

Appeal from the United States Bankruptcy Court for the
Western District of Washington, Hon. Karen A.
Overstreet, Chief Bankruptcy Judge, Presiding.

Before SMITH, PAPPAS and MONTALI, Bankruptcy
Judges.

### MEMORANDUM[1]

**\*1** After the appointment of a chapter 11 trustee and
without any legal authority, World Wide Angling LLC
("WWA"), solicited, booked, and collected over $540,000
in deposits and payments for fishing vacations to be
provided by debtor Katmai Lodge, Ltd. ("Katmai") in
upcoming seasons. WWA acted under the direction of
Katmai's former president, Anthony Sarp ("Sarp"). Upon
WWA's failure to turnover such funds to the trustee, the
trustee filed a complaint against Sarp, his wife Barbara
Sarp (collectively, the "Sarps"), Murray Armstrong, and
WWA (collectively, "defendants"). The complaint sought
1) an accounting, 2) turnover of property, 3) damages for
violation of the automatic stay, breach of fiduciary duties,
breach of § 521[2] duties, and fraud, and 4) injunctive relief.

The trustee moved for summary judgment, which the
court granted in part. Based on the its findings, the court
entered a $118,229.99 judgment in favor of the trustee,
for which defendants were jointly and severally liable.
The Sarps filed a timely notice of appeal on November

17, 2005. We AFFIRM.

## I. FACTS

Katmai Lodge, Ltd. ("Katmai") is a fishing lodge located
on 126 acres of land on the Alagnak River in Alaska. On
December 5, 2003, Katmai filed for chapter 11 relief.
Thereafter, on December 17, 2004, the bankruptcy court
entered an order substantively consolidating the
separately filed bankruptcy cases of Sarp and Barbara
Sarp with Katmai's bankruptcy.[3] The court's order
provided that David S. Mork, who had previously been
appointed as the chapter 11 trustee of the Sarps'
bankruptcy estates, would also serve as the chapter 11
trustee of the Katmai estate (the "trustee").

In late December 2004 or early January 2005, the trustee
notified Sarp of his intent to immediately terminate the
operations of Katmai and to discharge all of its
employees, including Sarp. He also advised Sarp of his
intention to auction off the company sometime in March
2005.

Believing that a complete shutdown of Katmai's
operations in January would cause the business to be
valueless by auction time,[4] Sarp took employment in
January 2005 with WWA, the principal booking agent for
Katmai. He worked as a "consultant" and continued
booking fishing trips for Katmai for the 2005 and 2006
seasons. From January 2005 through March 2005, Sarp
ran the day-to-day operations of WWA and oversaw the
solicitation and booking of vacations as well as the
collection of deposits and payments for those vacations
(the "customer payments"). By June 2, 2005, WWA had
collected $543,351.73 in customer payments.[5]

Following WWA's resistance to his demands for turnover
of the customer payments to the estate,[6] the trustee filed a
complaint against the defendants seeking an accounting,
turnover of the customer payments, damages for violation
of the automatic stay, breach of fiduciary duties, breach of
§ 521 duties, fraud, and injunctive relief.[7] On the same
day that the complaint was filed, WWA transferred to the
trustee's counsel $110,300.40 in customer payments.

**\*2** On September 15, 2005, the trustee moved for
summary judgment. The trustee maintained that the
proceeds generated from the vacation sales were property
of the estate under § 541(a)(6) and that, pursuant to §§

521(3) and (4), Sarp had an affirmative duty to cooperate in the surrender of the customer payments to the estate. Instead of upholding these duties, however, Sarp breached them by causing the disbursal of the customer payments to dozens of third parties, including more than $40,000 to himself.

The Sarps disputed the characterization of the customer payments as property of the estate, arguing that WWA had always operated as an independent company employing its own staff, hiring its own salespeople, and conducting its own business as a booking agent. Further, the customers from which WWA solicited vacations were derived from its own customer lists and the customers had contracted only with WWA, not Katmai. Therefore, the argument continued, any liability for unfulfilled vacations rested exclusively with WWA and, as a consequence, WWA was entitled to all of the payments.

According to the Sarps, the vacations had been openly sold in the ordinary course of the long-standing business relationship between Katmai and WWA and all relevant parties, including the trustee and the bankruptcy court, had full knowledge of WWA's continued solicitation of vacations. As such, they believed that no court approval of this activity was required.

The Sarps also argued that without the efforts of WWA and Sarp, the estate would have nothing to sell and no funds with which to pay administrative claims. Stated otherwise, WWA and Sarp brought value to the estate and prevented the estate from being administratively insolvent.

In addressing the Sarps' arguments, the trustee denied ever having knowledge of Sarp's continued booking of Katmai vacations. He pointed out that, unlike in prior seasons, there was no written agreement, or approval from the court, which allowed the defendants to resell vacations for the 2005 and 2006 seasons and to disburse customer payments. Because the customer payments represented payments for food and lodging, and not for the ministerial act of booking the vacation by WWA, the revenues constituted property of the estate.

The trustee further argued that WWA's and Sarp's continued efforts had harmed the estate by 1) creating a post-petition administrative liability to each customer who purchased a vacation for the 2005 and 2006 seasons, and 2) misappropriating over $430,000 in estate funds, including $40,000 paid directly to Sarp for alleged consulting fees. Based on this harm, he urged the court to find that there was nothing "ordinary" about defendants booking vacations and collecting and disbursing hundreds

of thousands of dollars in estate property.

On October 14, 2005, the summary judgment motion was heard. In its oral ruling, the court agreed with the trustee and found that neither WWA nor Sarp were authorized by the court or the trustee to continue booking vacations for Katmai and to collect customer payments. The court viewed Sarp and WWA as one and the same and believed that Sarp was merely using WWA as a vehicle by which he could continue booking trips for Katmai in circumvention of the decision made by the trustee to shut down the business.

**\*3** The court granted partial summary judgment in favor of the trustee.[8] Specifically, it found that defendants should have turned over $116,000[9] in customer payments pursuant to § 542. It also held that defendants had wrongfully assumed control over the customer payments, and thus had violated § 362—the automatic stay.

In discussing Sarp's duties, the court stated that "Sarp had a fiduciary duty to cooperate with the trustee" and comply with the requirements of the Code. The court found that Sarp had not upheld his duties, but instead, once ousted as Katmai's president, he developed an alternative way to continue selling vacations and collect funds from the estate, disguised as commissions, for his personal use. As a result, the court determined that Sarp had breached his fiduciary duties owed to the estate as an officer and shareholder of Katmai and the duties imposed upon him under § 521(3) and (4).

Pursuant to the court's oral ruling, an order granting in part and denying in part the summary judgment motion was entered on November 9, 2005. The order caused defendants to be jointly and severally liable for $118,229.99.

The Sarps appeal.[10]

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. § 1334 and § 157(b)(1), (b)(2)(A), and (2)(B). We have jurisdiction under 28 U.S.C. §§ 158(b)(1) and (c)(1).

In re Sarp, Not Reported in B.R. (2011)

2011 WL 1454072

### III. ISSUES[11]

1) Whether the customer payments represent property of the Katmai estate.

2) Whether there are genuine issues of material fact as to Sarp's breach of his duties under 🚩 §§ 521(3) and (4).

### IV. STANDARD OF REVIEW

We review a grant of summary judgment de novo. 🚩 *Patterson v. Int'l Bhd. of Teamsters, Local 959,* 121 F.3d 1345, 1349 (9th Cir.1997). In viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the applicable substantive law was correctly applied by the bankruptcy court. 🚩 *City of Vernon v. S. Cal. Edison Co.,* 955 F.2d 1361, 1365 (9th Cir.1992). A fact is material when, under the governing substantive law, it could affect the outcome of the case. 🚩 *Anderson v. Liberty Lobby, Inc.,* 477 U .S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party requesting summary judgment has the initial burden of establishing the absence of a genuine issue of material fact. 🚩 *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); 🚩 *Kennedy v.. Allied Mut. Ins. Co.,* 952 F.2d 262, 265 (9th Cir.1991). If the moving party satisfies his initial burden, the opposing party may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists. Fed.R.Civ.P. 56(e). In other words, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." 🚩 *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

### V. DISCUSSION

**\*4** The Sarps argue that the bankruptcy court erred by 1) finding that the customer payments were property of Katmai's estate and 2) holding them liable for Sarp's breach of his duties under 🚩 §§ 521(3) and (4) when genuine issues of material fact existed surrounding his cooperation and ability to surrender the customer payments. We disagree.

#### A. *Property of the Estate*

An estate is created when a bankruptcy petition is filed. *See* 🚩 11 U.S.C. §§ 301– 🚩 303 & 🚩 541(a); 🚩 *Fitzsimmons v. Walsh (In re Fitzsimmons),* 725 F.2d 1208, 1210 (9th Cir.1984). The scope of the estate is broad and encompasses "all legal or equitable interests of the debtor in property as of the commencement of the case" with certain limited exceptions. 🚩 11 U.S.C. § 541(a)(1). Included in the estate are "proceeds, product, offspring, rents, and or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case." 🚩 11 U.S.C. 541(a)(6).

No party disputes the facts surrounding WWA and Sarp's soliciting and booking of vacations for the 2005 and 2006 seasons. Thus, it was proper for the bankruptcy court to decide, as a matter of law, whether the customer payments derived from such sales were estate property. In making its determination, however, the Sarps contend that the bankruptcy court incorrectly characterized the customer payments as estate property because 1) WWA was a separate entity from the estate under Washington law; and 2) only WWA had contracted with the customers and therefore Katmai had no contractual relationship with them or entitlement to the customer payments.

We are not persuaded by the Sarps' argument that the customer payments are not property of the estate. The customer payments constitute prepaid amounts for fishing trips to be provided by Katmai through its land and lodge facility. Consequently, when WWA collected the customer payments, it was obtaining property of the estate. *See* 🚩 11 U.S.C. § 541(a)(6).

The Sarps admit that no formal contracts for the 2005 and 2006 seasons were assumed by Katmai in its chapter 11 case.[12] Nevertheless, they argue that Steven Hartung (Katmai's former chief financial officer)[13], Sarp, and Armstrong had entered into an agreement that allowed WWA to continue selling vacations for the 2005 and 2006 seasons, provided that all customer payments were deposited into a restricted account earmarked exclusively for Katmai. However, no writing was created to evidence

this agreement nor was a restricted account established by WWA. Therefore, even if it was reasonable for WWA to rely on an unwritten, undocumented, post-petition agreement, the record does not support a finding that such an arrangement was ever implemented.

While it is true that the vacations in question were solicited under WWA's name, the Sarps have failed to provide any evidence that WWA had a legal right to the customer payments resulting from such solicitations. On the contrary, the record supports the bankruptcy court's conclusion that the customer payments were property of Katmai's bankruptcy estate.

B. *Liability Pursuant to* 🔖 *§§ 521(3) and (4)*

**\*5** 🔖 Section 521 imposes self-executing obligations upon a debtor. Among other things, 🔖 § 521 requires a debtor to 1) cooperate with the trustee so as to enable the trustee to perform his or her duties, and 2) surrender all property of the estate and recorded information. 🔖 11 U.S.C. § 521(3)-(4).[14] This section is supplemented by Bankruptcy Rule 4002, which provides that it is the debtor's duty to "cooperate with the trustee in ... the administration of the estate." Fed. R. Bankr.P. 4002(3).

1. 🔖 *Section 521(3)—The Duty To Cooperate*
"The nature of a debtor's cooperation is coextensive with the tasks to be performed by the trustee in administering the estate." *In re Nesse,* 137 B.R. 797, 800 (Bankr.C.D.Cal.1992). "Cooperate" must be construed broadly and requires a debtor to respond whenever the trustee calls upon him for assistance in the performance of the trustee's duties. *Id.* at 801. A debtor will be found to have fulfilled his 🔖 § 521(3) duty if he cooperates to the best of his ability. *Id.* "Absent a trustee's express request for additional or ongoing information," 🔖 § 521 does not impose upon a debtor the ongoing obligation to provide information to the trustee with regard to assets that the [d]ebtor clearly disclosed in her bankruptcy schedules." 🔖 *In re Adair,* 253 B.R. 85, 90 (9th Cir.BAP2000).

a. *The trustee's knowledge and approval*

According to the Sarps, summary judgment should not have been granted pursuant to 🔖 § 521(3) because there is a genuine issue of material fact as to the trustee's knowledge and approval of WWA's continued operations. We disagree and find that the Sarps' evidence, at best, only establishes some "metaphysical doubt" as to the trustee's knowledge. 🔖 *Matsushita,* 475 U.S. at 586.

Here, the trustee has fulfilled his initial burden of establishing the absence of a genuine issue of material fact as to Sarp's lack of cooperation. The undisputed facts support a finding that in January 2005, the trustee clearly communicated to Sarp his intent to shut down Katmai's business operations and to discharge Sarp as its president. Notwithstanding the trustee's expressly stated intent, and without written or oral approval, Sarp admittedly continued to book Katmai vacations through WWA until March of 2005. As discussed above, the customer payments received from these bookings were property of the estate. Consequently, Sarp's acts not only impeded the trustee's efforts to liquidate the estate, but possibly exposed the estate to hundreds of thousands of dollars in administrative expenses. *See* 🔖 *In re Kadjevich,* 220 F.3d 1016, 1020 (9th Cir.2000)("postpetition business expenses are granted administrative-expense priority").

In order to defeat the trustee's summary judgment motion, the Sarps had to produce evidence sufficient to show that a genuine dispute concerning Sarp's cooperation existed. The Sarps contend that Sarp's and Armstrong's declarations raise material issues of fact as to the trustee's knowledge and approval of WWA's continued booking operations. The declarations state generally that the trustee visited WWA's office in late December or early January and observed WWA's staff. They further establish that the trustee's accountant was given access to Katmai's computers, accounting discs, and client information. From this visit, the accountant's access to accounting and client information, and the trustee's silence as to WWA's continued operations, the Sarps argue that there is evidence that the trustee was well aware of WWA's continued selling of Katmai vacations. Even viewing this evidence in a light most favorable to the Sarps, we find it insufficient.

**\*6** Missing from the declarations are facts that would tend to indicate that the trustee knew exactly for whom WWA's staff was booking vacations and that he, either expressly or implicitly, consented to the continued booking operations. The general, conclusory statements presented by the Sarps are inadequate to overcome the specific, unrefuted evidence presented by the trustee, i.e., the trustee's notification to Sarp of his intent to close the business, the trustee's discharge of Katmai's employees

(including Sarp), and the trustee's December 2004 demand to WWA for the turnover of all customer payments. Further, it is not clear from the declarations what the trustee should have been able to ascertain from Katmai's accounting or client information that would have alerted him to Sarp's activities with WWA. Simply put, the declarations amount to a "mere scintilla of evidence" of 1) the trustee's alleged knowledge and approval of WWA's continued solicitation of bookings and 2) Sarp's cooperation with the trustee. A scintilla of evidence is not enough. *See* 🏷 *City of Vernon,* 955 F.2d at 1369.

#### b. *The prospective purchasers' requests*

The Sarps also assert that the requests made by the perspective purchasers of Katmai to have WWA continue booking vacations and to collect customer payments creates a genuine issue of material fact as to Sarp's cooperation. Nevertheless, whether Sarp was fulfilling the perspective purchasers' requests is not a material fact in determining his cooperation. Sarp's duty under 🏷 § 521(3) is owed to the trustee, not the prospective purchasers. Thus, any request did not excuse Sarp from cooperating with the trustee's stated plans to cease the business operations.

Because the Sarps have not presented sufficient evidence to establish that a genuine issue of material fact existed as to Sarp's cooperation, and there is ample evidence in the record to establish that Sarp acted in direct defiance of the trustee's intentions to close Katmai's operations by continuing to book vacations and to collect customer payments without any authority to do so, Sarp is liable for not cooperating with the trustee in his administration of the estate under 🏷 § 521(3).

#### 2. 🏷 *Section 521(4)—The Duty to Surrender Property*

Pursuant to 🏷 § 521(4), a debtor is obligated to "surrender to the trustee all property of the estate...." 🏷 11 U.S.C. § 521(4). "The word 'surrender' generally connotes a[sic] act done by the mutual agreement of the parties. That is, the debtor must hold the estate property and turn it over to the trustee upon demand." *In re D & L Nicolaysen,* 228 B.R. 252, 263 (Bankr.E.D.Cal.1998).

In holding Sarp liable for breach of his 🏷 § 521(4) duty, the court stated that it did not

> see any separation between [WWA] and Mr. Sarp is [WWA] on this record, and all he did was what he was not authorized to do by [the court] or the trustee. As soon as he was ousted, [WWA] was merely the vehicle by which he could keep doing that which he wanted to do, was book trips for the company that he could no longer work for, Katmai Lodge.

*7 Tr. of Hr'g at 3, Oct. 14, 2005. Based on the nature and extent of Sarp's control over WWA, the court determined that Sarp had the ability and duty to surrender the outstanding customer payments that had been collected by WWA from the date of the trustee's appointment through March 2005. Nonetheless, the Sarps argue that the bankruptcy court's determination is in error because there is a genuine factual dispute as to Sarp's control over WWA.

The record amply establishes that Sarp had the ability to preserve the customer payments and to help with the surrendering of the amounts collected. Sarp and Armstrong both testified at their Rule 2004 examinations that from January 2005, Sarp had complete managerial control over WWA, including the right to hire and fire employees and to run its day-to-day operations. Armstrong admitted that once Sarp took over the day-to-day operations of WWA in January of 2005, he left all decision-making up to Sarp and began functioning as an absentee owner. Additionally, it is undisputed that WWA's office was located in Sarp's personal residence and that the customer payments were mailed to that address. It has also been established that Sarp told Armstrong when to write checks payable to him for his alleged consulting fees and expenses out of WWA's checking account. Through these checks, Sarp received over $40,000 in a little over two months when he was ultimately only entitled to $25,000 plus expenses.[15]

To survive summary judgment, the Sarps must produce specific evidence to show that a dispute exists as to Sarp's control before a genuine issue of material fact will be found. The evidence the Sarps have presented is, once again, based upon statements made by Sarp and Armstrong in their declarations filed in opposition to the

summary judgment. Specifically, the Sarps maintain that these declarations indicate that WWA was Armstrong's company and that Armstrong and Sarp met six days a week to discuss business issues prior to Armstrong making the final decision. While these statements may be accurate, and by themselves would show that there is a factual issue concerning Sarp's control over the customer payments, the statements are misleading in that they fall short of portraying an accurate picture of Sarp's relationship with WWA.

Though Armstrong at one time controlled WWA and exercised exclusive decision-making power, Sarp and Armstrong both testified to a very different decision-making environment once Sarp was hired as WWA's consultant. As discussed above, once Sarp took over WWA's operations in January 2005, Sarp, and not Armstrong, exercised total control over WWA's employees, WWA's daily operations, and the collection of customer payments, not to mention Sarp's generous compensation. On these facts, we cannot find any material issue of fact concerning Sarp's pervasive control over WWA. Thus, the trustee was entitled to a decision in his favor as to Sarp's liability under § 521(4).

Through Sarp's control of WWA, he clearly had the ability to prevent the disbursement of customer payments and, at the very least, preserve the customer payments for the estate. Sarp was aware of the trustee's request to turnover the customer payments. Nevertheless, instead of preserving the $118,229.99 in customer payments collected by WWA from the date of trustee's appointment to March 2005, he had Armstrong write checks payable to himself for over $40,000 in consulting fees and expenses. These checks were all written out of WWA's checking account which was comprised solely of the funds obtained from the customer payments. As a result, Sarp's failure to

not preserve the estate and work with the trustee in getting the customer payments surrendered constitutes a breach of his duty under § 521(4).

**\*8** Important policy considerations favor creating incentives for debtors to be forthcoming about all of their assets. *In re Mahan,* 104 B.R. 300, 302 (Bankr.E.D.Cal.1989). A debtor's voluntary compliance with the obligation to surrender all property of the estate is essential to the Code's delicate balancing of the competing interests of debtors and creditors. *See id.* If debtors were not required to be completely candid about estate assets and did not have to cooperate with the trustee, "the system could rapidly degenerate into one which debtors" are the favored party. *Id.* Consequently, we find that the judgment entered against the Sarps for the $118,229.99 in outstanding customer payments based upon Sarp's breach of his § 521(3) and (4) duties are appropriate.

# VI. CONCLUSION

For the foregoing reasons, we AFFIRM the order entered by the bankruptcy court.

**All Citations**

Not Reported in B.R., 2011 WL 1454072

**Footnotes**

1    This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (*see* Fed. R.App. P. 32.1), it has no precedential value. *See* 9th Cir. BAP Rule 8013–1.

2    Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036, as enacted and promulgated prior to the effective date (October 17, 2005) of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109–8, Apr. 20, 2005, 119 Stat. 23.

3    The Sarps owned Katmai and were its only shareholders. Prior to the trustee's termination of its operations, they

2011 WL 1454072

were also officers of Katmai.

4      A majority of Katmai's trips are booked during the winter, with the main bookings coming during the first quarter of the year.

5      The collection of the $543,351.73 occurred between September 1, 2004 and June 2, 2005. $316,039.50 of this amount was collected after December 17, 2004. However, when WWA closed its checking account on June 2, 2005, the account ending balance was a -$741.53.

6      The trustee's first demand for the customer payments occurred by letter dated December 22, 2004. The letter requested (1) the turnover of all customer payments, and (2) an accounting.

7      Initially, the trustee filed the complaint on the estate's behalf. Subsequent to initiating the adversary proceeding, the trustee sold Katmai to L.E. Duncan. Pursuant to the sale order, Duncan agreed to honor the vacations WWA had sold for the 2005 and 2006 seasons, and in return, the trustee agreed to continue prosecuting the complaint against defendants to recover for Duncan the outstanding customer payments.

8      The court denied summary judgment as to the accounting and fraud causes of action and denied the motion in its entirety as to Barbara Sarp individually. Damages against her were limited to property in which she held a community interest with Sarp.

9      The court arrived at this figure by subtracting from the total sum collected by WWA since September 1, 2004 ($540,000) the amount WWA had collected up to the trustee's appointment ($314,000) and the amount WWA turned over to the trustee after his request ($110, 000).

10      Neither WWA nor Armstrong appealed the November 9, 2005 order.

11      The Sarps' notice of appeal designates only a single issue to be heard on appeal: "Did the Court below err in granting Summary Judgement [sic] in favor of the Trustee against Anthony J. Sarp and the marital community of Anthony and Barbara Sarp for alleged violations of ⚑ 11 USC [sic] § 521(3) and (4) and awarding the Trustee damages on the claim?" As their opening brief fails to specify what issue[s] is on appeal, we have limited our analysis to the issues surrounding ⚑ § 521(3) and (4).

12      The last evidenced booking agreement WWA entered into with Katmai occurred on December 11, 2002. This agreement only provided WWA with the ability to sell vacations for the 2003 fishing season.

2011 WL 1454072

[13]     Prior to the trustee's appointment, Katmai and First Heritage Bank agreed that Steven Hartung was to act as the chapter 11 trustee. However, the United State's Trustee's office was unable to commit to the appointment of Hartung. This led to Katmai obtaining court approval for Hartung to act as president and chief financial officer.

[14]     ⚑ Section 521 provides, in relevant part:

The debtor shall—

....

(3) if a trustee is serving in the case, cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties under this title;

(4) if a trustee is serving in the case, surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate, whether or not immunity is granted under section 344 of this title.

[15]     Sarp had been employed as a consultant for $2,500 per week. The first check Sarp received for his services was dated January 20, 2005, and his last check was dated March 28, 2005. Assuming the January 20th check represented payment for his first week of consulting and the March 28th his last, Sarp would have only worked a total of ten weeks. Thus, he should have only been able to collect in consulting fees $25,000.

---

**End of Document**                     © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

1    **<u>DECLARATION OF JESSICA L. BAGDANOV</u>**

2    I, Jessica L. Bagdanov, declare:

3    1.    I am a partner at BG Law LLP and counsel of record for the duly appointed and

4    acting Chapter 7 Trustee for the bankruptcy estate of Allana Baroni.  I have personal knowledge of

5    the facts contained herein.  If called as a witness, I could and would competently testify to these facts

6    under oath.

7    2.    I make this declaration in support of the Motion.  All initial capitalized terms used but

8    not defined herein have the same meanings ascribed to them in the Motion.

9    3.    On June 30, 2022, Susan Seflin sent an email to Ms. Kathleen March requesting

10   access to the Calabasas Property. A true and correct copy of the email is attached hereto as **Exhibit**

11   **1.**

12   4.    Between the dates of October 3, 2022 and October 27, 2022, I engaged in

13   correspondence with the Trustee and Matthew Resnik, Esq., regarding the Trustee's repeated

14   requests for access to the Calabasas Property. Attached hereto as **Exhibit 2** is a true and correct copy

15   of that email string.

16   5.    Notwithstanding my attempts to arrange for access to the Calabasas Property, at the

17   time of the filing of this Motion I had not been provided with any substantive response from the

18   Debtor's counsel regarding the Trustee's request to access the Calabasas Property.

19   I declare under penalty of perjury and under the laws of the United States of America that the

20   foregoing is true and correct.

21   Executed this 8th day of November, 2022 at Woodland Hills, California.

22

23

24   _____
     Jessica L. Bagdanov

25

26

27

28

2394195

# EXHIBIT 1

| From: | Susan K. Seflin |
|---|---|
| To: | "K. P. March" |
| Cc: | Jessica Bagdanov; Jason B. Komorsky |
| Subject: | Liquidation and Sale of the Calabasas Property |
| Date: | Thursday, June 30, 2022 4:03:00 PM |

Dear Ms. March —

Now that the 9th Circuit has ruled on the conversion order and turnover order, the trustee would like access to the interior of the Calabasas property so his broker can access it to determine value. Please provide us with 3 convenient dates and times.

We will provide you with a response to your email below next week.

I hope you have a great holiday weekend.  Best regards, Susie

**From:** K. P. March <kmarch@bkylawfirm.com>
**Sent:** Thursday, June 30, 2022 3:30 PM
**To:** Susan K. Seflin <sseflin@bg.law>
**Subject:** Susan Selfin, from KPMarch, Esq. of Bky LF: Even if Judge Barash (in error) were to rule James Baroni has no 363(i) right to purchase the Carmel property, he has 11 USC 363(h) and (j) right he has 11 USC 363(h) and (j) right to be paid 50% of proceeds

CAUTION: This email originated from an external source.

06/30/22

Attorney Susan Selfin, counsel for Trustee Seror, from KPMarch, Esq. of Bky LF, counsel for James Baroni:

  Re:    Even if Judge Barash (in error) were to rule James Baroni has no 363(i) right to purchase the Carmel property, he has 11 USC 363(h) and (j) right to be paid 50% of proceeds from Carmel sale, as a non-debtor, joint-tenant owner, and demands payment

Atty Selfin:

I have read Seror's Notice (dkt.1482) filed by your firm on 6/27/22 (dkt.1482), saying that sale of Carmel property closed to Captains on 6/23/22.  Notice is false in stating that the sale to Captains  closed "in accordance with terms of 12/16/20 sale order".  Not true, because  the 16/16/20 sale order approved the Purchase Agreement, and the Purchase Agreement required sale to close within 15 days of entry of sale order.  The sale did not close by the 15 days of entry of sale order deadline.  Moreover, there was no stay of the 12/16/20 sale

order, for 50 days after the sale order was entered.  Therefore, Trustee would have to get a new order to sell the Carmel property, and the new order would have to sell to James Baroni, per James' 363(i) Notice filed 6/8/22, for same 1.4 million cash that the Captains were to pay.

However, even if Judge Barash (in error) were to refuse to rule that James Baroni has an 11 USC §363(i) right to purchase the Carmel property, James still has his rights as a non-debtor joint tenancy owner of the Carmel property. Per 11 USC §363(h), a trustee, with bankruptcy court approval, can sell property owned by a bankruptcy debtor and a non-bankruptcy debtor joint-tenant, but pursuant to 11 USC §363(j), the Trustee must pay 50% of the net proceeds of sale to the non-debtor joint-tenant co-owner. 11 USC 363(j) states:

> **"(j)** After a sale of property to which subsection (g) or (h) of this section applies, the **trustee shall distribute to** the debtor's spouse or **the co-owners of such property**, as the case may be, and to the estate, **the proceeds of such sale, less the costs and expenses, not including any compensation of the trustee**, of such sale, according to the interests of such spouse or co-owners, and of the estate."

Therefore, in the even Judge Barash (in error) were to refuse to rule that James Baroni has a §363(i) right to purchase the Carmel property, my law firm, as counsel for James Baroni, by this email demands that Trustee Seror immediately pay James Baroni 50% of the net sale proceeds on the Carmel sale to the Captains (not including as a cost/expense of sale  any compensation to Trustee), because James Baroni's deed (attached to James' 363(i) Notice my firm filed for James on 6/8/22) establishes that James Baroni, a non-debtor, was a 50% co-owner, by joint tenancy, of the Carmel property, at the time Trustee Seror (allegedly)sold that property to the Captains.  James cannot be charged for the $75,000 "carve out" for Trustee Seror, because 363(j) expressly says "not including any compensation of the trustee", plus James,  a non-debtor joint tenant,  cannot be charged for any costs of administration of the debtor Allana Baroni's bankruptcy  estate.

The final settlement statement from escrow, attached to  Seror's Notice (dkt.1482) filed 6/27/22, states total paid in was $1,400,224, and that "Mr. Cooper" (apparently holder of Note secured by 1st DOT, though escrow statement does NOT say what "Mr. Cooper" is) was paid $1,233,013 from escrow.  That leaves $167,211.  James Baroni's 50% joint tenancy share of that

is $83,605.

The settlement statement from escrow, that is an exhibit to Seror's Notice (dkt.1482) states "commission charges" of $42,000 to Thunderbird and $42,000 to Captain (a broker).  However, it appears that Mr. Captain is NOT being paid a $42,000 commission, that in fact, the Captains failed to pay the $43,500 deposit the Purchase Order required them to pay, and that what is listed at $42,000 "commission charge" to Captain is really being treated as a deposit.

Therefore, it appears that, at most, a $42,000 commission was paid to Thunderbird, and no commission was paid to Captain.  James Baroni can be charged for 50% of that $42,000 commission to Thunderbird (only if $42,000 was paid to Thunderbird), which  would be $21,000.  $83,605 - $21,000 = $62,605 that Seror is required to pay to James Baroni, as the non-debtor 50% joint tenancy co-owner of the Carmel property, even if Judge Barash (in error) refuses to rule that James Baroni has a 363(i) right to purchase the Carmel property.  James Baroni should have been paid his 50% non-debtor joint tenancy share of those net proceeds, from the sale escrow.

Please REPLY promptly to this email, to tell my firm whether and when Trustee Seror is going to pay James Baroni that $62,605.

Please also send my law firm:

1. a copy of any payoff demand received by escrow company, from "Mr. Cooper".
2. documentation of amount paid to "Mr. Cooper", by escrow company,  on what date, by what means (wire transfer, cashiers checke, etc) and for what.
3. documentation showing payment by escrow company of a real estate broker/agent commission to Thunderbird, and in what amount.
4. documentation showing whether the Captains paid the $43,500 deposit required by the Purchase Agreement, into escrow company, and if so what amount, on what date, by what means (wire transfer, cashiers check etc)
5. documentation showing payment by escrow company of a real estate broker/agent commission to Captain or his real estate company, and in what amount, on what date, by what means (wire transfer, cashiers check

**107**

etc),

KMarch


Kathleen P. March, Esq.
The Bankruptcy Law Firm, PC
10524 W. Pico Blvd, Suite 212
Los Angeles, CA 90064
Phone: 310-559-9224
Fax:  310-559-9133
E-mail:  kmarch@BKYLAWFIRM.com
Website:  www.BKYLAWFIRM.com
*"Have a former bankruptcy judge for your personal bankruptcy attorney"*

# EXHIBIT 2

| | |
|---|---|
| **From:** | Jessica Bagdanov |
| **To:** | Matt Resnik |
| **Cc:** | David Seror |
| **Subject:** | RE: Baroni |
| **Date:** | Thursday, October 27, 2022 1:42:00 PM |
| **Attachments:** | image001.png |

Matt,

Have you heard anything? I guess we'll just proceed with a motion?

Jessica

**From:** Matt Resnik <matt@rhmfirm.com>
**Sent:** Wednesday, October 19, 2022 11:25 AM
**To:** Jessica Bagdanov <jbagdanov@bg.law>
**Cc:** David Seror <dseror@bg.law>
**Subject:** Re: Baroni

CAUTION: This email originated from an external source.

Good morning:

I guess we were crossed. I will contact Allana again to see if we can get some dates.

I do appreciate the fact that it would be nice  not to have to go through the expense of having to go to Court.

Sincerely,

Matthew D. Resnik*

*Certified Bankruptcy Specialist, State Bar of California, Board of Legal Specialization

**NEW FIRM NAME as of February 15, 2022:**

**RHM LAW LLP**

17609 Ventura Boulevard, Suite 314
Encino, CA 91316
**Main Line:** (818) 285-0100
**Facsimile:** (818) 855-7013

**RHM LAW LLP**

510 West Sixth Street, Suite 1220
Los Angeles, CA 90014
**Telephone:** (213) 572-0800
**Facsimile:** (213) 572-0860

www.RHMFirm.com

www.CentralDistrictInsider.com

*If you liked our services, please do not forget to give us some kind words and 5 star Yelp review
at www.yelp.com and click* Google Review

Though RHM LAW LLP  attorneys and staff are working remotely in order to reduce the
risks associated with COVID-19, we will continue doing our utmost to provide prompt,
professional service to and on behalf of our clients. Thank you for your understanding.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally
privileged information and is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. The
information contained herein is intended only for use by the individual or entity named above. Unauthorized
interception, review, use or disclosure is prohibited. If you are not the intended recipient, please destroy this email
after advising by reply that you erroneously received this, and that it has been destroyed and permanently deleted
from all of your email servers and work stations. The receipt by anyone other than the designated recipient does not
waive the attorney-client privilege or work-product doctrine.

On Wed, Oct 19, 2022 at 11:18 AM Jessica Bagdanov <jbagdanov@bg.law> wrote:

> Matt,
>
> What is the update? Please advise on access; it would be most helpful to have 3 acceptable dates
> and times on your end and we will make one of them work for the broker.
>
> We would like I do not want the estate to bear even further expense gaining broker access to the
> property to simply view and take photos.
>
> Thank you,
>
> Jessica
>
> **Jessica Bagdanov**
> Partner

(818) 827-9000   Main
(818) 827-9212   Direct / Text / Fax
jbagdanov@bg.law
Jessica Bagdanov

21650 Oxnard St., Suite 500
Woodland Hills, CA 91367

www.bg.law

The preceding e-mail message is subject to BG LAW's e-mail policies, which can be found at: https://www.bg.law/web-disclaimer

**From:** Jessica Bagdanov
**Sent:** Tuesday, October 11, 2022 6:13 PM
**To:** Matt Resnik <matt@rhmfirm.com>
**Cc:** David Seror <dseror@bg.law>
**Subject:** RE: Baroni

Yes, this is her only attorney disclosure filed – it states that it dates back to October 7, 2021.

We shouldn't have to sift through all of these filings to figure out who represents the debtor for what – please let us know about access and the documents requested. We will follow up with you if we don't receive a response in the next few days.

Thank you,


Jessica

**From:** Matt Resnik <matt@rhmfirm.com>
**Sent:** Tuesday, October 11, 2022 5:55 PM
**To:** Jessica Bagdanov <jbagdanov@bg.law>
**Cc:** David Seror <dseror@bg.law>
**Subject:** Re: Baroni


CAUTION: This email originated from an external source.

This was filed October 3 2022?

I am not aware of any substantive limitations outside of this recent disclosure.

I have forwarded the request pursuant to my previous email


Matthew D. Resnik*


 *Certified Bankruptcy Specialist, State Bar of California, Board of Legal Specialization

**NEW FIRM NAME as of February 15, 2022:**


**RHM LAW LLP**


17609 Ventura Boulevard, Suite 314
Encino, CA 91316
**Main Line:** (818) 285-0100
**Facsimile:** (818) 855-7013

**RHM LAW LLP**
510 West Sixth Street, Suite 1220
Los Angeles, CA 90014
**Telephone:** (213) 572-0800
**Facsimile:** (213) 572-0860


www.RHMFirm.com

www.CentralDistrictInsider.com

*If you liked our services, please do not forget to give us some kind words and 5 star Yelp review
at* www.yelp.com *and click* Google Review

> Though RHM LAW LLP  attorneys and staff are working remotely in order to reduce
> the risks associated with COVID-19, we will continue doing our utmost to provide
> prompt, professional service to and on behalf of our clients. Thank you for your
> understanding.



CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally
privileged information and is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521.
The information contained herein is intended only for use by the individual or entity named above. Unauthorized
interception, review, use or disclosure is prohibited. If you are not the intended recipient, please destroy this
email after advising by reply that you erroneously received this, and that it has been destroyed and permanently
deleted from all of your email servers and work stations. The receipt by anyone other than the designated
recipient does not waive the attorney-client privilege or work-product doctrine.




On Tue, Oct 11, 2022 at 5:41 PM Jessica Bagdanov <jbagdanov@bg.law> wrote:

> Hi Matt – actually Ms. March's representation is much more limited. See attached. Ms. March is
> only retained to pursue specific motions and everything else is excluded.

> You remain counsel of record for the debtor for everything else, which includes the trustee's
> request based on my reading of Ms. March's disclosure.

Please advise, thank you.


Jessica

**Jessica Bagdanov**
Partner

(818) 827-9000   Main
(818) 827-9212   Direct / Text / Fax

jbagdanov@bg.law

21650 Oxnard St., Suite 500
Woodland Hills, CA 91367

Jessica Bagdanov

www.bg.law

The preceding e-mail message is subject to BG LAW's e-mail policies, which can be found at: https://www.bg.law/web-disclaimer

**From:** Matt Resnik <matt@rhmfirm.com>
**Sent:** Tuesday, October 11, 2022 5:23 PM
**To:** David Seror <dseror@bg.law>
**Cc:** Jessica Bagdanov <jbagdanov@bg.law>
**Subject:** Re: Baroni


CAUTION: This email originated from an external source.

Good afternoon:

Please make your request to Kathleen March who is currently representing the Debtor in the underlying case.

I will follow up with the Debtor however please make sure your request is made to the proper party representing the debtor.

Sincerely


Matthew D. Resnik*


*Certified Bankruptcy Specialist, State Bar of California, Board of Legal Specialization


**NEW FIRM NAME as of February 15, 2022:**


**RHM LAW LLP**

17609 Ventura Boulevard, Suite 314
Encino, CA 91316
**Main Line:** (818) 285-0100
**Facsimile:** (818) 855-7013

**RHM LAW LLP**
510 West Sixth Street, Suite 1220
Los Angeles, CA 90014
**Telephone:** (213) 572-0800
**Facsimile:** (213) 572-0860

www.RHMFirm.com

www.CentralDistrictInsider.com

*If you liked our services, please do not forget to give us some kind words and 5 star Yelp review at www.yelp.com and click* Google Review

Though RHM LAW LLP  attorneys and staff are working remotely in order to reduce the risks associated with COVID-19, we will continue doing our utmost to provide prompt, professional service to and on behalf of our clients. Thank you for your understanding.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information and is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. The information contained herein is intended only for use by the individual or entity named above. Unauthorized interception, review, use or disclosure is prohibited. If you are not the intended recipient, please destroy this email after advising by reply that you erroneously received this, and that it has been destroyed and permanently deleted from all of your email servers and work stations. The receipt by anyone other than the designated recipient does not waive the attorney-client privilege or work-product doctrine.

On Tue, Oct 11, 2022 at 5:04 PM David Seror <dseror@bg.law> wrote:

Matt.  I have not heard back from you.  My next step is seeking a court order.  Also, please provide mortgage, insurance and payment of property taxes.



**David Seror**
Partner

(818) 827-9000 Main
(818) 827-9099 Fax

dseror@bg.law

 David Seror

21650 Oxnard St., Suite 500
Woodland Hills, CA 91367

www.bg.law

The preceding e-mail message is subject to BG LAW's e-mail policies, which can be found at: https://www.bg.law/web-disclaimer

**From:** David Seror
**Sent:** Monday, October 3, 2022 2:57 PM
**To:** matt@rhmfirm.com
**Cc:** Jessica Bagdanov <jbagdanov@bg.law>
**Subject:** Baroni

Hi Matt:  I would like my broker to inspect the interior of the property at 3339 Via Verde Court, Calabasas.  Please provide several convenient dates and times over the next 10 day period.  Thanks.

**DECLARATION OF JASON B. KOMORSKY**

I, Jason B. Komorsky, declare:

1.     I am a partner at BG Law LLP and counsel of record for the duly appointed and acting Chapter 7 Trustee for the bankruptcy estate of Allana Baroni.  I have personal knowledge of the facts contained herein.  If called as a witness, I could and would competently testify to these facts under oath.

2.     I make this declaration in support of the Motion.  All initial capitalized terms used but not defined herein have the same meanings ascribed to them in the Motion.

3.     I spent 12 hours drafting this motion.  I anticipate that I will spend 6 hours drafting a reply brief and attending the hearing on this matter.  My current rate is $675 hour for a total of $12,150.

I declare under penalty of perjury and under the laws of the United States of America that the foregoing is true and correct.

Executed this 8th day of November, 2022 at Woodland Hills, California.


_____
Jason B. Komorsky

47

2394195

**111**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367**.

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION FOR ORDER (1) DIRECTING THE DEBTOR TO PROVIDE ACCESS TO CALABASAS PROPERTY AND TO COOPERATE IN THE SALE OF SAID REAL PROPERTY PURSUANT TO 11 U.S.C § 362(a)(3), 11 U.S.C. § 521(a)(3), AND FED. R. BANKR. P. 4002(a)(4), AND (2) AWARDING DAMAGES TO THE TRUSTEE FOR DEBTOR'S WILLFUL STAY VIOLATION; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF JESSICA L. BAGDANOV AND JASON B. KOMORSkY IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

 **\*\*JUDGE'S COPY UNDER 25 PAGES NOT REQUIRED (GENERAL ORDER 21-05).**

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **November 8, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒    Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On **November 8, 2022**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Martin R. Barash
United States Bankruptcy Court
Central District of California
21041 Burbank Boulevard, Suite 342 / Courtroom 303
Woodland Hills, CA 91367

☐    Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 8, 2022 | JESSICA STUDLEY | /s/ Jessica Studley |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**VIA NOTICE OF ELECTRONIC FILING (NEF)**

- **Richard L Antognini**    rlalawyer@yahoo.com
- **Richard L Antognini**    rlalawyer@yahoo.com, rlalawyer@yahoo.com
- **Jessica L Bagdanov**    jbagdanov@bg.law, ecf@bg.law
- **Justin D Balser**    Justin.Balser@troutman.com, LitigationDocketRequests@troutman.com;
  Elizabeth.Streible@troutman.com; Tracey.Cantu@troutman.com; evelyn.duarte@troutman.com;
  Carla.Llarena@troutman.com; erin.edwards@troutman.com; OCCcourtnotices@troutman.com
- **Adam N Barasch**    anb@severson.com, elw@severson.com
- **Eric Bensamochan**    eric@eblawfirm.us, G63723@notify.cincompass.com
- **Justin C Bentley**    justinbentley@yahoo.com, mslattery@lkfirm.com,mabner@lkfirm.com,caguilar@lkfirm.com
- **Linda M Blank**    linda@lmblank.com, lindablank.lb@gmail.com
- **Theron S Covey**    tcovey@raslg.com, sferry@raslg.com
- **Ryan Coy**    rcoy@bg.law, ecf@bg.law
- **Michael Daniels**    BkECFnotifications@nationstarmail.com
- **Louis J Esbin**    Louis@Esbinlaw.com
- **Richard W Esterkin**    richard.esterkin@morganlewis.com
- **Oscar Estrada**    oestrada@ttc.lacounty.gov
- **Sean C Ferry**    sferry@raslg.com, sferry@ecf.courtdrive.com
- **Christopher R Fredrich**    cfredrich@stroock.com, lacalendar@stroock.com
- **Daniel K Fujimoto**    wdk@wolffirm.com
- **Steven T Gubner**    sgubner@bg.law, ecf@bg.law
- **M. Jonathan Hayes**    jhayes@rhmfirm.com,
  roksana@rhmfirm.com;matt@rhmfirm.com;rosario@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;david
  @rhmfirm.com;sloan@rhmfirm.com;boshra@rhmfirm.com;rosario@rhmfirm.com
- **Gregory K Jones**    gjones@stradlinglaw.com, smjohnson@sycr.com;smjohnson@stradlinglaw.com
- **Jeff Katofsky**    jeff@katofskylaw.com, jgroves@propertymanagers.biz
- **Kelly M Kaufmann**    bknotice@mccarthyholthus.com, kraftery@ecf.courtdrive.com
- **Jason B Komorsky**    ecf@bg.law, jkomorsky@bg.law
- **Bernard J Kornberg**    bernard.kornberg@practus.com, elw@severson.com
- **Andrew Kussmaul**    Andrew.Kussmaul@Bonialpc.com
- **Lewis R Landau**    Lew@Landaunet.com
- **Kathleen P March**    kmarch@bkylawfirm.com, kmarch3@sbcglobal.net,kmarch@sbcglobal.net
- **Jeannette Marsala**    jmarsala@marsalalawfirm.com, jmarsala@marsalalawfirm.com
- **Thomas E McCurnin**    tmccurnin@bkolaw.com, aduran@bkolaw.com;kescano@bkolaw.com
- **Kenneth Misken**    Kenneth.M.Misken@usdoj.gov
- **John Rafferty**    john.rafferty@bonialpc.com
- **Robert Reganyan**    reganyanlawfirm@gmail.com
- **Robert Reganyan**    reganyanlawfirm@gmail.com
- **Matthew D. Resnik**    matt@rhmfirm.com,
  roksana@rhmfirm.com;rosario@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;priscilla@rhmfirm.com;par
  dis@rhmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;sloan@rhmfirm.com
- **J. Alexandra Rhim**    arhim@hrhlaw.com
- **Cassandra J Richey**    cdcaecf@bdfgroup.com
- **Michael S Riley**    mriley8@aol.com, 10986aa@gmail.com
- **Stefanie A Schiff**    stefanie.schiff@akerman.com,
  preston.ascherin@akerman.com;Melissa.cizmorris@akerman.com;Suzanne.jimenez@akerman.com
- **Susan K Seflin**    sseflin@bg.law, ecf@bg.law
- **David Seror (TR)**    dseror@bg.law, csalazar@bg.law;C133@ecfcbis.com;mgalvan@bg.law
- **Mark M Sharf**    msharf00@gmail.com, 2180473420@filings.docketbird.com;mark_091@ecf.courtdrive.com
- **Wayne A Silver**    ws@waynesilverlaw.com, w_silver@sbcglobal.net
- **James K Snyder**    ksnyder@dykema.com, cacossano@dykema.com
- **Lukas Sosnicki**    lsosnicki@thompsoncoburn.com
- **Bill Taylor**    ecfnotices@4stechnologies.com
- **Edward A Treder**    cdcaecf@bdfgroup.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**
113

- **United States Trustee (SV)**    ustpregion16.wh.ecf@usdoj.gov
- **Kristin A Zilberstein**    Kris.Zilberstein@Padgettlawgroup.com,
  BKecf@padgettlawgroup.com;Kris.Zilberstein@ecf.courtdrive.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                          **F 9013-3.1.PROOF.SERVICE**
114

# EXHIBIT 3

STEVEN T. GUBNER – Bar No. 156593
JASON B. KOMORSKY – Bar No. 155677
SUSAN K. SEFLIN – Bar No. 213865
JESSICA L. BAGDANOV – Bar No. 281020
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:  (818) 827-9000
Facsimile:  (818) 827-9099
Email:       jkomorsky@bg.law
               sseflin@bg.law
               jbagdanov@bg.law

Attorneys for David Seror, Chapter 7 Trustee

FILED & ENTERED

DEC 02 2022

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Cetulio    DEPUTY CLERK

CHANGES MADE BY COURT

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re<br><br>Allana Baroni,<br><br>                    Debtor. | Case No. 1:12-bk-10986-MB<br><br>Chapter 7<br><br>**INTERIM ORDER ON TRUSTEE'S MOTION (1) DIRECTING THE DEBTOR TO PROVIDE ACCESS TO CALABASAS PROPERTY AND TO COOPERATE IN THE SALE OF SAID REAL PROPERTY PURSUANT TO 11 U.S.C § 362(A)(3), 11 U.S.C. § 521(A)(3), AND FED. R. BANKR. P. 4002(A)(4), AND (2) AWARDING DAMAGES TO THE TRUSTEE FOR DEBTOR'S WILLFUL STAY VIOLATION**<br><br>**Continued Hearing:**<br><br>Date:  December 1, 2022<br>Time: 2:30 p.m.<br>Place: Courtroom 303 [Via ZoomGov]<br><br>**Continued Hearing:**<br><br>Date:  January 25, 2023<br>Time:  1:30 p.m.<br>Place:  Courtroom 303<br><br>The hearing will be conducted remotely, using ZoomGov video and audio:<br><br>URL: **https://cacb.zoomgov.com/j/1603715261**<br>Meeting ID: **160 371 5261**<br>Password: **870081**<br>Telephone Numbers:   1 (669) 254 5252 |

On November 30, 2022, at 11:00 a.m. and on December 1, 2022 at 2:30 p.m., hearings were held before the Honorable Martin R. Barash, United States Bankruptcy Judge for the Central District of California, on the *Motion (i) Directing the Debtor to Provide Access to Calabasas Property and to Cooperate in the Sale of Said Real Property Pursuant to 11 U.S.C § 362(A)(3), 11 U.S.C. § 521(A)(3), and Fed. R. Bankr. P. 4002()(4), and (2) Awarding Damages to the Trustee for Debtor's Willful Stay Violation* ("Access Motion") [ECF No. 1618] filed by David Seror, Chapter 7 Trustee in the bankruptcy case of Allana Baroni (the "Debtor").  Appearances were made as noted in the record at the respective hearings.

The Court, having reviewed and considered the Access Motion and supporting evidence; having considered the Debtor's opposition [ECF No. 1636] to the Motion and the Trustee's reply thereto [ECF No. 1640]; having considered the arguments and representations of counsel at the hearing and the other matters which the Court may properly take judicial notice, including, without limitation, the record in this case as reflected on the docket; the Court having set forth its findings of fact and conclusions of law on the record pursuant to Rule 52 of the Federal Rules of Civil Procedure and Rule 7052 of the Federal Rules of Bankruptcy Procedure which findings and conclusions are incorporated herein by this reference; and after due deliberation and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED:**

1.    The Motion is granted in part <u>on an interim basis</u> and denied in part as set forth below.

2.    The Trustee's proposed real estate broker, Marc Shevin, and up to two of Mr. Shevin's associates/agents shall have one hour to inspect and take photos of that certain residential real property located at 3339 Via Verde Ct., Calabasas, California (the "Calabasas Property"), <u>which is property of the bankruptcy estate,</u> between December 5, 2022 and December 15, 2022 during the hours of 9 a.m. and 3 p.m.

1      3.      The Debtor's counsel, Richard Antognini, shall <u>email</u> <s>provide</s> the Trustee's counsel,

2  <u>Jason Komorsky</u>, with three proposed dates and times that Mr. Shevin (and up to <u>two</u> of his

3  associates/agents) can inspect and take photos of the Calabasas Property by no later than 5:00 p.m.

4  on December 2, 2022.

5      4.      The <u>hearing on the Access Motion regarding the</u> further relief sought by the Trustee

6  with respect to access to the Calabasas Property <u>is continued to January 25, 2023 at 1:30 p.m. The</u>

7  <u>Trustee may (but is not required) to file and set for hearing on January 25, 2023 at 1:30 p.m. his</u>

8  <u>forthcoming</u> <s>will be considered with the Trustee's</s> motion to employ a broker to sell the Calabasas

9  Property. <s>if and when filed</s>.

10      5.      <u>To the extent the Access Motion sought damages against the Debtor for violations of</u>

11  <u>the automatic stay, the</u> Trustee's request for damages is denied.

12      IT IS SO ORDERED.

13                                          ###

14

15

16

17

18

19

20

21

22

23

24      Date: December 2, 2022

_Martin R. Barash_

Martin R Barash
United States Bankruptcy Judge

25

26

27

28

2853799

# EXHIBIT 4

| From: | Jason B. Komorsky |
|---|---|
| To: | "Richard Antognini" |
| Cc: | Jessica Bagdanov; Susan K. Seflin |
| Subject: | RE: In re Baroni |
| Date: | Tuesday, December 06, 2022 10:56:00 AM |
| Importance: | High |

Richard –

The Trustee will not consent to a stay of the administration of this case, and he does not consent to a hearing on shortened time.  Please be advised that all actions you are taking on behalf of your client are (a) a collateral attack of the Carmel sale order, (b) a collateral attack of the turnover order, and/or (c) a collateral attack of the settlement order with the rental lenders. The Trustee reserves all of his rights related thereto.

Your email does not identify a date for any ex parte application, which the local rules require you to provide.  Rule 8007 requires that before you seek a stay from the district court you must first seek a stay of the bankruptcy court's order directly from the bankruptcy court.  No such stay was sought; rather, the Debtor only sought a stay *prior* to the entry of the bankruptcy court's order but not of the order after it was entered.  Failure to first seek a stay from the bankruptcy court of its order is grounds for denial of a stay before the district court.  *See In re Rivera*, 2015 WL 6847973, at *2 (N.D. Cal. Nov. 9, 2015) ("A failure to seek emergency relief in the bankruptcy court is a critical defect and not often overlooked.").  "[D]istrict courts routinely dismiss motions for a stay pending appeal when stay relief is not first sought from the bankruptcy judge and the failure to do so is not adequately explained." *Id.* (*quoting In re BGI, Inc.*, 504 B.R. 754, 761 (S.D.N.Y. 2014)). Further, I note that the Court's order that you are appealing was entered four months ago.  Thus, if exigent circumstances existed, it was incumbent on you to seek a stay then.  The fact that you waited four months reflects that there is no need for a stay, let alone an expedited hearing.  See *In re Stage Coach Venture, LLC*, 2017 WL 664015, at *3 (Bankr. C.D. Cal. Feb. 17, 2017) (stay motion brought four months after entry of order deemed untimely).   Accordingly, we will oppose any attempt to shorten time, as well as any substantive motion—especially in light of the fact that the Court found that your client has no standing (pecuniary interest) and that the Court lacked jurisdiction in light of the currently-pending appeals assuming, in the first instance, a debtor could seek such a remedy.  As the Court previously found: "The Debtor and Antognini have failed to present any evidence demonstrating such cause. Their principal arguments against the Trustee are nothing more than a collateral attack on the Compromise Order, which is currently before the Court of Appeals on appeals filed by the Debtor and Antognini. Additionally, many of the allegations advanced by the Debtor and Antognini are premised on reckless misrepresentations of the procedural history of this case and therefore are without merit."  *In re Baroni*, 643 B.R. 253, 284 (Bankr. C.D. Cal. 2022); *see also id.*, at 288 ("The Debtor and Antognini's misrepresentation of the facts in this case is inexcusable.").


Jason


---

**From:** Richard Antognini <rlalawyer@yahoo.com>

**Sent:** Monday, December 05, 2022 4:14 PM
**To:** Jessica Bagdanov <jbagdanov@bg.law>; Jason B. Komorsky <jkomorsky@bg.law>
**Subject:** In re Baroni

CAUTION: This email originated from an external source.

Counsel,

Pursuant to the U.S. District Court's local rules, the purpose of this email is to advise you that Appellants Allana Baroni and Richard Antognini intend to file today a request for an order seeking a stay of Mr. Seror's administration of Ms. Baroni's estate, including a stay of Mr. Seror's efforts to market the Camarillo and Calabasas properties pending the outcome of the appeal of the order denying Mr. Seror's removal from the case, concurrently with an application to be heard on shortened notice, with the district court in USDC Case No. 2:22-cv-06867-MWF. Please advise if Mr. Seror will stipulate to a stay, and whether Mr. Seror will oppose the application to be heard on shortened notice. Please advise if any further meet and confer efforts would be productive concerning the stay or the application to be heard on shortened time.

Finally please advise if you would agree to hearing by Zoom as I reside in Northern California.

Thank you,


**Please note the new address:**

Richard L. Antognini
Law Office of Richard L. Antognini
2485 Notre Dame Blvd.,
Suite 370 #45
Chico, California 95928-7167
Telephone: (916) 295-4896
E-mail: rlalawyer@yahoo.com

**121**

# EXHIBIT 5

STEVEN T. GUBNER – Bar No. 156593
SUSAN K. SEFLIN – Bar No. 213865
JESSICA L. BAGDANOV – Bar No. 281020
BRUTZKUS GUBNER
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:  (818) 827-9000
Facsimile:   (818) 827-9099
Email:       sgubner@bg.law
             sseflin@bg.law
             jbagdanov@bg.law

FILED & ENTERED

MAR 31 2020

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gasparia  DEPUTY CLERK

Attorneys for David Seror, Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re: | Case No. 1:12-bk-10986-MB |
| ALLANA BARONI, | Chapter 7 |
| Debtor. | **ORDER GRANTING TRUSTEE'S TURNOVER MOTION** |

A continued hearing was held on August 29, 2019 before the Honorable Martin R. Barash, United States Bankruptcy Judge for the Central District of California, for the Court to consider the *Motion for Turnover of Property of the Estate, and (2) Order Compelling Debtor to Comply with Bankruptcy Rule 1019 and Local Bankruptcy Rules 2015-2(c) and 3020-1(d)* [Doc. #991] (the "Turnover Motion") filed by David Seror, Chapter 7 Trustee ("Trustee") for the bankruptcy estate of debtor Allana Baroni (the "Debtor").  All appearances were made as noted in the record at the hearing.

**123**

2183379

1    The Court, having considered all pleadings and evidence filed in support of the Turnover

2    Motion and in opposition thereto, having entered an *Interim Order Directing Turnover of Property*

3    *of the Estate* [Doc. #1057], having issued findings of fact and conclusions of law in a separate order

4    [Doc #1146], and finding good cause appearing therefor,

5    IT IS HEREBY ORDERED that the Motion is granted on a final basis as follows:

6    1.    That certain real property located at 3435 Rio Road, Carmel, California 92321 (the

7    "Carmel Property") and all rents and proceeds derived therefrom from the conversion date and

8    continuing thereafter are property of the bankruptcy estate, and shall be turned over to the Trustee.

9    2.    That certain real property located at 5390 Plata Rosa Court, Camarillo, California (the

10   "Camarillo Property") and all rents and proceeds derived therefrom from the conversion date and

11   continuing thereafter are property of the bankruptcy estate and shall be turned over to the Trustee.

12   3.    The real property located at 3339 Via Verde Ct., Calabasas, California 91302 is

13   property of the estate.

14   4.    The Sale Proceeds from the sale of the Henderson Property are property of the

15   chapter 7 estate; accordingly, the Debtor shall turn over to the Trustee the sum of $315,078.12.

16   5.    The Trustee's request in the Turnover Motion for turnover of the 1955 Ford

17   Thunderbird is deemed withdrawn.

18                                    # # #

19

20

21

22

23

24   Date: March 31, 2020

25                                    Martin R Barash
                                      United States Bankruptcy Judge

26

27

28

2183379

# EXHIBIT 6

| From: | Richard Antognini |
|-------|-------------------|
| **To:** | Jason B. Komorsky |
| **Cc:** | Susan K. Seflin; Jessica Bagdanov |
| **Subject:** | Re: In re Baroni |
| **Date:** | Saturday, December 03, 2022 5:51:22 PM |
| **Attachments:** | image187573.png |

CAUTION: This email originated from an external source.

I did.

**Please note the new address:**

Richard L. Antognini
Law Office of Richard L. Antognini
2485 Notre Dame Blvd.,
Suite 370 #45
Chico, California 95928-7167
Telephone: (916) 295-4896
E-mail: rlalawyer@yahoo.com


On Friday, December 2, 2022 at 04:49:34 PM PST, Jason B. Komorsky <jkomorsky@bg.law> wrote:


Richard,

Please confirm you received my email identifying the selected time.

Get Outlook for iOS



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367

www.bg.law

**Jason B. Komorsky**
Partner

(818) 827-9000   Main
(818) 827-9155   Direct / Text / Fax

jkomorsky@bg.law

   Jason B. Komorsky

The preceding e-mail message is subject to BG LAW's e-mail policies, which can be found at: https://www.bg.law/web-disclaimer

**From:** Jason B. Komorsky <jkomorsky@bg.law>
**Sent:** Friday, December 2, 2022 4:04:09 PM
**To:** Richard Antognini <rlalawyer@yahoo.com>
**Cc:** Susan K. Seflin <sseflin@bg.law>; Jessica Bagdanov <jbagdanov@bg.law>
**Subject:** Re: In re Baroni

Richard,

We will take the 11:45 slot on the 15th.

Get Outlook for iOS

**From:** Richard Antognini <rlalawyer@yahoo.com>

**126**

**Sent:** Friday, December 2, 2022 12:16 PM
**To:** Jason B. Komorsky <jkomorsky@bg.law>
**Subject:** In re Baroni

CAUTION: This email originated from an external source.

Mrs. Baroni's home is available for the broker at these times:

Thursday December 15, 2022:

11:45am -12:45pm
12:45pm -1:45pm
1:45pm - 2:45pm

**Please note the new address:**

Richard L. Antognini
Law Office of Richard L. Antognini
2485 Notre Dame Blvd.,
Suite 370 #45
Chico, California 95928-7167
Telephone: (916) 295-4896
E-mail: rlalawyer@yahoo.com

**127**